# EXHIBIT F

# OFFERING MEMORANDUM

**in respect of Class A Shares in**

**Himalaya Digital Assets Fund SP**

**a Segregated Portfolio of**

**Hamilton Opportunity Fund SPC**

A Cayman Islands Segregated Portfolio Company operating as a mutual fund under Section 4(3) of the Mutual Funds Act (Revised) of the Cayman Islands, a Cayman Islands Segregated Portfolio Company operating as a mutual fund under Section 4(3) of the Mutual Funds Act (Revised) of the Cayman Islands

**Investment Manager**

Hamilton Investment Management Ltd

**2021-02-26**

**Investment Adviser**

Ivy Capital Advisors Limited

# NOTICE

Himalaya Digital Assets Fund SP is a Segregated Portfolio of the Fund Hamilton Opportunity Fund SPC. Each class of participating shares in the Fund will participate exclusively in one of the Fund's Segregated Portfolios, however the Fund may issue more than one class in respect of a Segregated Portfolio. Class A Shares which are offered pursuant to the terms of this Memorandum are segregated portfolio shares that are attributable to Himalaya Digital Assets Fund SP

The Fund is a Cayman Islands Segregated Portfolio Company operating as a mutual fund and registered with the Cayman Islands Monetary Authority ("**CIMA**") under Section 4(3) of the Mutual Funds Law (Revised) of the Cayman Islands (the "**Mutual Funds Law**").

This Offering Memorandum (this **"Memorandum"**) is furnished to each Subscriber on a confidential basis solely for the purpose of evaluating an investment in the Class A Shares of the Fund and may be furnished to existing Shareholders as an update or amendment to the existing Memorandum of the Fund delivered to Shareholders prior to the date as set out on the first page of this Memorandum.

By accepting receipt of this Memorandum, each recipient of the Memorandum agrees that the information contained in this Memorandum and any and all information regarding the business of the Fund and the Investment Manager, including, but not limited to, the Fund's performance, may not be reproduced or used in whole or in part for any other purpose or be made available to any other person not directly concerned with, or connected with a Subscriber's decision regarding such investment.

If you are in any doubt about the contents of this Memorandum, you should consult your stockbroker, bank manager, lawyer, accountant or other professional advisor(s). There will be no public offering of Class A Shares. The distribution of this document, and the offering of Class A Shares in certain jurisdictions may be restricted and accordingly any such persons who gain possession of this document are required by the Fund to duly make themselves informed about, and to observe and follow such restrictions. This document does not constitute an offer or solicitation to anyone in any jurisdiction where such an offer is not authorised, or to any person to whom it is unlawful to make such an offer or solicitation.

The Class A Shares are offered on the basis of the information and representations contained in this Memorandum, and any other information given or representations made by any person may not be relied on as having been authorised by the Fund and its Directors. Neither the delivery of this document, nor the allotment or issue of Class A Shares shall under any circumstances create any implication that there has been no change in the affairs of the Fund since the date as set out on the first page of this Memorandum.

Class A Shares offered hereby have not been filed or registered with, or approved or disapproved by, any regulatory authority of any country or jurisdiction, nor has any such regulatory authority passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Memorandum. Any representation to the contrary is unlawful. In making an investment decision, Subscribers must rely upon their own examination of the Fund and the terms of the offering, including the merits and risks involved.

The Fund will fall within the definition of a "mutual fund" under the Mutual Funds Law and accordingly, will be regulated under that law. The Fund will be required to file registration particulars in the prescribed form and to file this Memorandum (and any changes to it) with the CIMA, and to file audited financial statements and other prescribed reports with, and pay fees to CIMA on an annual basis.

A MUTUAL FUND REGISTERED BY THE CAYMAN ISLANDS MONETARY AUTHORITY DOES NOT CONSTITUTE AN OBLIGATION OF THE AUTHORITY TO ANY INVESTOR AS TO THE PERFORMANCE OR THE CREDITWORTHINESS OF THE FUND.

FURTHERMORE, IN REGISTERING A FUND, THE AUTHORITY SHALL NOT BE LIABLE FOR ANY LOSSES OR DEFAULT OF THE FUND OR FOR THE CORRECTNESS OF ANY OPINIONS OR STATEMENTS EXPRESSED IN ANY PROSPECTUS OR OFFERING DOCUMENT.

There are other consequences of regulation under this law. Documentation and registration particulars filed with CIMA are available for review inspection on the Fund's Dashboard and may also be requested via an email sent to the Administrator requesting such documents. No Cayman Islands authority, including CIMA, has reviewed or commented on the contents of this Memorandum or on the merits of an investment in the Class A Shares.

The Class A Shares have not been registered under any United States securities laws and, except in transaction(s) which do not violate US securities laws, may not be directly or indirectly offered or sold in the US, or any of its territories or possessions or areas subject to its jurisdiction, or to or for the benefit of a US person.

This Memorandum contains a summary of the memorandum of association and articles of association of the Fund (together, the **"Articles"**) and certain other documents as referred to herein. However, the information as set out in this Memorandum does not purport to be a complete enumeration. This Memorandum is subject to, and qualified in its entirety, by reference to the Articles and any other such documents, which should be reviewed in their entirety for complete information concerning the rights, privileges and obligations of Shareholders in the Fund. A copy of the Subscription Agreement and other documentation required for the acquisition of Class A Shares by Subscribers is accessible on the Fund's Dashboard and can be viewed and used as the basis for the Shareholders to subscribe for Class A Shares of the Fund.

Except as otherwise and specifically indicated, this Memorandum speaks as of the date of its issuance, and neither the delivery of, nor any sale made by way of this Memorandum will, under any circumstances, create any implication that there has been no change since the date as set out on the first page of the Memorandum of the condition or status of the Fund or any other matters as described in the Memorandum.

As part of its responsibility for the prevention of money laundering and terrorism or proliferation financing, the Fund (and any person acting on its behalf, including the Administrator) reserves the right to request such information as is necessary to verify the identity of a Subscriber or existing Shareholder, any beneficial owner(s) of a Subscriber or existing Shareholder and the source of any payment for the acquisition of Class A Shares. In the event of delay or failure by the Subscriber or existing Shareholder to produce the requested information required for the purposes of verifying the identity of the prospective or existing Shareholder, the Fund may refuse to accept a subscription of any such Subscriber and, in the case of an existing Shareholder, freeze such Shareholder's investment by prohibiting additional investments and/or declining or suspending any redemption requests, initiating compulsory redemption of such Shareholder's investment or withholding any redemption proceeds until all required verification documents have been provided to the Fund or the Administrator.

# DIRECTORY

**Hamilton Opportunity Fund SPC**

| | |
|---|---|
| **Directors** | **Kin Ming JE**<br>71-75 Aurora House, Uxbridge Rd, Ealing, London W5 5SL, United Kingdom<br>**David Fallon**<br>71-75 Aurora House, Uxbridge Rd, Ealing, London W5 5SL, United Kingdom |
| **Registered Office** | McGrath Tonner Corporate Services Limited, Genesis Building, 5th Floor, Genesis Close, PO Box 446 Grand Cayman KY1-1106, Cayman Islands |
| **Investment Manager** | **Hamilton Investment Management Ltd**<br>c/o AMS Trustees Limited, Sea Meadow House, PO Box 116, Road Town, Tortola, British Virgin Islands |
| **Investment Manager's Principals** | **KIN JE**<br>71-75 Aurora House, Uxbridge Rd, Ealing, London W5 5SL, United Kingdom<br>**David Fallon**<br>71-75 Aurora House, Uxbridge Rd, Ealing, London W5 5SL, United Kingdom |
| **Investment Adviser** | **Ivy Capital Advisors Limited**<br>3a Montagu Row, London, England, W1U 6DZ<br><br>All references to 'Investment Manager' include the Investment Adviser. |
| **Administrator** | **NAV Fund Administration Group**<br>NAV Consulting \| NAV Cayman \| NAV Backoffice<br>5th Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman KY1-1202, CAYMAN ISLANDS |
| **Fund Auditor** | **Moore Cayman**<br>Suite 6, 10 Market St., Camana Bay, Box 30900, KY1-1204, Cayman Islands |
| **Legal Adviser as to Cayman Islands law** | McGrath Tonner, Genesis Building, 5th Floor, Genesis Close, PO Box 446 Grand Cayman KY1-1106, Cayman Islands |

# DEFINITIONS

The words and phrases as listed below are defined in this Memorandum as follows:

| | |
|---|---|
| **Administration Agreement** | the agreement between the Fund and the Administrator, as summarised in the section titled The Administrator. |
| **Administrator** | **NAV Fund Administration Group**, or any other such person appointed as the administrator of the Fund, from time to time. |

| | |
|---|---|
| **Articles** | In accordance to the relevant context, the Memorandum of Association and the Articles of Association of the Fund, as they may be amended, from time to time. |
| **Auditors** | **Moore Cayman**, or any other such reputable person or firm approved by CIMA, as may be appointed as the auditor(s) of the Fund, from time to time. |
| **Base Currency** | The base currency of the Fund is the USD and the financial statements of the Fund will be presented in USD. |
| **Board** | The board of directors appointed in accordance with the Articles. |
| **Business Day** | a day on which banks in London (United Kingdom) are authorised to open for normal banking business. |
| **Class** | any class of Participating Shares as designated by the Directors, pursuant to the Articles (including any sub-class of such class). |
| **Class A Shares** | Participating Share designated by the Directors as a Class A Shares. |
| **Class S Share** | Participating Shares designated by the Directors as a Class S Shares in the circumstances described in this Memorandum under the heading Side Pockets, in respect of Special Investments, which are only redeemable at the option of the Fund and only entitle holders to the proceeds of realization, if any, of such Special Investments. |
| **Close of Business** | 5:00PM (London (United Kingdom) time). |
| **CIMA** | the Cayman Islands Monetary Authority. |
| **Companies Law** | the Companies Law (Revised) of Cayman Islands. |
| **Dealing Currency** | in respect of any Class, the currency determined by the Directors on the establishment of the Class as the currency in which the Subscription Price, Redemption Price and Net Asset Value per Share of such Class will be calculated. |
| **Dealing Currency for Class A Shares** | USD |
| **Directors** | The members of the Board of the Fund, as the context requires, and any duly constituted committee of the board, and any successors to such members or committees, as may be appointed from time to time. |
| **Eligible Investors** | Investors:<br><br>• who are sophisticated investors;<br>• who are not members of the public in the Cayman Islands;<br>• who are not Non-Qualified Persons;<br>• who are not from a jurisdiction in which an offer of Participating Shares is not authorized;<br>• to whom it is not unlawful to make the offer.<br><br>Such "eligibility" shall be without prejudice to the right of the Board to refuse a subscription application. |
| **Financial Year** | the financial year of the Fund ending on 31st of December of each year. |
| **Fund** | In accordance to the relevant context, Hamilton Opportunity Fund SPC, an Segregated Portfolio Company incorporated in the Cayman Islands 28 January 2020 with limited liability and unlimited duration under the |

|  | provisions of Part XIV of the Companies Law or the Segregated Portfolio Himalaya Digital Assets Fund SP. |
|---|---|
| **Gate** | the limitation on the ability of Shareholders to redeem Class A Shares as described under the section headed the Gate. |
| **High-Water Mark** | in relation to any Class A Shares, the greater of the Net Asset Value per Share of the relevant Class at the time of issue of that Class A Shares, and the highest Net Asset Value per Share of the relevant Class with respect to which a Performance Fee has been charged at the end of any previous Performance Period (if any) during which such Class A Shares was in issue. |
| **Initial Offering Period** | the period as determined by the Board, during which the Class A Shares are first offered for subscription, which will commence at 9:00 a.m. on the date of this Memorandum until 5:00 p.m. 29 April 2021 or at such earlier or later time or date as the Board may determine. |
| **Initial Subscription Price** | USD100.00 per Class A Shares. |
| **Investment Manager** | **Hamilton Investment Management Ltd** c/o AMS Trustees Limited, Sea Meadow House, PO Box 116, Road Town, Tortola, British Virgin Islands |
| **Investment Adviser** | Ivy Capital Advisors Limited  All references to 'Investment Manager' include the Investment Adviser. |
| **Lock-Up Period** | is, with respect to a Class A Shares, a period of 6 calendar months from the day where that Class A Shares was issued. |
| **Management Agreement** | the agreement between the Fund and the Investment Manager, as summarised in the section titled Investment Manager. |
| **Management Fee** | the management fee charged by the Fund to the Investment Manager, in relation to the investment management services provided by the Investment Manager to the Fund as set out in the section titled Fees and Expenses. |
| **Management Share** | a non-participating, non-redeemable, voting share, of par value USD1.00 in the capital of the Fund, specifically designated as a Management Share. |
| **Memorandum** | this offering memorandum, as amended or supplemented, from time to time. |
| **Minimum Holding** | Class A Shares with an aggregate Net Asset Value of not less than USD100,000.00. |
| **Minimum Initial Investment** | USD100,000.00 or such other minimum aggregate value of Shares purchasable by a prospective investor for the time being prescribed in the Mutual Funds Law. |
| **Net Asset Value** | the Net Asset Value of the Fund or each Class, in accordance to the relevant context and as applicable, determined in accordance with the section titled Net Asset Value. |
| **Net Asset Value per Share** | with respect to a Participating Share of any Class, the Net Asset Value of the relevant Class divided by the number of Participating Shares of that Class in issue. |

Any person holding Participating Shares:

**Non-Qualified Person**

- in breach of the law or requirements of any country or governmental authority;
- where such person has given representations in a Subscription Agreement which were not true when given or have ceased to be true; or
- in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any other person or persons, connected or not, or any other circumstances appearing to the Board to be relevant) in which the Board determines the continuing ownership of Participating Shares by such person or persons would cause an undue risk of adverse tax or other consequences to the Fund or any of the Shareholders.

**Participating Share**
a participating, redeemable, non-voting share of par value USD0.001 in the capital of the Fund being offered for subscription by a Subscriber under the terms of this Memorandum and in accordance with the relevant context, a participating non-voting share of par value USD0.001 in the capital of the Fund generally.

**Redemption Day**
subject to any restrictions on redemptions as set out in the Articles, the first Business Day of each calendar quarter or such other day as the Board may determine either in any particular case or generally.

**Redemption Price**
the Net Asset Value per Share of the relevant Class as of the Valuation Point on the Valuation Day immediately preceding the relevant Redemption Day.

**Redemption Notice**
a request for the redemption of Class A Shares which shall be in such form as the Board may determine from time to time.

**Shareholder**
a holder of one or more Participating Shares.

**Subscriber**
a prospective investor.

**Subscription Agreement**
an application by a Subscriber to subscribe for Participating Shares of any Class which shall be in any form as the Board may determine, from time to time.

**Segregated Portfolio**
means a segregated portfolio of the Fund established pursuant to Part XIV of the Companies Law, the assets and liabilities of which are kept segregated, separate and separately identifiable from those of any other segregated portfolios of the Fund and any general assets of the Fund.

**Segregated Portfolio Assets**
Means the assets of the Fund held within or on behalf of a particular Segregated Portfolio.

**Subscription Day**
the first Business Day of each calendar month or such other day as the Board may determine either in any particular case or generally.

**Subscription Price**
the price per Participating Share of the relevant Class in which Participating Shares of that Class may be issued after the close of the Initial Offering Period, calculated in the manner as set out in the section titled Subscription for Class A Shares.

| | |
|---|---|
| **United States or US** | the United States of America, its territories and possessions, including the States and the District of Columbia. |
| **US Person** | as defined in the Regulation S under the United States Securities Act of 1933, and as it may be amended or revised, from time to time. |
| **US$ or USD** | the lawful currency of the United States. |
| **Valuation Day** | in respect of each Class, the Business Day immediately preceding each Redemption Day and each Subscription Day or such other day as the Board may determine either in any particular case or generally. |
| **Valuation Point** | the close of business in the last market relevant to the Fund on each Valuation Day or any other such time as the Board may determine. |

In addition, the following matters of interpretation have to be noted:

- a reference to any law is a reference to the most recent revision of such law and a reference to any law, legislation or legislative provision includes any statutory modification, amendment or re-enactment, and any subordinate legislation or regulations issued under that legislation or legislative provision;
- a reference to any document or agreement is to that document or agreement as amended, novated, supplemented or replaced; and
- a reference to 'including', 'include', 'in particular' or similar expression is illustrative and does not imply any limitation.

Certain defined terms appear in the body of this Memorandum but may not appear in the Definitions section. This is because such defined terms are generally only used within the section where they are so defined. However, where any such defined term is used elsewhere in the Memorandum the given definition will continue to apply.

# SUMMARY OF TERMS

The following is a summary of certain information set forth in detail elsewhere in this Memorandum, the Articles and any other documents as referred to in this Memorandum. It is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Memorandum, in the Articles and in the other referenced documents. Unless specifically noted otherwise, references throughout this Memorandum to the Fund will include the Board of the Fund or any agent authorised to act on the Fund's behalf.

| | |
|---|---|
| **The Fund** | Himalaya Digital Assets Fund SP is a Segregated Portfolio of the Fund Hamilton Opportunity Fund SPC. Each class of participating shares in the Fund will participate exclusively in one of the Fund's Segregated Portfolios, however the Fund may issue more than one class in respect of a Segregated Portfolio. Class A Shares which are offered pursuant to the terms of this Memorandum are segregated portfolio shares and are attributable to Himalaya Digital Assets Fund SP

The Fund may create one or more Segregated Portfolios in order to segregate the assets and liabilities held by the Fund on behalf of each Segregated Portfolio from the assets and liabilities held by the Fund on |

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

behalf of any other Segregated Portfolio or the general assets and liabilities of the Fund.

The Fund was incorporated with an authorised share capital of USD50,000.00 consisting of 100.00 voting Management Shares of par value of USD1.00 each and 49,900,000.00 non-voting Participating Shares of par value of USD0.001 each.

The Articles provide that the Participating Shares may be issued in different Classes.

The Directors has designated the Class A Shares, to be offered to Subscribers under the terms of this Memorandum.

The Fund may issue, from time to time, additional classes, subclasses or series of Participating Shares which are not being offered by this Memorandum without notice to or without obtaining the consent of the existing Shareholders. Such Participating Shares may be offered on terms which are different to the terms of the Participating Shares as offered pursuant to this Memorandum, such as different Management Fees, Performance Fees and redemption rights.

| | |
|---|---|
| **Investment Objective, Strategies and Policies** | The Fund's objective is to achieve absolute returns for investors during and over a long-term time period, with the aim of achieving consistent returns irrespective of the prevailing market condition, with such returns being independent of, and uncorrelated to traditional forms of securities investments. There can be no assurance that the Fund will achieve its investment objectives.

Refer to the section titled "Investment Objective, Strategies and Policies" for further information. |
| **Risks and Special Considerations** | The purchase of Class A Shares is speculative and involves a high degree of risk. There is no assurance that the Fund will be profitable or achieve its investment objective. An investment in the Fund is suitable only for persons who can bear the economic risk of loss of their entire investment, and who have limited need for liquidity in their investment. The performance of the Fund may in the future, vary substantially over time. Past performance and the experience of the Investment Manager and its personnel is no assurance of the future success of the Fund.

An investment in the Class A Shares should only be made after consultation with independent investment, tax and legal counsel.

Refer to the section titled "Risk Factors and Considerations" for further information. |
| **Subscription** | Class A Shares are being offered for subscription during the Initial Offer Period at a fixed price of USD100.00 per Class A Shares. Following the close of the Initial Offer Period, Class A Shares will be |

available for subscription on each Subscription Day at the relevant Subscription Price.

The minimum initial subscription per subscriber is USD100,000.00. The minimum subsequent subscriptions by a Shareholder are USD10,000.00.

Refer to the section titled "Subscription of Class A Shares" for further information.

Class A Shares may be redeemed at the option of the Shareholder on any Redemption Day except that Class A Shares may not be redeemed at the option of the Shareholder on any Redemption Day during the Lock-Up Period.

A Shareholder wishing to redeem its Class A Shares should complete the Redemption Notice.

**Redemption**

Class A Shares will be redeemed at the relevant Redemption Price, subject to the limitations as described in this Memorandum, including the Lock-up Period and Gate.

Where an Investor breaks the Lock-Up period, a redemption fee of 6% will be charged with respect to Class A Shares.

Refer to the section titled "Redemption and Transfer of Class A Shares" for further information.

The Fund is entitled to charge and pay to the Innvestment Manager an annual Management Fee with respect to the Class A Shares equal to 1% of the applicable Net Asset Value of the Class A Shares.

The Fund is also entitled to charge an annual Management Fee with respect to the Class S Shares, which shall be equal to 1% of the applicable Net Asset Value of the Class S Shares. Such fees will be accrued and only paid to the Investment Manager out of the sale proceeds of Special Investments.

**Management Fee**

The Management Fee is calculated on each Valuation Day after deducting any redemptions and adding any subscriptions as of the Redemption Day and Subscription Day immediately preceding that Valuation Day .

The Management Fee will be paid in arrears each month to the Investment Manager, after the finalisation of the Net Asset Value for the relevant Valuation Day.

Refer to the section titled "Fees and Expenses" for further information.

**Operating Expenses**

The Fund will bear all of its own costs and expenses including, without limitation, Management Fee, legal, regulatory & government fee, audit and tax preparation, accounting & fund administrator fee,

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

|  | custody fee, bank fee, brokerage & trading/transactions related-fee, administration & IT, directors meetings & travel, the costs and expenses of operating the Investment Manager and its affiliates that are attributable to the Fund. |
|---|---|
| **Organisational Expenses** | In order to ensure that the Total Expense Ratio remains as low as possible for investors, the Investment Manager shall be responsible for the payment of the Fund's organisational expenses. |
| **Tax** | There is no Cayman Islands income or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax payable by a Shareholder with respect to its Class A Shares in the Fund.<br><br>Shareholders and Subscribers should consult their own tax advisors in regard to the tax consequences, and the filing requirements, if any, associated with the purchase, ownership and disposition of the Class A Shares in any applicable jurisdiction. |
| **Transfers** | Shareholders are entitled to, with the consent of the Board, transfer their Class A Shares by an instrument in writing acceptable to the Board. Unless the Board otherwise determines, a Shareholder is not entitled to transfer Class A Shares if as a result of such transfer, either the transferor or transferee to whom the Class A Shares are to be transferred to will hold less than the Minimum Holding. Shareholders are not authorised to transfer Class A Shares to any person who would not be entitled to subscribe for Class A Shares. |
| **Dividends** | It is not envisaged that any income or gains will be distributed by way of dividend. This does not preclude the Board from declaring a dividend at any time in the future out of the Fund's lawfully distributable reserves if the Board considers it appropriate to do so. |
| **Functional Currency** | The Fund reports its results in US dollars and transacts subscriptions and redemptions in USD in respect of the Class A Shares. The functional currency for financial reporting purposes is the US dollars. |
| **Accounting Standards** | International Financial Reporting Standards or IFRS. |
| **Reporting** | Shareholders will receive annual audited financial statements within a reasonable time after the Fund's financial year end. Each Shareholder will also receive monthly statements detailing the number of Class A Shares that it owns and the Net Asset Value of such Class A Shares.<br><br>The Fund may, in its sole discretion, agree to provide certain Shareholders with additional or different information than that it provided to the Shareholders as set forth above. |

# THE FUND

## General

Himalaya Digital Assets Fund SP is a Segregated Portfolio of the Fund. Each class of participating shares in the Fund will participate exclusively in one of the Fund's Segregated

Portfolios, however the Fund may issue more than one class in respect of a Segregated Portfolio. Class A Shares which are offered pursuant to the terms of this Memorandum are segregated portfolio shares and are attributable to Himalaya Digital Assets Fund SP

The Board may, at any time, create further Segregated Portfolios in their absolute discretion, in addition to Himalaya Digital Assets Fund SP and any other Segregated Portfolios created at the date of the Memorandum. The assets of each Segregated Portfolio are invested separately in accordance with the investment objective, strategies and guidelines for such Segregated Portfolio as specified in the Memorandum and the relevant Supplement.

Under Part XIV of the Companies Act:

- a segregated portfolio company may create and issue shares in one or more classes or series (including different classes or series relating to the same segregated portfolio), the proceeds of the issue of which shall be included in the segregated portfolio assets of and accounted for in the segregated portfolio in respect of which the segregated portfolio shares are issued. The proceeds;of the issue of shares, other than segregated portfolio shares, shall be included in the segregated portfolio company's general assets;
- a segregated portfolio company may pay a dividend or other distribution in respect of segregated portfolio shares of any class or series whether or not a dividend is declared on any other class or series of segregated portfolio shares or any other shares. Such dividends or other distributions are paid on segregated portfolio shares only out of the segregated portfolio in respect of which the segregated portfolio shares were issued and otherwise in accordance with the rights of such shares;
- it is duty of the directors of a segregated portfolio company to establish and maintain (or cause to be established and maintained) procedures (a) to segregate, and keep segregated, portfolio assets separate and separately identifiable from general assets; (b) to segregate, and keep segregated, portfolio assets of each segregated portfolio separate and separately identifiable from segregated portfolio assets of any other segregated portfolio; and (c) to ensure that assets and liabilities are not transferred between segregated portfolios or between a segregated portfolio and the general assets otherwise than at full value; and
- any transaction or agreement which is to be binding on a segregated portfolio is required to be executed by the segregated portfolio company on behalf of such segregated portfolio must be identified and such execution must specify that it is in the name of, or by, or for the account of, such segregated portfolio. If there is any breach of this requirement the directors, as soon as they become aware of the breach, must (a) make any necessary enquiries to determine the correct segregated portfolio to which the relevant act, matter, deed, agreement, contract, instrument under seal or other instrument or arrangement should be attributed; (b) make the correct attribution; and (c) notify in writing all persons which are party to the act, matter, deed, agreement, contract, instrument under seal or other instrument or arrangement that was executed, or which may be adversely affected by any such attribution, of that attribution and the parties' rights and any person so notified (or who should have been so notified) who objects to an attribution by the directors may, within thirty days of receiving written notice under that subsection in the case of persons who received such notice, apply to the Court by petition for a reattribution; and the Court may, upon hearing the petition and taking account of the intention of the parties and such other factors as are deemed relevant by it, order that the act, matter, deed, agreement,

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

contract, instrument under seal or other instrument or arrangement be deemed to be attributable to a particular segregated portfolio or portfolios or to the general assets (if applicable in particular proportions or on a particular basis) and may make such orders as may be just and equitable in the case.

The location of the registered office of the Fund appears in the Directory.

The Fund is structured as an investment fund to facilitate the pooling of Participating Shareholders' subscriptions for the purpose of investment and capital appreciation in accordance with the investment objectives and strategies set out in this Memorandum. The Fund will only accept subscriptions for Class A Shares from Eligible Investors and the Fund may modify, withdraw or cancel any offering made pursuant to this Memorandum at any time prior to consummation of the offering and may reject any subscription, in whole or in part, in its sole discretion.

The Fund was incorporated with an authorised share capital of USD50,000.00 consisting of 100.00 voting Management Shares of par value of USD1.00 each and 49,900,000.00 non-voting Participating Shares of par value of USD0.001 each.

The Board has designated the Class A Shares to be offered to Subscribers on the terms of this Memorandum.

The purchase of Class A Shares is not open to the general public and Class A Shares will be privately offered only to Eligible Investors.

General meetings may be called by the Board and by the holders of the Management Shares of the Fund. All general meetings require at least five (5) Business Days' prior notice. Notice may be sent by hand, mail, fax or email, or alternatively, where the recipient has agreed, by posting the notice on a secure nominated website.

Prospective investors should note that there are no provisions under the laws of the Cayman Islands or under the Articles conferring pre-emption rights on Participating Shareholders. The Fund may by ordinary resolution increase its share capital, consolidate its shares or subdivide any of them into shares of a smaller amount or cancel authorised but unissued shares. Subject to the provisions of Cayman Islands law and the rights of any holders of any class of shares, the Fund may by special resolution reduce its share capital or any capital redemption reserve or share premium account.

Unless the context otherwise requires, the terms "Class", "Series" and "Shares" used herein shall refer to all Classes, Series or Shares issued by the Board. Shares within each Class and Series have equal voting, dividend, distribution and liquidation rights.

Different Classes of Participating Shares may be established to accommodate different rights, privileges and terms associated with one or more Shareholders (including but not limited to voting rights, redemption rights, and different fees). Except as otherwise indicated herein and in the Articles, the Board shall determine the allocation of Participating Shares to a particular Class at the time of issuance.

Without prejudice to the rights previously conferred on the holders of existing Participating Shares, Participating Shares may be issued with such preferred, deferred or other special

rights or such restrictions as the Board may from time to time determine. The rights of existing Participating Shareholders may only be varied with the consent in writing of the members holding not less than two-thirds of the issued Participating Shares that may be affected by such variation. The unissued Participating Shares of the Fund shall be at the disposal of the Board which may issue them at its discretion subject to the Articles. Each Class of Participating Shares may differ in terms of, among other things, the Base Currency, the fees charged, redemption rights, voting rights and minimum initial subscription amounts and minimum subsequent subscription amounts, as determined from time to time by the Board in their sole discretion.

The Fund (acting through the Board or any duly authorised agent) may enter into a written agreement with a Shareholder or Subscriber in respect of Participating Shares of a certain Class or Sub-Class providing for offering terms that vary from those applicable to other holders of Participating Shares of the same Class or Sub-Class including, without limitation, the waiver or reduction of fees payable in respect of such Participating Shares, different redemption terms, and the provision of additional information or reports, and in such circumstances the Board may issue Participating Shares of the same Class or Sub-Class to such Shareholder or may determine to issue a separate Class or Sub-Class to such Shareholder.

## Class A Shares

The Class A Shares are participating, redeemable non-voting shares in the capital of the Fund. A Participating Shareholder will have no right to receive notice of, attend and vote at general meetings of the Fund but will be entitled to vote at any Class meeting convened to approve

any materially and adverse change to the rights attaching to Class A Shares or the terms of their offer.

On a winding-up of the Fund, the Class A Shares are entitled to the full amount of the assets of the Fund other than the paid-up capital of the Management Share. The surplus assets of the Fund attributable to each Class will be distributed among the holders of Class A Shares of that Class according to the Net Asset Value of such Class A Shares held by each of them.

The Class A Shares carry no pre-emption rights.

Class A Shares are held in registered form and share certificates will only be issued at the sole discretion of the Board. Each Subscriber is furnished with a written confirmation of the amount of the investment made and the number of Class A Shares purchased.

## Management Shares

The Management Shares carry the right for the holders thereof to receive notice of, attend, and vote at general meetings of the Fund. The Management Shares do not carry any entitlement to participate in any profits of the Fund.

On the winding-up of the Fund, the holder of the Management Shares is only entitled to receive its paid-up capital. Management Shares are not redeemable.

Except as described under "Modification of Class Rights", the holders of the Management Shares have the exclusive right to vote (to the exclusion of the holders of the Participating Shares) in respect of all matters relating to the Fund. Each holder of Management Shares is entitled to one vote for each Management Share held by it.

## Dividend Policy

It is not envisaged that any income or gains will be distributed by way of dividend. This does not preclude the Board from declaring a dividend at any time in the future out of the Fund's lawfully distributable reserves if the Board considers it appropriate to do so.

## The Rights of the Shareholders

The holders of Participating Shares shall, subject to the provisions of the Articles:

- except in relation to a class meeting for the purpose of varying class rights, not be entitled to vote;
- be entitled to such dividends as the Board of Board may from time to time declare;
- in the event of a winding-up or dissolution of the Fund, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and,
- be entitled to, and subject, to redemption, repurchase or conversion of such Participating Shares as provided in the Articles.

The holders of Management Shares shall, subject to the provisions of the Articles:

- be entitled to one vote per share in respect of such Management Shares;
- not be entitled to any dividends in respect of such Management Shares;
- in the event of a winding-up or dissolution of the Fund, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution, be entitled, pari passu with the holders of Participating Shares, to an amount equal to the amount paid up on such Management Shares but to no other or further amount; and
- not be subject to redemption or repurchase of such Management Shares, whether at the option of the Fund or the holder.

## Modification of Class Rights

The Articles provide that all or any of the class rights attaching to any Class or Series of Participating Shares in issue may be varied or abrogated without the consent of the holders of the issued shares of that Class or Series where such variation is considered by the Board, not to have a material adverse effect upon such holders' share rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds (2/3) by par value of such shares, or with the sanction of a resolution passed by a majority of at least two-thirds (2/3) of the votes cast in person or by proxy at a separate meeting of the holders of such shares. For the avoidance of doubt, the Board reserves the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Shares. Each subscriber for Participating Shares will be required to agree that the terms of the offer set out in the applicable Subscription

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

Agreement and the rights attaching to the Participating Shares can be varied or abrogated in accordance with the provisions of the Articles.

In the Subscription Documents, each Shareholder will agree that if the Shareholder is asked to consent to any proposed variation or abrogation of the special rights that are attached to any class of shares and written notice of such proposed variation or abrogation is given to the Shareholder in accordance with the notice provisions of the Articles, the Shareholder shall be deemed to have consented to the proposed variation or abrogation if the Shareholder does not affirmatively object in writing to such proposed variation or abrogation within twenty (20) days (or such shorter time as may be determined by the Board in its discretion) after such notice is received or deemed to have been received in accordance with the notice provisions of the Articles.

## Segregated Portfolios

The Board shall establish a separate Segregated Portfolio in accordance with Part XIV of the Companies Law with its own distinct name and designation for one or more Classes of Shares, and the following provisions shall apply thereto:

- the proceeds from the allotment and issue of each Class of Shares shall be applied in the books of the Fund to the relevant Segregated Portfolio and the assets, profits, gains, income and liabilities, losses and expenses attributable thereto shall be applied in the books of the Fund to such Segregated Portfolio and assets required to satisfy any redemption of Shares of any such Class or paid as dividends, shall be accounted for out of the relevant Segregated Portfolio;
- where any subsequent event takes place that may affect the previous allocation of assets or liabilities to a Segregated Portfolio, the Board may make such adjustment to the allocation as they deem appropriate to ensure any gain or loss of the Fund and all liabilities and expenses are attributable to the Segregated Portfolios properly and fairly;
- where any asset is derived from another asset (whether cash or otherwise) such derivative asset shall be applied in the books of the Fund to the same Segregated Portfolio as the asset from which it was derived. On each revaluation of an asset, the increase or diminution in value shall be applied to the relevant Segregated Portfolio;
- the assets of each Segregated Portfolio shall be kept separate and separately identifiable from assets attributable to other Segregated Portfolios and from the Fund's general assets; and
- where any costs or expenses or any liabilities incurred by the Fund are specifically attributable to a particular Segregated Portfolio, they shall be borne only by such Segregated Portfolio as the asset from which it was derived, and where they are not specifically attributable to a Segregated Portfolio, such costs, expenses, or liabilities shall be allocated among the Segregated Portfolios on an equitable basis as determined by the Board in its discretion, after consultation with the Administrator.

## Records

The Fund shall, on behalf of each Segregated Portfolio, establish in its books for that Segregated Portfolio a separate record with its own distinct designation for the Classes of Shares referable to such Segregated Portfolio.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

**Side Pockets**

**Special Investments and Class S Shares**

The Investment Manager may, in its sole and absolute discretion, designate certain investments that do not have a readily ascertainable value or which are not freely transferable as "Special Investments". If the Investment Manager designates an existing investment as a Special Investment, Investors at that time will have a portion of their Class A Shares automatically converted (on a _pro rata_ basis) into Class S Shares, which are not redeemable at the option of the holder. Each Special Investment will be represented by a series of Class S Shares.

Any Investor who redeems their Class A Shares during the life of the side pocket will retain their Class S Shares until the relevant Special Investment is realized. Upon the occurrence of a liquidity event in respect of the Special Investment in question (generally a sale or its becoming liquid): (a) if the holder of the Class S Shares still holds Class A Shares, the net proceeds will be used to subscribe for additional Class A Shares at the then-current Net Asset Value per share, or (b) if the holder no longer holds Class A Shares, the net proceeds paid out to the holder.

The purpose and effect of such side pocketing is to segregate illiquid or hard-to-value assets from the remaining liquid portion of the Fund's investment portfolio with the intention of allowing the Investment Manager to manage cash outflows where the Fund has received substantial redemption requests in situations where a material percentage of its portfolio is illiquid.

Generally, until Class S Shares are converted back into Class A Shares, no performance will be paid in respect of the Class S Shares.

**Winding-down by Management**

The Board may determine that, due to changes in market conditions or other circumstances, it is in the best interests of the Fund that:

- the Fund commences the orderly winding-down of its investment operations over such period of time as they may determine with a view to realizing its assets and returning surplus funds to Shareholders;
- such winding-down be carried out by the Board and/or a committee appointed by the Board and/or any other third party investment adviser who has familiarity with the Fund's investment portfolio or parts thereof. If the Board determines to imposes a wind-down plan, they may take, or cause to be taken, such steps as they deem necessary or appropriate in their sole discretion including, without limitation:
  - declaring a suspension, which may be permanent, of the right of Shareholders to require redemption of their Participating Shares;
  - suspending the payment of any amount due to a Shareholder in connection with the redemption of Participating Shares;
  - instructing the committee or other third party investment adviser appointed by the Board responsible for implementing the wind-down plan, to sell or otherwise dispose of the assets of the Fund, and in connection therewith determine the timing, manner and terms of any such sale or other disposition,

having due regard for the Fund's liquidity requirements, the activity and condition of the relevant market and general financial and economic conditions;
- o compulsorily redeeming or requiring the transfer of Participating Shares;
- o settling and closing the business and affairs of the Fund.

## Other Rights and Liabilities

All Shareholders are entitled to the benefit of, are bound by and are deemed to have notice of, the provisions of the Articles. The Articles have been drafted in broad and flexible terms to allow the Board:

- the ability to issue additional Classes of Participating Shares with different terms (including the offering of Shares in different currency) than those of the Shares offered and described in this Memorandum;
- the authority to, in their discretion, determine a number of issues including the period of notice to be given for redemptions and whether or not to charge subscription or redemption fees, generally or in any particular case. In approving this Memorandum, the Board has exercised a number of these discretions granted in the Articles.

Under the terms of the Articles and Cayman Islands law, the liability of the Shareholders is limited to any amount unpaid on their Participating Shares. As the Participating Shares can only be issued if they are fully paid, the Shareholders will not be liable for any debt, obligation or default of the Fund.

## Regulation of the Fund

The Fund is a Cayman Islands Segregated Portfolio Company operating as a mutual fund under Section 4(3) of the Mutual Funds Law.

The Class A Shares offered hereby have not been filed or registered with, or approved or disapproved by, any regulatory authority of any country or jurisdiction, nor has any such regulatory authority passed upon or endorsed the merits of this offering or the accuracy or adequacy of this Memorandum. Any representation to the contrary is unlawful. In making an investment decision, Subscribers must rely upon their own examination of the Fund and the terms of the offering, including the merits and risks involved.

The Fund will fall within the definition of a "mutual fund" under the Mutual Funds Law of the Cayman Islands and accordingly, will be regulated under that law. The Fund will be required to file registration particulars in the prescribed form and to file this Memorandum (and any changes to it) with CIMA, and to file audited financial statements and other prescribed reports with, and pay fees to CIMA on an annual basis.

There are other consequences of regulation under this law. Documentations and registration particulars filed are available for review or inspection on the Fund's Dashboard and may also be requested via an email sent to the Administrator requesting such documents. No Cayman Islands authority, including CIMA, has reviewed or commented on the contents of this Memorandum or on the merits of an investment in the Class A Shares.

# INVESTMENT OBJECTIVES, STRATEGIES AND RESTRICTIONS

## Investment Objectives

The Fund's objective is to achieve absolute returns for investors during and over a long-term time period, with the aim of achieving consistent returns irrespective of the prevailing market conditions, with such returns being independent of, and uncorrelated to traditional forms of securities investments. There can be no assurance that the Fund will achieve its investment objectives.

## Investment Strategy

Hamilton Investment Management Limited ("Hamilton") is a technology-focused, value-oriented investment management firm serving world-renowned institutional investors who invest in a broad spectrum of asset classes. Hamilton adopts a multi-strategy approach to investing in order to generate an optimal risk-return profile while ensuring that it captures the most compelling investment opportunities across different investment products and geographical markets. Hamilton Opportunity Fund SPC, is a fund specialised in the digital asset class. The Hamilton multi strategy fund utilizes a comprehensive set of alpha-oriented cryptocurrency trading strategies and applies them to a variety of cryptocurrencies. The aim of the fund is to optimise risk and return using modern portfolio theory, active risk management, and quantitative algorithmic trading strategies. Example fund algorithmic trading strategies include (arbitrage, macro, basis, options trading, advanced market-making and OTC). Hamilton offers a complete asset management solution that covers the lifecycle of your crypto investment. It includes a fully developed: Order Execution Management System (OEMS) Portfolio Management System (PMS) Risk Management System (RMS) Advanced Suite of Sophisticated Trading Algorithms (ALGO) Real-Time and Historical P&L and Exposure Tracking System(Reporting/Compliance) Hamilton provides a single interface into all major crypto exchanges.

## Investment Policy and Risk Management Policy

We have a strong understanding of the fundamentals and economic value of crypto assets; we are able to properly understand the valuations and price action of crypto assets. There are no shortage of new coins/projects coming into the crypto space. We are highly selective when choosing new projects to invest in. By being highly selective and leveraging our wide network, we continue to generate significant returns. Modern Portfolio Theory looks at returns, volatilities, and correlations of assets, and attempts to place different combinations of each together to mitigate overall portfolio risk. An 'efficient frontier' of portfolios can be built, where returns are optimised per unit of risk. The crypto asset class is uncorrelated to other asset classes, and thus can provide a diversification benefit. Because of this we believe that the efficient frontier shifts up if you include crypto assets in your portfolio of investments. We have designed the fund's investment strategies to capture these exciting new investment opportunities. Our size and network have allowed us to secure allocations to varies crypto coin's, at strategic investor rounds not available to retail investors. We only pursue opportunistic trades that we have high level of conviction in, position sizing is key, and we use our advanced suite of algorithmic trading strategies to opportunistically trade and generate returns, we actively rebalance our risk portfolio monthly.

### Development and Risks of Fund's Investment Strategy

The development of an investment strategy is a continuous process and the investment strategy and methods used may therefore be modified from time to time. The investment methods are confidential and the descriptions of them in this Memorandum are not exhaustive. The investment strategies utilized may differ from those used by members of the Board with respect to other accounts they may from time to time manage. Investment decisions require the exercise of judgment by the Investment Manager. The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements which would have yielded profits or avoided losses. Shareholders cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investment for the Fund. The Fund's investment program entails substantial risks and there can be no assurance that its investment objectives will be achieved.

### Changes to Investment Strategies and Restrictions

The investment objective, investment strategies, investment restrictions and limits summarised above represent the current intentions of the Board. Subject to any applicable law or regulation, the Board may change the investment objective, investment strategies, investment restrictions and limits on leverage by giving Shareholders not less than 3 months' prior written notice of the proposed changes.

# MANAGEMENT OF THE FUND & SERVICE PROVIDERS

### Board of Directors

The Fund has a Board of Directors and each Director serves in accordance with the laws of the Cayman Islands and the Articles. The primary function of the Board is to manage and supervise the affairs of the Fund, including managing the Fund's investment portfolio, developing investment strategies and policies and making all investment decisions on behalf of the Fund. The Board has delegated the administration of the Fund to the Administrator (see "Administrator" below) powers of delegation under the Articles. The Board will review the performance and operations of the Fund at its regular meetings.

As of the date of this Memorandum, the Fund's Directors are as follows.

### Kin Ming JE

Kin JE has been a fund manager and investment banker for almost 30 years, currently managing a global investment fund with an Asset Under Management of USD12 billion. Prior to that, Mr. Je was the Chairman of Equity Capital Markets, Greater China at the Macquarie Banking Group for 10 years, managing its Greater China capital markets and principal investment activities. Prior to Macquarie, Mr. Je served as the senior management for several investment banks including as the Managing Director and joint venture partner of China Merchant Securities (Hong Kong) Limited, Executive Director and Head of China of Credit Agricole Indosuez (and Board member of its securities arm, Indosuez W.I. Carr Securities), Director of Dresdner Kleinwort Wasserstein and Vice President of NatWest

Markets.

Mr. Je has successfully completed more than 70 global IPO, M&A and principal investment transactions amounted to US$40 billion. Mr.Je is recognised by "International Who's Who" as a leading investment banking professional in the world and is awarded honourable citizenship of the Washington State, U.S.A. for his contribution to Sino-US relationship. Mr. Je is a Vice Chairman of the Hong Kong International Blockchain and Financial Association, an NGO promoting blockchain technology and advocating crypto market regulation.

Mr. Je graduated from the Manchester Business School and the University of Wales (U.K.) with a Master of Business Administration. Mr. Je is a fellow member of the Association of Chartered Certified Accountants (U.K.) and the Hong Kong Institute of Certified Accountants. He is also a member of the Certified Financial Consultant (U.S.).

**David Fallon**

David is a Portfolio Manager at Hamilton Investment Management Ltd. Previously, he was a Portfolio Manager at TradeLink Holdings LLC, a diversified alternative investment and proprietary trading firm founded in 1979 by Walt Weissman. Prior to his tenure at Tradelink, David was a Portfolio Manager at Vanguard Asset Management and a Portfolio Manager at the Diversified Trading Group of Mizuho Bank London.

Prior to joining investment banking and Mizuho Bank in 2010, David studied applied mathematics and finance in University College Dublin. He holds an MSc in Quantitative Finance from University College Dublin, Thesis: A Genetic Programming Self Evolving Trading System and a BSc Hons in Mathematics and Computer Science from University College Dublin. Neural Networks & Natural Computing are of keen research interest to him. Natural computing (Biologically inspired algorithms for financial modelling) present a lot of opportunities for future developments of computational methods. Various bio-inspired methodologies such as neural networks, evolutionary computing (particularly genetic algorithms and grammatical evolution), particle swarm, all present endless possibilities for future developments in computational methods in finance. David has applied some of these techniques in developing proprietary trade finding tools throughout his trading career.

**Regulation of the Directors of the Fund**

Each of the Directors of the Fund is registered with and regulated by CIMA pursuant to the Directors Registration and Licensing Law, 2014 of the Cayman Islands.

**Conflicts of Interest relating to Directors**

Under the Fund's Articles:

- Any Director, or any Director's firm, partner or any company with whom any Director is associated, may act in any capacity for, be employed by or render services to the Company on such terms, including with respect to remuneration, as may be agreed between the parties, provided that a Director or a Director's firm, partner or company may not to act as an auditor to the Company.
- A Director who is directly or indirectly interested in a contract or proposed contract with the Company (an "Interested Director") shall declare the nature of such interest.

- An Interested Director who has complied with the requirements of the foregoing Article may:
  - vote in respect of such contract or proposed contract; and/or
  - be counted in the quorum for the meeting at which the contract or proposed contract is to be voted on,

and no such contract or proposed contract shall be void or voidable by reason only that the Interested Director voted on it or was counted in the quorum of the relevant meeting and the Interested Director shall not be liable to account to the Company for any profit realised thereby.

**Indemnification and exculpation of Directors**

Under the Fund's Articles:

- the Directors (including any person appointed to any committee by the Board) acting in relation to any of the affairs of the Fund and their heirs, executors, administrators and personal representatives (each an "indemnified party") are indemnified and secured harmless out of the assets of the Fund from and against all actions, costs, charges, losses, damages and expenses which they or any of them shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty, provided that such indemnity will not extend to any matter in respect of any fraud or dishonesty in relation to the Fund which may attach to any of the indemnified parties.
- the Fund may purchase and maintain insurance for the benefit of any Director of the Fund against any liability incurred by him in his capacity as a Director or indemnifying such Director in respect of any loss arising or liability attaching to him by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which the Director may be guilty in relation to the Fund or any subsidiary thereof.

# Investment Manager

Hamilton Investment Management Ltd has been appointed to provide asset management services in respect of the Fund pursuant to an agreement between the Fund and the Investment Manager (the Investment Management Agreement). The directors of the Investment Manager are David Fallon and Kin Ming Je.

Hamilton Investment Management Limited ("Hamilton") is a technology-focused, value-oriented investment management firm serving world-renowned institutional investors who invest in a broad spectrum of asset classes. Hamilton adopts a multi-strategy approach to investing in order to generate an optimal risk-return profile while ensuring that it captures the most compelling investment opportunities across different investment products and geographical markets. Hamilton Investment Management Ltd is a BVI Approved Manager, regulated by the FSC with company number 2053164.

Under the Investment Management Agreement, the Investment Manager shall invest and reinvest the assets of the Fund in accordance with the Fund's investment objective and strategies described in this Offering Memorandum as amended and/or supplemented from time to time. Furthermore, the Fund has agreed to pay to the Investment Manager the

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

Management Fee described in the section headed "Fees and Expenses" for its services as Investment Manager. The Investment Management Agreement is for an indefinite term. It may be terminated by either party giving ninety 90 days' notice in writing to the other. In certain circumstances it may be terminated immediately.

The Investment Management Agreement provides that the Investment Manager may assign or delegate to one or more to one or more suitably qualified portfolio advisors some or all of the Investment Manager's rights and duties under the Investment Management Agreement.

The Investment Manager shall be entitled to receive compensation from counterparties.

The Investment Management Agreement contains broad indemnification provisions that require the Fund, to the fullest extent permitted by law, to indemnify the Investment Manager, any affiliate of the Investment Manager, and any member, partner, shareholder, manager, director, officer, employee, or agent of the Investment Manager or any such affiliate (each, an "Indemnitee") from and against any and all losses, claims, damages, liabilities, expenses (including reasonable legal fees and expenses), judgments, fines, amounts paid in settlement, and other amounts actually and reasonably paid or incurred by such Indemnitee in connection with any and all claims, demands, actions, suits, or proceedings (including arbitration and mediation proceedings and actions by or in the right of the Fund), civil, criminal, administrative, or investigative, that relate, directly or indirectly, to acts or omissions (or alleged acts or omissions) of such Indemnitee in connection with the formation, business, or operations of the Fund and in which such Indemnitee may be involved, or is threatened to be involved, as a party, witness, or otherwise, whether or not the same will proceed to judgment or be settled or otherwise be brought to a conclusion ("Losses"), except to the extent that it is finally adjudicated that an act or omission of the Indemnitee was material to the matter giving rise to such Losses and was committed by such Indemnitee with fraud, bad faith, Gross Negligence or willful misconduct.

**Other Activities of the Investment Manager**

The Investment Manager is not required to manage the Fund as its sole and exclusive function. Although the Investment Manager intends to devote such time to the Fund as it deems necessary to accomplish the purposes of the Fund, the Investment Manager and its principals and affiliates may engage in other business activities.

In addition to managing the investments of the Fund, the Investment Manager and its principals and affiliates may provide investment management services to other persons and may manage other accounts and/or establish other private investment funds (both domestic and offshore) which may or may not employ an investment strategy similar to that of the Fund. Such other accounts or vehicles may co-invest in all portfolio investments on a side by side basis with the Fund, subject to applicable legal, tax or regulatory considerations.

# Investment Adviser

The Investment Manager has appointed Ivy Capital Advisors Limited to provide investment advisory services in respect of the Fund pursuant to an agreement between the Fund, Investment Manager and the Investment Adviser (the Investment Sub-Advisor Agreement).

The key personnel of the Investment Adviser in relation to the Fund are:

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

**Justin Hong**

Finance and Investment Consultant

Education and Qualification
Justin obtained his undergraduate degree in Business Management and Economics from University of Manchester, and then went on to complete a master's degree in Finance at University of Cambridge. With professional experience in investment banking and successful passing of the rigorous exams, he is a fully qualified member of the well-established Chartered Financial Analyst Institute (CFA)

Career Development
He has worked for some of the world's leading top tier investment banks such as Goldman Sachs, UBS and Morgan Stanley. Initially he was heavily involved in the trading relationship between institutional investors and the investment bank for equities products, setting up complex commission structures to facilitate trading and research spending as well as manage relationships with investors and sales desk. Later on, he explored a more technical avenue and became a specialist in leveraged financing in prime brokerage which provided collateralised lending to hedge funds. His core strengths lied in the comprehensive understanding of financial instruments across multiple asset classes, valuation and risk return analysis of investment portfolios and strategies, as well as relationship management skills from dealing with some of the most sophisticated investment fund managers in London and New York.

Areas of Expertise
Academic and professional knowledge and understanding of:
Characteristics of financial instruments and products,
Investment risks and portfolio strategies,
Capital markets and participants, both sell side (investment banks) and buy side (institutional investors and fund managers),
Relationship management skills from dealing with top tier international players in the industry

All references to 'Investment Manager' include the Investment Adviser.

## Administrator

NAV Consulting, Inc. has been engaged as the NAV calculation agent of the Fund (the "NAV Calculation Agent") pursuant to a Service Agreement entered into with the Fund (the "NAV Calculation Agreement"). The NAV Calculation Agent is responsible for, among other things, calculating the Fund's net asset value and performing certain other accounting, back-office, data processing and related professional services all as described in the NAV Calculation Agreement.

NAV Fund Services (Cayman) Ltd. (the "Administrator") acts as the Administrator of the Fund pursuant to a Service Agreement entered into with the Fund (the "Administration Agreement," the Administrative Agreement and the NAV Calculation Agreement referred to collectively as the "NAV Agreements"). The Administrator is responsible for, among other things: (i) maintaining the register of shareholders of the Fund and processing the issuance and transfer of Shares of the Fund; (ii) disseminating financial information to Shareholders; (iii) processing

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

requests for redemption of Shares; (iv) keeping books and records of the Fund; and (v) performing other services in connection with the administration of the Fund as described in the Administration Agreement.

The NAV Agreements provide that the NAV Calculation Agent and the Administrator (referred to collectively as "NAV") shall not be liable to the Fund, any Shareholder or any other person in absence of finding of willful misconduct, gross negligence, or fraud on the part of NAV. Furthermore, Fund shall indemnify and hold harmless the NAV Calculation Agent, the Administrator, their affiliates, and their respective officers, directors, shareholders, employees, agents and representatives (collectively, the "NAV Parties") from and against any liability, damages, claims, loss, cost or expense, including, without limitation, reasonable legal fees and expenses (individually, "Loss" and collectively, "Losses") arising from, related to, or in connection with the services provided to the Fund pursuant to the NAV Agreements, unless any such Losses are the direct result of the willful misconduct, gross negligence or fraud of NAV. In no event shall NAV have any liability to the Fund, any Shareholder or any other person or entity which seeks to recover alleged damages or losses in excess of the fees paid to NAV by the Fund in the one year preceding the occurrence of any loss, nor shall NAV be liable for any indirect, incidental, consequential, collateral, exemplary or punitive damages, including lost profits, revenue or data, regardless of the form of the action or the theory of recovery, even if NAV has been advised of the possibility of such damages or such damages were foreseeable. Any claim brought against NAV in connection with the NAV Agreements will be barred unless it is initiated within one year of the earlier of the disclosure of the event which is the subject of such claim or the date that the party advancing such claim knew or could with due inquiry have known of such event.

NAV shall not be liable to the Fund, any Shareholder or any other person for the actions or omissions of any agent, contractor, consultant or other third party performing any portion of the services under the NAV Agreements absent a finding of gross negligence or fraud on the part of NAV in appointing such agent, contractor, consultant or other third party.

NAV shall not be liable to the Fund, any Shareholder or any other person for actions or omissions made in reliance on instructions from the Fund or advice of legal counsel.

The services provided by NAV are purely administrative in nature. NAV has no responsibilities or obligations other than the services specifically listed in the NAV Agreements. No assumed or implied legal or fiduciary duties or services are accepted by or shall be asserted against NAV. NAV does not provide tax, legal or investment advice. NAV has no duty to communicate with Shareholders other than as set forth in Exhibit A of the NAV Agreements. NAV does not have custody of Fund's assets, it does not verify the existence of, nor does it perform any due diligence on the Fund's underlying investments including, investments in or via related or affiliated entities. In connection with the payment processing functions, NAV shall not be responsible for performance of the due diligence on payment recipients other than in connection with payments for Investors' withdrawals from the Fund, which are subject to anti-money laundering review functions of the services.

The NAV Agreements also provide that it is the obligation of the Fund's management, and not of NAV, to review, monitor or otherwise ensure compliance by the Fund with the investment policies, restrictions or guidelines applicable to it or any other term or condition of the Fund's offering documents, including, without limitation, with its valuation policy or the Fund's stated investment strategy, and with laws and regulations applicable to its activities. The Fund's

management's responsibility for the management of the Fund, including without limitation, the valuation of the Fund's assets and liabilities, including, defining and maintaining the valuation policy and for fair valuing the Fund's assets, the oversight of the services provided by NAV and the review of work product delivered by NAV shall not be affected by or limited by any of the services provided by NAV.

The NAV Agreement provides that NAV is entitled to rely on any information, including valuation information, received by NAV from the Fund, the Fund's management or other parties, including without limitation, broker-dealers and data vendors, without independent verification, audit, review, inquiry, or performing other due diligence and NAV shall not be liable to the Fund, any Shareholder or any other persons for losses suffered as a result of NAV relying on incorrect information.  NAV has no responsibility to review, independently value, verify, compare to other pricing source or otherwise perform due diligence on the valuation information.  NAV may accept such information as accurate and complete without independent verification.  Furthermore, NAV shall not be liable to the Fund, any Shareholder or any other person for any loss incurred as a result of an error or inaccuracy of any valuation information received from the Fund or from any pricing or valuation service or data service provider or delay, interruption in service or failure to perform of any pricing or valuation service or data service provider used by NAV.

The information on investor statements and other reports produced by NAV shall not be considered an offer to sell or a solicitation of an offer to purchase any Shares, nor may it be used to induce or recommend the purchase or holding of Shares.

The NAV Agreements bar non-parties from asserting third party beneficiary claims against NAV.

The Fund pays NAV fees out of the Fund's assets, generally based upon the size of the Fund, in accordance with NAV's standard schedule for providing similar services, subject to a monthly minimum.

Either party may terminate the NAV Agreements on 60 days' prior written notice as well as on the occurrence of certain events.

Shareholders may review the NAV Agreements by contacting the Fund; provided, that NAV reserves the right not to disclose the fees payable thereunder.

NAV is not responsible for the preparation of this Confidential Memorandum or the activities of the Fund and therefore accepts no responsibility for any information contained in any other section of this Confidential Memorandum.

Within the meaning of the applicable data protection laws, NAV acts as a Processor of Fund's Personal Data. NAV engages its affiliate, Back Office IT Solutions, Pvt. Ltd. to perform some of the Services, which may include, processing of Fund's Personal Data. As NAV Consulting, Inc. is located in the United States and Back Office IT Solutions Pvt. Ltd. in India, Fund's Personal Data is exported to and processed in the United States and India. For more information about how NAV collects, processes, uses and secures the Fund's Personal Data, please reference NAV's Privacy Notice at: https://www.navconsulting.net/Privacy-Policy.

## Auditor

**Moore Cayman** has been appointed by the Fund to serve as the Fund Auditor. The Fund may change its auditor from time to time and will provide Shareholders with reasonably prompt written notice of any such change.

## Cayman Islands Legal Advisors

McGrath Tonner, Cayman Islands ("McGrath Tonner"), acts as Cayman Islands legal counsel to the Fund. In connection with the offering of Class A Shares and subsequent advice to the Fund, McGrath Tonner will not be representing Shareholders and no independent legal counsel has been retained to represent the Shareholders. McGrath Tonner's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which McGrath Tonner has not been consulted. In addition, McGrath Tonner does not undertake to monitor compliance by the Fund and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does McGrath Tonner monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, McGrath Tonner's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. While advising the Fund, there are times when the interests of the Shareholders may differ from those of the Fund. McGrath Tonner does not represent the Shareholders' interests in resolving these issues. In reviewing this Memorandum, McGrath Tonner has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

## AML Officers

The Board has appointed an anti-money laundering compliance officer, a money laundering reporting officer and a deputy money laundering reporting officer in accordance with the relevant and applicable Anti-Money Laundering Regulations in force in the Cayman Islands as at the date of this Memorandum.

## Change of Service Providers

The Board may, at any time, change any of the service providers referred to above, agree on different contractual terms with any of them, and/or appoint additional or alternative service providers, in each case without prior notice to, or the agreement of, Shareholders.

# FEES AND EXPENSES

## Management Fee

The Investment Manager is entitled to receive an annual Management Fee from the Fund with respect to the Class A Shares which shall be equal to 1% of the applicable Net Asset Value of the Class A Shares. The Management Fee will be allocated and paid to individual Directors in such proportions as the Board may determine.

The Fund is also entitled to charge an annual Management Fee with respect to the Class S Shares, which shall be equal to 1% of the applicable Net Asset Value of the Class S Shares. Such fees will be accrued and only paid to the Investment Manager out of the sale proceeds if any, of Special Investments.

The Management Fee is calculated on each Valuation Day after deducting any redemptions and adding any subscriptions as of the Redemption Day and Subscription Day immediately preceding that Valuation Day .

The Management Fee will be paid to the Investment Manager as soon as reasonably practicable after the end of each calendar month, after the finalisation of the Net Asset Value for the relevant Valuation Day.

### Subscription Fee

The Fund shall not charge any Subscription Fee.

### Redemption Fee

The Fund will charge a tiered redemption fee:

In the period from the day where the Class A Shares were issued up to 1 year, a redemption fee of 3% will be charged with respect to the Class A Shares.

In the period from 1 year after the day the Class A Shares were issued up to 2 years, a redemption fee of 2% will be charged with respect to the Class A Shares.

In the period from 2 years after the day the Class A Shares were issued up to 3 years, a redemption fee of 1% will be charged with respect to the Class A Shares.

In the period from 3 years after the day the Class A Shares were issued onwards, there will be no redemption fees.

### Operating Expenses

The Fund will bear all of its own costs and expenses including, without limitation,Management Fee, legal, regulatory & government fee, audit and tax preparation, accounting & fund administrator fee, custody fee, bank fee, brokerage & trading/transactions related-fee, administration & IT, directors meetings & travel, the costs and expenses of operating the Investment Manager and its affiliates that are attributable to the Fund.

### Organisational Expenses

In order to ensure that the Total Expense Ratio remains as low as possible for investors, the Investment Manager shall be responsible for the payment of the Fund's organisational expenses.

# SUBSCRIPTIONS

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

## Subscription Price and Issuance of Class A Shares

Class A Shares are offered to Eligible Investors during the Initial Offering Period at the Initial Offer Price of USD100.00 per Share and thereafter at the Subscription Price, subject to the Minimum Initial Investment and to the right of the Fund to charge a Subscription Fee. The minimum amount of any subsequent subscription is USD10,000.00 in the case of Class A Shares or such lesser amount as the Board may determine, either generally or in any particular case.

- **Purchase of Class A Shares during the Initial Offering Period**

  Prospective investors interested in subscribing for Class A Shares should complete the Subscription Agreement (including uploading the required supplemental documentation) on the Fund's Dashboard and digitally sign and execute accordingly. Alternatively, a hard copy of the Subscription Agreement may be completed by hand and sent by courier to the Administrator, or a digital copy of the Subscription Agreement may be completed by hand and sent by email to the Administrator.

  Payment for the Class A Shares should be made by wire transfer using the transfer instructions set out in the Subscription Document. The acceptance of subscriptions is subject to confirmation of the prior receipt of cleared funds credited to the Fund's subscription account, as provided in the Subscription Document, and the receipt of completed Subscription Document in a form acceptable to the Board.

  During the Initial Offering Period, the deadline for receipt of the subscription form is no later than Close of Business time on a Business Day on the last Business Day before the relevant Subscription Day (subject to the Board waiving such notice), or at such other times as the Board may determine. The deadline for receipt of the subscription money is no later than 5:00 p.m. last Business Day before the relevant Subscription Day. Any portion of a gross subscription amount not accepted for investment will be returned to the Subscriber. No interest will accrue on any returned amount.

- **Purchase of Class A Shares after the Initial Offering Period**

  After the Initial Offering Period, the deadline for receipt of the subscription form is no later than the Close of Business time on a Business Day falling at the last Business Day before the relevant Subscription Day (subject to the Board waiving such notice), or at such other times as the Board may determine. The deadline for receipt of the subscription money is no later than 5:00 p.m. on the last Business Day before the relevant Subscription Day. If any Subscription Application or payment is received late, it will be processed on the next Subscription Day provided that following consultation with the Administrator and Investment Manager, the Board may waive those requirements in any particular case or generally if they determine that to do so will not materially prejudice the other holders of Class A Shares.

  Any portion of a gross subscription amount not accepted for investment will be returned to the Subscriber. No interest will accrue on any returned amount.

## Due Diligence Requirements applicable to Investors

The Fund reserves the right to reject any application in whole or in part. In this event, the application monies or any balance thereof or non-cash assets will be returned to the applicant without interest. The Administrator may require such information and representations from both existing and Subscribers as may be necessary to comply with all applicable laws and regulations (whether statutory or not) including, without limitation, to comply with FATCA, the US IGA, CRS and any future IGAs and Cayman Islands laws and regulations relating to the verification of an applicant's identity and source of funds. In the event of delay or failure to supply such information, the Fund may decline to accept the subscription application and the subscription money and return said money to the investor without interest or compulsorily redeem Shares.

The Administrator shall, on behalf of the Fund, acknowledge all subscriptions by way of trade confirmation upon approval of a subscription by the Fund. Should a Subscriber not receive a trade confirmation, it is the Subscriber's responsibility to contact the Administrator to ascertain the status of its subscription as it cannot assume its successful subscription until it receives a trade confirmation.

## Payment for the Class A Shares

Payment for Class A Shares must be made in cash by electronic transfer, net of bank charges, and is due in cleared funds in USD. Cash payments must be sent to the Fund's bank account, details of which will be communicated to the Subscriber by the Administrator.

If subscription monies are received in any currency other than USD, conversion into USD will be arranged by the Administrator at the risk and expense of the Subscriber. Any bank charges in respect of electronic transfers will be deducted from subscriptions and only the net amount will be invested in Class A Shares.

The acceptance of subscriptions is subject to confirmation of the prior receipt of cleared funds credited to the Fund's subscription account, as provided in the Subscription Documents, and the receipt of completed Subscription Documents in a form acceptable to the Board.

Where a subscription for Class A Shares is accepted, the Shares are treated as having been issued with effect from the relevant Subscription Day notwithstanding that the Subscriber for those Shares may not be entered in the Fund's Register of Members until after the relevant Subscription Day. The subscription monies paid by a Subscriber for Class A Shares will accordingly be subject to investment risk in the Fund from the relevant Subscription Day.

The Board may in their sole discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such time as it may determine, or accept/reject the subscription application. The Fund is not under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Agreements or incur any liability for failure to give such notification.

None of the Directors, the Fund or the Administrator accept any responsibility for any loss arising from the non-receipt or illegibility of any Subscription Agreement sent, or for any loss caused by or as a result of any action taken in connection with instructions believed in good faith to have originated from properly authorised persons.

Once a completed Subscription Agreement has been received by the Administrator it is irrevocable.

The Fund may reject any application in whole or in part and without giving any reason for doing so. If an application is rejected, the subscription monies paid, or the balance thereof in the case of a partial rejection, will be returned (without interest) as soon as practicable to the account from which the subscription monies were originally remitted. Any costs incurred in returning the subscription monies will be borne by the Subscriber.

### Issue of Class A Shares

Written confirmation detailing the Class A Shares which have been issued will be sent to Subscribers whose subscription has been accepted as soon as practicable after the close of the Initial Offer Period or the relevant Subscription Day, as the case may be.

Class A Shares subscribed for during the Initial Offer Period will be issued on the Business Day immediately after the close of the Initial Offer Period. Class A Shares subscribed after the Initial Offer Period are deemed to be issued on the relevant Subscription Day.

Class A Shares will be issued to two decimal places. Any smaller fraction of a Participating Share that would otherwise arise will be rounded down, with the relevant subscription monies being retained for the benefit of the Fund.

### Form of Class A Shares

All Class A Shares will be issued in registered form, meaning that a Shareholder's entitlement will be evidenced by an entry in the register of members of the Fund and not by a certificate. No certificates will be issued unless the Board determines otherwise.

A Participating Share may be registered in a single name or in up to four joint names. Where Class A Shares are registered in joint names, the joint holders may authorise the Fund to act upon the sole written instructions of any one of the joint holders in respect of the transfer or redemption of all or any of such Class A Shares. Unless so authorised, the Fund will only act upon the written instruction of all the joint holders.

### Anti-money laundering policy

To ensure compliance with applicable requirements relating to anti-money laundering and prevention of terrorism or proliferation financing, the Fund, or the Administrator on behalf of the Fund, will require such information and documentation as it considers necessary to verify the identity and/or source of wealth of each Subscriber. In the event of delay or failure by the Subscriber to produce any information required for verification purposes, the application may be refused or there may be a delay in processing the application. Neither of the Fund nor the Administrator or their respective delegates, agents and affiliates will be liable for any loss suffered by a Subscriber arising as a result of any such refusal or a delay.

By subscribing for Class A Shares, a Subscriber consents to the disclosure of any information provided by the Subscriber to government agencies, regulatory bodies and other relevant persons in connection with anti-money laundering requirements and similar matters. Such disclosure may be made by the Fund the Administrator or their delegates, agents or affiliates.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

Each subscriber will be required to make such representations as may be required by the Fund in connection with its anti-money laundering programmes. Such representations will include representations that the subscriber is not a prohibited country, territory, individual or entity listed on the United States Department of Treasury's Office of Foreign Assets Control (OFAC) website and that it is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programmes. Each subscriber will also be required to represent that subscription monies are not directly or indirectly derived from activities that may contravene relevant laws and regulations, including anti-money laundering laws and regulations.

# REDEMPTIONS AND TRANSFERS

## Procedure for the Redemption of Class A Shares

Subject to any restrictions set out in this section and under "Net Asset Value - Suspensions" below, and to the Lock-up Period and any Gate, Class A Shares may be redeemed at the option of the Shareholder on any Redemption Day.

Existing Investors interested in redeeming their Shares should complete the Redemption Notice on the Fund's Dashboard and digitally sign and execute accordingly. Alternatively, a digital copy of the Redemption Notice may be completed by hand and sent by email to the Administrator. The completed Redemption Notice must be received by no later than 5:00 pm on the Close of Business time on a Business Day falling at least 1 month (or such shorter period as the Board may permit, either generally or in any particular case) before the relevant Redemption Day. Unless the Board agrees otherwise, any Redemption Notice received after this time will be held over and dealt with on the next Redemption Day.

None of the Directors, the Fund or the Administrator accept any responsibility for any loss arising from the non-receipt or illegibility of any Redemption Notice sent, or for any loss caused by or as a result of any action taken in connection with instructions believed in good faith to have originated from properly authorised persons.

If a Redemption Notice is received which would, if satisfied, result in the Shareholder retaining less than the Minimum Holding, the Board may treat such Redemption Notice as a request for a partial redemption (so that the Shareholder retains the Minimum Holding) or may redeem the Shareholder's entire holding of Class A Shares.

A request for a redemption of Class A Shares with an aggregate Net Asset Value of less than the Minimum Holding (or such lesser amount as the Board may determine, either generally or in any particular case) will be refused. If a redeeming Shareholder owns Class A Shares of more than one Series, Class A Shares will be redeemed on a "first in-first out" basis for the purpose of determining the Redemption Price. Accordingly, Class A Shares of the earliest issued Series held by the Shareholder will be redeemed first, at the Redemption Price of Class A Shares of such Series until the redeeming Shareholder no longer owns any Class A Shares of such Series.

Once a Redemption Notice has been received by the Administrator it may not be revoked by the Shareholder unless redemptions have been suspended in the circumstances set out in "Net Asset Value - Suspensions" below or the Board otherwise agrees.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CCFC07D1B00

## Limitations on Redemptions

The Class A Shares may not be redeemed at the option of the Shareholder on any Redemption Day during the Lock-Up Period unless a redemption fee of 6% is paid in respect of such Class A Shares being redeemed.

If Redemption Notices are received by the Administrator in respect of any Redemption Day in relation to Class A Shares with an aggregate Net Asset Value of more than 20% (or such higher or lower percentage as the Board in its discretion may determine) of the Net Asset Value of the Fund, the Board may, in their discretion, reduce each request for redemptions pursuant to such Redemption Notices pro rata, so that only Class A Shares with an aggregate Net Asset Value equal to 20% (or such higher or lower percentage as the Board in its discretion may determine) of the Net Asset Value of the Fund are redeemed as at such Redemption Day. A redeeming Participating Shareholder whose request for redemption of Class A Shares is reduced in this manner will be deemed to have submitted a Redemption Notice to have the remaining balance of the Class A Shares as specified in the original Redemption Notice redeemed on the next following Redemption Day without the need to submit a further Redemption Notice.

Redemptions on any such subsequent Redemption Day shall always be subject to the discretion of the Board to reduce each request for redemptions pursuant to each Redemption Notice on a pro rata basis as aforesaid. Where any redemption requests have been reduced in this manner, the Board may determine that any Redemption Notices which have been postponed from any prior Redemption Day shall have priority on any subsequent Redemption Day, or may take such other steps in respect of such postponed Redemption Notices as they deem appropriate.

## Rights Following the Redemption Day

With effect from the relevant Redemption Day, a redeeming Shareholder will be treated as a creditor for the redemption proceeds of the Class A Shares being redeemed (rather than a Shareholder). After the relevant Redemption Day, the redeeming Shareholder will have no rights as a Shareholder in respect of the Class A Shares being redeemed save for the right to receive the redemption proceeds and any dividend which has been declared in respect of the relevant Class A Shares prior to the relevant Redemption Day. The right of the redeeming Shareholder to receive the redemption proceeds and any such dividends shall rank ahead of the rights of remaining Shareholders in the distribution of the surplus assets of the Fund on its liquidation.

## Redemption Price and Redemption Proceeds

The Redemption Price of a Class A Shares will be equal to the Net Asset Value per Share of the relevant Series as at the Valuation Day immediately preceding the relevant Redemption Day.

## Settlement

Payment of redemption proceeds will normally be made within fourteen (14) Business Days of the later of:

- the finalisation of the Redemption Price for the relevant Redemption Day, and
- the date on which the Administrator has received the original of the Redemption Notice and such other information and documentation as may be required. Payment will be made in the Dealing Currency of the Class A Shares being redeemed by direct transfer to an account in the name of the Shareholder. Any costs incurred in making the transfer will be borne by the Shareholder. No redemption proceeds will be paid to a third party. No interest will be paid to the Shareholder in respect of redemption proceeds.

A Shareholder may request that payment of redemption proceeds be made in a currency other than the relevant Dealing Currency. If the Board permits payment in a currency other than the relevant Dealing Currency the cost of conversion will be deducted from the redemption proceeds.

A portion of the redemption proceeds may be held back at the discretion of the Board pending completion of the next occurring annual audit. Promptly after completion of the audit, the balance, if any, of the amount to which such Shareholder is entitled after taking account of any adjustment made to the relevant Redemption Price as a result of the audit will be paid to such Shareholder. No interest will be paid in respect of redemption proceeds held back.

The Fund aims to pay all redemption proceeds in cash. However, under circumstances of low liquidity or adverse market conditions, the Board may pay redemption proceeds in whole or in part by the transfer of assets. The assets to be transferred will be valued as at the relevant Redemption Day, by reference to the valuation principles applied in the calculation of the Net Asset Value. Assets may be transferred directly to the redeeming Shareholder or may be transferred to a liquidating trust, account or entity and sold or otherwise realised for the benefit of the redeeming Shareholder. If assets are transferred to a liquidating trust, account or entity, the cash proceeds received by a redeeming Shareholder will reflect the value of the assets on the date on which they are sold or realised. The cost of operating the liquidating trust, account or entity and managing, selling or otherwise realising the assets will be deducted from the proceeds paid to the redeeming Shareholder.

## Compulsory Redemption

The Fund may, with or without cause and without giving any reason, redeem all or any of the Class A Shares held by a Shareholder on any day designated by the Board by giving five (5) Business Days' prior written notice to such Shareholder.

In particular, the Fund may redeem the Class A Shares held by a Shareholder if the Board becomes aware that (i) the Shareholder has ceased to be an Eligible Investor, (ii) any representation, warranty, acknowledgement or undertaking given by the Shareholder to the Fund has ceased to be accurate in any material respect, or (iii) the continued holding of Class A Shares by the Shareholder would or may, in the opinion of the Board, cause an undue risk of adverse tax, pecuniary, regulatory, legal or other consequences to the Fund or any other Shareholders. Shareholders are required to notify the Fund and the Administrator immediately if at any time they become aware that any of the above circumstances apply to them.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

Where any fees, payment, withholding or deduction becomes payable by the Fund because of a particular Shareholder, the Fund may redeem a portion of such Shareholder's Class A Shares in order to pay such amount. In such circumstances, the redemption proceeds may be paid directly by the Fund to the relevant third party and not paid to the Shareholder.

### Prevention of Money Laundering

Redemption proceeds will not be paid to a Shareholder until the Fund has received any outstanding information or documentation requested in connection with any applicable anti-money laundering requirements or similar matters. Neither of the Board, nor the Administrator will be liable for any loss arising as a result of any delay in payment of any redemption proceeds if such information and documentation have not been provided by the Shareholder.

The Fund may refuse to pay redemption proceeds to a Shareholder if the Board, the Investment Manager or the Administrator suspects or is advised that the payment of the redemption proceeds may result in a breach of any applicable laws or regulations in any relevant jurisdiction.

### Transfer of Class A Shares

Class A Shares may not be transferred without the prior written consent of the Board. The Board may withhold their consent without giving any reason for doing so. Consent will not be given if, as a consequence of such transfer, the Class A Shares retained by the transferor or registered in the name of the transferee would be less than the Minimum Holding.

Shareholders wishing to transfer Class A Shares must complete a transfer request, which shall be in such form as the Board may from time to time approve. The completed transfer request, duly stamped, if applicable, together with such evidence as the Board may require to show the right of the transferor to make the transfer, must be sent to the Administrator. If the transferee is not already a Shareholder, it will be required to comply with all eligibility and applicable anti-money laundering requirements or similar matters for a subscriber for Class A Shares.

The transfer will take effect upon the registration of the transferee in the register of members of the Fund maintained by the Administrator.

The transferor and transferee will be responsible for paying any taxes, duties, imposts or levies payable on, or in consequence of, a transfer of Class A Shares.

# DETERMINATION OF NET ASSET VALUE

The Net Asset Value of the Fund and the Net Asset Value per Share of each Series will be calculated as at the Valuation Point on each Valuation Day.

In calculating the Net Asset Value per Share, the Administrator may rely, without verification, on the closing prices from automatic pricing services at each valuation day. The Administrator is not liable for any loss suffered by the Fund or any of its Shareholders by

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

reason of any error in the calculation of Net Asset Value per Share resulting from any inaccuracy in that information.

## Valuation of Assets

For the purposes of calculating the Net Asset Value, assets of the Fund will be valued in accordance with the following principles:

- any security which is listed or quoted on any securities exchange or similar electronic system and regularly traded thereon will be valued at its last traded price as at the Valuation Point or, if no trades occurred on such day, at the closing bid price if held long and at the closing offer price if sold short, on the relevant Valuation Day. Where prices are available on more than one exchange or system for a particular security the price will be the last traded price or closing bid or offer price, as the case may be, on the exchange which constitutes the main market for such security or the one which the Board determines provide the fairest criteria in ascribing a value to such security;

- any security which is not listed or quoted on any securities exchange or similar electronic system or if, being so listed or quoted, is not regularly traded thereon or in respect of which no prices as described above are available will be valued at its probable realisation value as at the Valuation Point, as determined by the Board having regard to its cost price, the price at which any recent transaction in the security may have been effected, the size of the holding having regard to the total amount of such security in issue, and such other factors as the Board deems relevant in considering a positive or negative adjustment to the valuation;

- investments, other than securities, which are dealt in or traded through a clearing house or exchange or through a financial institution will be valued as at the Valuation Point by reference to the most recent official settlement price quoted by that clearing house, exchange or financial institution. If there is no such price, then the average will be taken between the lowest offer price and the highest bid price as at the Valuation Point on any market on which such investments are or can be dealt in or traded, provided that where such investments are dealt in or traded on more than one market, the Board may determine which market shall prevail;

- investments, other than securities, including over-the-counter derivative contracts, which are not dealt in or traded through a clearing firm or an exchange or through a financial institution will be valued by reference to the valuation obtained from an independent pricing source, but where no such valuation is available for a particular investment, the investment will be valued by comparing the latest available valuation provided by the relevant counterparty against the valuation provided by such other counterparties as the Board deems appropriate. In the event that the valuations provided respectively by the relevant counterparty and the other counterparties differ to the extent that the Board considers to be material, the investment shall be valued on the basis of the average of all of the valuations but otherwise will be valued on the basis of the valuation provided by the relevant counterparty;

- deposits will be valued at their cost plus accrued interest; and

- any value (whether of a security or cash) which is not in USD will be converted into USD at the rate (whether official or otherwise) which the Board deems appropriate to the circumstances having regard, inter alia, to any premium or discount which it considers may be relevant and to costs of exchange.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

The Board may permit any other method of valuation to be used if they consider that such method of valuation better reflects fair value generally or in particular markets or market conditions.

The financial statements of the Fund will be drawn up in accordance with IFRS. However, the valuation policies described above may not comply with IFRS. To the extent that the valuation basis deviates from IFRS, the Board may make necessary adjustments in the annual financial statements in order to comply with IFRS. If relevant, a reconciliation note may be included in the annual financial statements to reconcile values shown in such statements determined under IFRS to those arrived at by applying the valuation policies described above.

Subject to the discretions set out above, the Board has delegated to the Administrator the calculation of the Net Asset Value and the Net Asset Value per Share.

The Administrator is not liable for any loss suffered by the Fund or any of its Shareholders by reason of any error in the calculation of Net Asset Value per Share resulting from any inaccuracy in the information relied upon by the Administrator.

## Suspensions due to Special Circumstances

The Board may declare a temporary suspension of (i) the determination of Net Asset Value per Share of one or more Classes (ii) the redemption of Participating Shares of one or more Classes and/or (iii) the payment of redemption proceeds. The Board may declare any such suspension in such circumstances as they may deem appropriate, including:

- during which any stock exchange, commodities exchange, futures exchange or market on which any significant portion of the Investments of the Company are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such exchange or market is restricted;
- when circumstances exist as a result of which in the opinion of the Board it is not reasonably practicable for the Company to dispose of its Investments or as a result of which any such disposal would be materially prejudicial to the Members (or any of them);
- when a breakdown occurs in any of the means normally employed in ascertaining the value of the Company's Investments or the Net Asset Value of the Company or the Net Asset Value per Share of any class or series or when for any other reason the value of any of the Investments or other assets of the Company or the Net Asset Value of the Company or the Net Asset Value per Share of any class or series cannot in the opinion of the Board reasonably or fairly be ascertained;
- during which the Company is unable to repatriate, receive or transfer funds required for the purpose of making payments due on the redemption or purchase of Shares of the relevant class or during which any transfer of funds involved in the realisation or acquisition of Investments or payments due on the redemption or purchase of Shares of the relevant class cannot in the opinion of the Board be effected at normal rates of exchange;
- when the business operations of the Company and/or a Service Provider (or their authorised agents) in relation to the operations of the Company are substantially interrupted or closed as a result of or arising from pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riots, strikes, cyber-attack, natural disaster or acts of God;

- when, as a result of exchange restrictions or other restrictions affecting the repatriation or transfer of funds, transactions on behalf of the Company are rendered impracticable, or where purchases, sales, deposits or withdrawals of any asset of the Company cannot be effected at the normal rates of exchange, as determined by the Board;
- when the Company has resolved to wind up;
- where the Board deems it necessary to do so to comply with anti-money laundering laws and regulations or any other law or regulations applicable to the Company and/or any Service Provider, directly or indirectly, in any jurisdiction;
- when it is not reasonably practicable to accurately ascertain the value of a material portion of the Company's assets due to such as the closure of or suspension of trading on any underlying funds or individual investment accounts and segregated accounts; or
- when the Board otherwise determines that it is in the best interests of the Company or the Members to do so.

Any suspension will take effect at the time the Board specifies in its declaration. The suspension will continue until the Board declares that it has ended. The holders of Participating Shares of the affected Class or Classes will be notified of any suspension as soon as practicable after the declaration of such suspension. Such Shareholders will also be notified when the period of such suspension has ended.

Applications for Participating Shares for a Subscription Day falling within a period when the issue of Participating Shares of the relevant Class is suspended will be acted upon on the first Subscription Day after the suspension has ended. A Subscriber may withdraw his application for Participating Shares during a period of suspension provided that a withdrawal notice is actually received by the Administrator before the suspension has ended.

Redemption Notices received prior to the commencement of a period of suspension will be carried forward to the next earliest relevant Redemption Day occurring after the suspension has ended and will be given priority over Redemption Notices received during a period of suspension. A Shareholder may withdraw his Redemption Notice during a period of suspension provided that a withdrawal notice is actually received by the Administrator before the suspension has ended.

While such suspensions may be temporary, the circumstances giving rise to the decision to suspend may continue for a prolonged period of time such that the Board considers that it is appropriate that the suspension be declared permanent. In such circumstances the investments of the Fund will be managed for the sole purpose of realising all investments in anticipation of the termination of the business of the Fund and its winding up.

## High Water Mark

In relation to Class A Shares, the greater of the Net Asset Value per Participating Share at the time of issue and the highest Net Asset Value per Participating Share with respect to which a Performance Fee has been charged at the end of any previous Performance Period (if any) during which such Participating Share was in issue.

## Adjustments

If an Investor subscribes for Class A Shares at a time when the Net Asset Value per Share is other than the Peak Net Asset Value per Share, certain adjustments will be made to reduce inequities that could otherwise result to the Investor or to the Fund.

The Peak Net Asset Value per Share is the greater of: (i) the price at which Class A Shares are issued at the close of the Initial Offering Period; and (ii) the highest Net Asset Value per Share in effect immediately after the end of the previous Performance Period in respect of which a Performance Fee (other than a Performance Fee Redemption, as defined below) was charged.

- If Class A Shares are subscribed for at a time when the Net Asset Value per Share is less than the Peak Net Asset Value per Share, the Investor will be required to pay a Performance Fee with respect to any subsequent appreciation in the value of those Class A Shares. With respect to any appreciation in the value of those Class A Shares from the Net Asset Value per Share at the date of subscription up to the Peak Net Asset Value per Share, the Performance Fee will be charged at the end of each Performance Period by redeeming at par value such number of the Investor's Class A Shares as having an aggregate Net Asset Value (after accrual for any Performance Fee) equal to the Relevant Percentage of any such appreciation (a Performance Fee Redemption). An amount equal to the aggregate Net Asset Value of the Class A Shares as redeemed will be paid as a Performance Fee. The Fund will not be required to pay to the Investor the redemption proceeds of the relevant Class A Shares, being the aggregate par value thereof. Performance Fee Redemptions are employed to maintain a uniform Net Asset Value per Share. In regards the Investor's remaining Class A Shares, any appreciation in the Net Asset Value per Share of those Class A Shares above the Peak Net Asset Value per Share will be charged a Performance Fee in the manner described above. If an Investor redeems Class A Shares during a Performance Period and an adjustment in accordance with the principles of this section is required in relation to such Class A Shares, such adjustment shall be deducted from the redemption proceeds and will be paid to the Investment Manager.
- If Class A Shares are subscribed for at a time when the Net Asset Value per Share is greater than the Peak Net Asset Value per Share, the Investor will be required to pay an amount in excess of the then-current Net Asset Value per Share equal to the Relevant Percentage of the difference between the then-current Net Asset Value per Share (before accrual for the Performance Fee) and the Peak Net Asset Value per Share. This is to account for the fact that the Net Asset Value per Share has been reduced to reflect an accrued Performance Fee to be borne by existing Investors that might otherwise be payable out of the assets of the Fund but that should not, for the purposes of fairness, be charged against the Investor making the subscription because, as to such Class A Shares, no favourable performance has yet occurred. This ensures that all holders of Class A Shares have the same amount of capital at risk per Participating Share.

At the end of each Performance Period, if the Net Asset Value per Share (before accrual for the Performance Fee) exceeds the Peak Net Asset Value per Share, that portion equal to the Relevant Percentage of the excess, will be applied by subscribing for additional Class A Shares for the Investor at par value, such number of the Investor's Class A Shares as have an aggregate Net Asset Value (after accrual for any Performance Fee) equal to the Relevant Percentage of any such depreciation (a Performance Fee Subscription). Additional Class A

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

Shares will continue to be so subscribed for at the end of each Performance Period until the original Subscription Price for the Class A Shares has been reached.

If the Investor redeems Class A Shares before the original Subscription Price for those Class A Shares has been reached, the Investor will receive redemption proceeds equal to the Net Asset Value times the number of Class A Shares.

# VARIATION OF OFFERING TERMS AND SIDE LETTERS

The Fund may waive or modify the application of, or grant special rights with respect to, any provision of this Memorandum, including, without limitation, the provisions relating to the Management Fee, the Performance Fee, redemptions, transfers, notices and transparency with respect to any Shareholder. Such waivers or modifications or the granting of any special rights by the Fund may be by way of the entry into agreements ("Side Letters") with certain Shareholders which amend the terms of the investments of such Shareholders in the Fund, in each case without notice to, or the consent of other shareholders.

# RISK FACTORS AND SPECIAL CONSIDERATIONS

An investment in the Fund involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurances or guarantees that (i) the Fund's investment objectives will prove successful or (ii) investors will not lose all or a portion of their investment in the Fund.

Investors should consider an investment in the Fund as a supplement to an overall investment program and should only invest if they are willing to undertake the risks involved. In addition, investors who are subject to income tax should be aware that an investment in the Fund could (if the Fund is successful) create taxable income or tax liabilities in excess of cash distributions to pay such liabilities. Investors should therefore bear in mind the following risk factors and conflicts of interest before purchasing Class A Shares.

The Fund relies on each Subscriber to obtain independent, qualified investment and tax advice before purchasing Class A Shares in the Fund.

The following risk factors are a non-exhaustive summary of the main risks which need to be considered by Subscribers.

## Risks associated with the Fund

### Limited Operating History

The Fund does not have any operating history. There is no market for investments in the Fund and as such, Class A Shares may only be disposed of through the redemption procedures described in this Memorandum, or through a permitted transfer of Class A Shares to a third-party.

**Illiquidity and Continuous Offering of Class A Shares**

The Fund is not intended to be a short-term investment. There are restrictions on redemptions of Class A Shares, and Class A Shares are not freely tradable. Accordingly, an investment in the Fund is an illiquid investment. Class A Shares are subject to the Lock-Up Period during which they may not be redeemed (except in circumstances where a redemption fee will be charged). In addition, there will be a period between the date on which Investors may submit a request for redemption, the effective date of the redemption, and the wire transfer of the redemption proceeds. Investors will bear the risk that the Fund's Net Asset Value may fluctuate significantly during such periods. The Investment Manager may limit redemptions to the extent that aggregate redemption requests by Investors exceeds the Gate, and with respect to a redeeming Investor, reserve a portion of such Investor's redemption proceeds for liabilities and for other contingencies of the Fund. The Fund may suspend redemption rights, or the payment of redemption proceeds, in whole or in part. Significant numbers of redemption requests by Investors that are not offset by new subscriptions could cause the Fund to postpone or suspend redemptions

**Non-Voting Shares**

Class A Shares do not carry any right to vote and accordingly Shareholders have limited control over the management of the Fund.

## Risks associated with the Fund's investment objectives, strategies and policies

### Risks of Investments Generally

All investments generally risk the loss of capital. No guarantee or representation is made that the Fund's investment objective, strategies and policies will be successful.

## Operational and Strategy Risks

### Order execution risks

The Fund's investment theses and trading strategies may be negatively impacted by internal (Fund) and external (third-party) actions, developments or omissions that prevent orders from being executed and cleared in a timely fashion, due to factors including but not limited to systems failures, counter-party errors or third-party service provider errors.

### Operational risks

The volume and complexity of the Fund's strategies and transactions may impact the Board's operational capacity. Traders' errors, system errors and other risks may impact the Fund's holdings and financial position.

### Lack of Insurance

The assets of the Fund are not insured by a government entity or a private insurance company. Where the Fund or/and its third-party service providers become insolvent, the Fund may be unable to recover its funds or assets in part or in full.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

## Risks associated with the Investment Management

### Operational and Systems Risk

The Fund depends on the Investment Manager to develop and implement appropriate systems and procedures to control operational risk. Operational risk may arise from mistakes made in the confirmation or settlement of transactions, from transactions not being properly booked, evaluated or accounted for or other similar disruption in the Fund's operations may cause it to suffer financial losses, the disruption of business, liability to clients or third parties, regulatory intervention or reputational damage. The Fund's business may depend on the Investment Manager's ability to process a large number of transactions across numerous and diverse markets in a timely and accurate manner. Consequently, The Fund relies heavily on its financial accounting and other data processing systems. The ability of its systems to accommodate an increasing volume of transactions could also constrain the Investment Manager's ability to properly manage the portfolio.

The Fund's trading orders may not be executed in a timely and efficient manner due to various circumstances, including but not limited to system failures or human error attributable to the Investment Manager, its brokers, agents or other service providers. In such event, the Fund might only be able to acquire, or dispose of, some, but not all, of the components of such position, or if the overall positions were to need adjustment, the Fund might not be able to make such adjustment. As a result, the Fund may not be able to enter or exit the market positions selected by the Investment Manager and may incur a loss whilst liquidating its position. In addition, the Fund relies heavily on electronic execution systems, and such systems may be subject to failure, causing the interruption of trading orders made by the Fund.

The Fund depends on the Investment Manager to develop and implement appropriate systems for it. The Fund relies extensively on computer software, algorithms and systems to analyse, trade, clear and settle securities transactions, to evaluate certain securities based on real-time trading information, to monitor its portfolio and net capital, and to generate risk management and other reports that are critical to oversight of the Fund's activities. In addition, certain of the operations of the Fund and the Investment Manager interface with or are depend on systems operated or developed by third-parties, including its Prime Brokers and market counterparties, and their sub-custodians and other service providers, and as such the Investment Manager may not be in a position to verify the risks and reliability of such third-party systems. These systems may be subject to certain defects, failures or interruptions, including, but not limited to, those caused by software-related defects, viruses and power failures. Any such defect or failure could have a material adverse impact on the Fund.

### Reliance on the Investment Manager and its Key Personnel

The success of the Fund depends upon the ability of the Investment Manager to develop and implement investment strategies that achieve the Fund's investment objective. Whilst the software is automated, and as such, where key personnel leave the Investment Manager, the Fund can continue to trade, no assurance can be given that the Investment Manager will be able to do so. The ability of the Investment Manager to develop and implement investment strategies that achieve the Fund's investment objective depends in substantial part upon the skill and experience of the Investment Manager.

**Other Relationships of the Investment Manager and the Board**

The Investment Manager (including its partners, principals, employees, officers and affiliates) may have external relationships, such as having investment interests in, holding directorships or serving as executives of or otherwise being involved with, third-parties, including without limitation, other investment managers, investment companies, investment banks and public companies which may result in conflicts of interest. The activities of Directors with these other relationships may affect the Fund's ability to participate in investment opportunities that it would otherwise have been eligible to participate in or may present regulatory or reporting issues with respect to certain investments.

**Cybersecurity Risk**

As part of its ongoing business and operations of the Fund, the Investment Manager (and its affiliates), will utilise, process, store and transmit information on its internal and external systems and technology platforms. This will include software both developed in-house by the Investment Manager (and its affiliates) and the advisor, along with software licensed or utilised from a third-party service provider or a software development companies. As such, there are operational risks that stem from the use of such technologies as well as information security risks (collectively "Cybersecurity Risk"). Where there are bugs, breaches, and other failures leading to Cybersecurity Risk, this may have an impact on the ongoing business and operations of the Fund, and as such, potentially negatively impacting the performance of the Fund, and cause it to be unable to continue operating during the duration the Cybersecurity Risk occurence.

**Performance Fee**

Whilst the directors of the Investment Manager (and if appointed, sub-advisors) may have a significant stake (in respect of the capital raised) in the Fund, and as such, the Investment Managers' and the investors' interests are in alignment, the payment of a performance-based fee to the Investment Manager may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would otherwise be the case if these payments were not made. Since a portion of the Performance Fee is calculated on a basis which includes unrealised appreciation of the Fund's assets, the Performance Fee may be greater than if it were based solely on realised gains. The Board has delegated to the Investment Manager the authority to value the Fund's assets. As the Performance Fee is paid to the Investment Manager, the Investment Manager may have an incentive to place a higher value on Fund's investments than may otherwise be the case.

**Changes in investment strategies**

Throughout the life of the Fund, the Investment Manager may develop or change its strategy over time. As such, an investment into the Fund may be subject to additional and/or different risk factors.

**No Assurance**

There can be no assurance that the investment objective will be achieved, and certain strategies will involve higher risk, including limited liquidity and possible risks associated with more complex financial products.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

# CONFLICTS OF INTEREST

Due to the operations which are or may be undertaken by the Administrator, the Directors and the Investment Manager (the "Service Providers"), their respective holding companies, subsidiaries and affiliates (each an "interested party"), conflicts of interest may arise. The Service Providers may provide similar services to others provided that the services they provide to the Fund are not impaired thereby. An interested party may acquire or dispose of any investment notwithstanding that the same or similar investments may be owned by or for the account of or otherwise connected with the Fund. Furthermore, an interested party may acquire, hold or dispose of investments notwithstanding that such investments had been acquired or disposed of by or on behalf of the Fund by virtue of a transaction effected by the Fund in which the interested party was concerned provided that the acquisition or disposal by an interested party of such investments is effected on normal commercial terms as if negotiated on an arm's length basis and the investments held by the Fund are acquired on the best terms reasonably obtainable having regard to the interests of the Fund. The Investment Manager owe fiduciary duties to the Fund and in discharging such duties will use their best efforts to ensure that investment allocations as between all accounts, including for this purpose, their own accounts, will be made in a manner which is fair and does not prejudice the interests of the Fund, or its shareholders as a whole.

Should a conflict of interest arise in relation to the Fund, so far as practicable, each Service Provider will have regard to its obligation to act in the best interests of the Fund's Shareholders, having regard to its obligations to other clients, when undertaking investments. Further, each will endeavour to resolve any conflicts fairly.

## Soft Dollar Arrangements

A broker or a dealer may offer goods or services to the Fund or the Investment Manager in consideration of directing transaction business for the account of the Fund to such broker or dealer. The Fund may be deemed to be paying for these services with "soft" dollars; such goods and services offered may include research and advisory services, economic and political analysis, portfolio analysis (including valuation and performance measurement), market analysis, data and quotation services, clearing and custodian services and investment-related publications. The goods and services which the Fund or the Investment Manager may receive, will not include any goods and services prohibited from time to time by any code or guidelines issued by any relevant regulatory authority.

The Investment Manager does not intend to receive goods or services from a broker or a dealer in consideration of directing transaction business for the account of the Fund to such broker or dealer except if:

- there is no better way for such benefits to flow directly to the benefit to the Fund;
- the goods or services to be received are of demonstrable benefit to the Fund;
- the proposed transaction execution is consistent with best execution standards; and
- the brokerage rates applied are not in excess of customary brokerage rates.

On behalf of the Fund, the Investment Manager will generally consider the amount and nature of research, execution and other services provided by the proposing brokers as well as the extent to which such services will be relied upon, and may attempt to allocate a portion of

the Fund's brokerage business to an offering broker on the basis of that consideration. The Investment Manager will only accept such offers if it believes that such an allocation of brokerage business may help to provide research and execution capabilities and other benefits to the Fund. Any such investment information received from brokers, however, may be used by the Investment Manager and its affiliates in servicing other accounts to which they provide investment management and not all such information received may in fact be used by the Investment Manager in connection with the Fund.

The relationships with brokerage firms that provide "soft" dollar services to the Fund may influence the Investment Manager's judgement in allocating brokerage business and create a conflict of interest in using the services of those broker-dealers to execute brokerage transactions. The brokerage commissions paid to those firms, however, shall not differ materially from nor be in excess of the customary brokerage commissions payable to other firms for comparable services.

# TAXATION

The following was written to support the promotion or marketing of the transactions or matters addressed herein. This summary was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under U.S. federal tax law. This discussion does not constitute an opinion or advice of counsel. Each Shareholder should seek advice from their own tax advisor based on the Shareholder's particular circumstances.

The taxation of the Fund and its Shareholders under the tax laws of the Cayman Islands is summarized below.

The following comments are based on advice received by the Fund regarding current law and practice in the Cayman Islands and the United States. Shareholders should appreciate that the taxation consequences for Shareholders may be otherwise than as stated below. Shareholders should consult their professional advisors on the possible tax consequences of their action in subscribing for, purchasing, holding, selling or redeeming Class A Shares under the laws of their countries of citizenship, residence, ordinary residence or domicile.

## Cayman Islands Tax Matters

There is, at present, no direct taxation in the Cayman Islands and interest, dividends and gains payable to the Fund will be received free of all Cayman Islands taxes.

Prospective investors must consult their own tax advisers as to the Cayman Islands tax consequences of acquiring, holding and disposing of Shares, as well as the effects of tax laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

Although the Fund is not subject to tax in the Cayman Islands, the Fund may be liable for any taxes which may be withheld at source in other countries in respect of income or gains derived from its investments.

## United States

The United States of America (U.S.) Foreign Account Tax Compliance Act ("FATCA") provisions enacted under the Hiring Incentives to Restore Employment Act, 2010, and regulations issued thereunder require foreign financial institutions ("FFIs") to agree inter alia (i) to report to the Internal Revenue Service of the U.S. ("IRS") certain taxpayer information (including name, address and taxpayer identification number and account details) regarding U.S. account holders (or in the case of account holders that are non-U.S. entities owned by U.S. owners, regarding those U.S. owners) and (ii) to impose U.S. withholding tax of 30 per cent (the "Withholding Tax") on certain payments made to a recalcitrant account holder or a non-participating FFI.

As part of the process of implementing FATCA, the U.S. government has negotiated intergovernmental agreements ("IGAs") with many foreign jurisdictions to make it easier for FFIs in those partner jurisdictions to comply with the provisions of FATCA. The Cayman Islands has signed a Model 1B (non-reciprocal) inter-governmental agreement with the U.S. (the "U.S. IGA") to give effect to the reporting rules. Broadly, FFIs in a jurisdiction with a Model 1 IGA in place will be able to report information on U.S. account holders directly to their national tax authorities, who in turn will on an automatic basis report to the IRS.

The Tax Information Authority Law (2017 Revision) (as amended) (the "TIA Law") is the primary Cayman Islands legislation dealing with the implementation of the U.S. IGA, and detailed rules are contained in regulations made under the TIA Law. The Tax Information Authority (International Tax Compliance) (United States of America) Regulations (2018 Revision) (the "U.S. FATCA Regulations") sets out inter alia: (i) the general requirements for Cayman Islands Reporting Financial Institutions ("Cayman Islands FIs") to register under FATCA, (ii) the requirements of a Cayman Islands FI to identify reportable accounts, (iii) the reporting obligations of a Cayman Islands FI to the Cayman Islands Tax Information Authority ("Cayman Islands TIA"), (iv) that the procedures are to be complied with by a Cayman Islands FI under the U.S. IGA, and (v) that the offences for failing to comply with the reporting obligations set out in the U.S. IGA. As a Cayman Islands FI, the Fund generally will be required to register with the IRS as soon as possible and within 30 days of the Fund commencing business, and to agree to identify relevant "Specified U.S. Persons" (being any U.S. Shareholder and any non U.S. Shareholder with U.S. owners). Provided that the Fund complies with the U.S. IGA and the enabling legislation, it will not be subject to the related Withholding Tax. Shareholders will generally be required to provide to the Fund information that identifies their direct or indirect U.S. ownership. Any such information provided to the Fund will be disclosed to the Cayman Islands TIA, which will in turn report the information to the IRS annually on an automatic basis, unless it is otherwise exempt from the reporting and withholding rules.

## The OECD Standard for Automatic Exchange of Financial Account Information (Common Reporting Standard)

The Standard for Automatic Exchange of Financial Account Information (commonly referred to as the "Common Reporting Standard" or "CRS") is a regime developed by the Organisation for Economic Co-operation and Development (OECD) to facilitate and standardise the exchange of information on residents' assets and income, primarily for taxation purposes, between numerous jurisdictions around the world (the "participating foreign jurisdictions"). The Cayman Islands has committed to the Convention on Mutual Administrative Assistance in Tax Matters, which permits participating foreign jurisdictions to enter into agreements that provide for the automatic exchange of information with respect to

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

certain tax matters. On 29 October 2014, the Cayman Islands signed the OECD Multilateral Competent Authority Agreement on Automatic Exchange of Financial Account Information (the "MCAA"), which provides the legal basis by which participating foreign jurisdictions can agree to implement and exchange information under CRS. the Cayman Islands, together with over 60 other participating foreign jurisdictions, committed to implement CRS with effect from 1 January 2016 and, as a result, the Fund is required to identify accounts held directly or indirectly by residents in participating foreign jurisdictions and to report information on such persons to the Cayman Islands TIA, which will then exchange such information annually with foreign fiscal authorities in the participating foreign jurisdictions (the "foreign fiscal authorities"). the Cayman Islands has issued the Tax Information Authority (International Tax Compliance) (Common Reporting Standards) Regulations (2018 Revision) (the "Common Reporting Standard Regulations"), which set out inter alia: (i) the requirements of a Cayman Islands FI to identify reportable accounts; (ii) the reporting obligations of a Cayman Islands FI to the Cayman Islands TIA; (iii) the procedures to be complied with by a Cayman Islands FI under CRS; and (iv) general offences for breach.

In future, it is possible that IGAs similar to the U.S. IGA and the MCAA may be entered into with other countries or jurisdictions by the Cayman Islands Government to introduce similar regimes for reporting to other countries' or jurisdictions' fiscal authorities.

## SHAREHOLDER ACKNOWLEDGEMENT

By investing (or continuing to invest) in the Fund, Shareholders are deemed to have acknowledged and agreed, and have given their consent to, the following:

- the Fund (or its agent) disclosing to the Cayman Islands TIA certain information in relation to the Shareholder or, if the Shareholder is an entity, its direct or indirect shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) (including, but not limited to, the name, address, jurisdiction of residence, date and place of place of birth, tax identification number (if any), social security number (if any) of the Shareholder (or any of the persons specified above), as well as financial information, information regarding the Shareholder's investment in the Fund, and any information relating to any of the persons specified above);
- the Cayman Islands TIA automatically exchanging information as outlined above with the IRS and other foreign fiscal authorities;
- the Fund (or its agent) disclosing to the Cayman Islands TIA, IRS and other foreign fiscal authorities certain confidential information when registering with such authorities, and if such authorities contact the Fund (or its agent directly), assisting with further enquiries;
- the Fund requiring the Shareholder to provide additional information and documentation which the Fund is required to disclose to the Cayman Islands TIA;
- in the event that a Shareholder's failure to comply with any FATCA or CRS related reporting requirements results in any Withholding Tax or other withholdings, costs (including without limitation all costs, legal fees, professional fees and other costs), expenses, fines, interest, penalties, debts, losses or liabilities being incurred by the Fund, the Investment Manager, the Administrator or any other agent, delegate, employee, director, officer or affiliate of any of the foregoing person related to FATCA or CRS (collectively, "relevant liabilities"), the Fund reserves the right to ensure that the relevant liability is economically borne by such Shareholder (including

without limitation, by deducting such amounts from any account of, or distribution or other payment due to the Shareholder);

- in the event a Shareholder does not provide the requested information or documentation and has not itself complied with the applicable requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund's or its Shareholders' being subject to Withholding Taxes or other relevant liabilities as a result of FATCA or CRS, or otherwise results in withholding tax being imposed or any relevant liabilities being incurred, the Fund reserves the right to take any action and/or pursue all remedies at its disposal (including, without limitation, the immediate compulsory redemption or withdrawal of the Shareholder from the Fund for an amount equal to the Net Asset Value of the Shareholder's Participating Shares, the compulsory transfer, re-designation or conversion of the Shareholder's Participating Shares, the allocation of FATCA/CRS liabilities to the Shareholder and the deduction of such allocations from any account of, or distribution or other payment due to, the Shareholder);

- no Shareholder (including a person who has ceased to be a Shareholder) affected by any such action or remedy pursued by or on behalf of the Fund in order to comply with FATCA or CRS, or mandatory tax information reporting requirements to which the Fund is subject (or any relevant legislation, regulations or official guidance published in connection therewith) (together, the "Reporting Requirements") shall have any claim against the Fund, the Administrator, the Investment Manager or any other agent, delegate, employee, director, officer or affiliate of any of the foregoing persons for any form of damages or liability as a result of such action or remedy and the Shareholder shall be deemed to have consented to the taking of such action or the exercise of such remedy and to have waived any and all rights or claims in respect thereof, to the fullest extent permitted by applicable law; and,

- each Shareholder (including without limitation any person who has ceased to be a Shareholder) indemnifies the Fund, the Investment Manager, the Administrator, and their respective agents delegates, employees, directors, officers or affiliates for any withholding(s) (to include U.S. withholding tax), and all other relevant liabilities incurred by the relevant person(s) for or arising out of or in connection with as a result of any failure (directly or indirectly, including by virtue of the status, action or inaction of any person related or connected to such Shareholder, including without limitation the direct or indirect shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Shareholder to comply in a timely manner with any Reporting Requirements, to the fullest extent permitted by applicable law.

This summary does not address all the provisions of FATCA, the U.S. IGA, CRS, the MCAA, the TIA Law or other Reporting Requirements that might be applicable to the Fund or a particular Shareholder. In addition, changes in applicable tax and regulatory laws after the date of this Memorandum may alter the anticipated tax consequences or the matters referred to in this summary. None of the Fund, the Investment Manager, the Administrator, or any of their respective officers, directors, delegates, employees, agents, accountants, counsel or consultants assumes any responsibility for the tax consequences to any Shareholder of an investment in the Fund.

Shareholders should consult their own tax advisors regarding FATCA, CRS and any equivalent or similar regime or Reporting Requirements and the possible implications of such rules for their investments in the Fund. An investment in the Fund could result in significant

adverse tax consequences for Shareholders, which are not discussed herein. As such, Subscribers should not invest in the Fund without first consulting their tax advisors.

# ANTI-MONEY LAUNDERING REGULATIONS

In order to comply with regulations aimed at the prevention of money laundering and of terrorism or proliferation financing ("AML Regime"), the Fund, or the Administrator on its behalf, is required to adopt and maintain anti-money laundering procedures, and will require detailed verification of identity and source of funds from all Subscribers. Such verification may be required at any time, including before the deadline for the submission of applications. Once the Subscriber has become a Shareholder, on-going periodic verifications may also be conducted.

Although certain due diligence exceptions may be available under the AML Regime, the Fund, the Administrator and the Investment Manager reserve the right to request such information as is necessary to verify the identity and source of funds of a Subscriber (i.e. a subscriber or a transferee).

Any information obtained from the Subscriber, or in relation to the Subscriber, its investments in the Fund or its business, may be disclosed by the Fund or the Administrator (i) to third parties, within or outside the jurisdiction, including, inter alia, affiliates , the Investment Manager, service providers and/or regulatory, legal, fiscal and administrative authorities, in the course of conduct of business of the Fund or the Administrator. Such disclosures shall not be treated as a breach of any restriction on the disclosure of information imposed by law or otherwise.

In the event of delay or failure on the part of a Subscriber in producing any information required for verification purposes, the Fund or the Administrator on the Fund's behalf, may refuse to accept the application or forcibly redeem the subscriber's position, in which case any funds received will be returned without interest in due course to the account from which they were originally debited, or dealt with by the Fund or the Administrator in compliance with the AML Regime.

The Fund and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a Shareholder if the Board, the Administrator, or the Investment Manager suspect or are advised that the payment of redemption or dividend proceeds to such Shareholder may be non-compliant with the AML Regime or any other applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the Administrator and the Investment Manager with the AML Regime or any other applicable laws or regulations. In the event of failure by an existing Shareholder to produce any information required for verification purposes, such Shareholder's Shares may be compulsorily redeemed and payment of the corresponding redemption proceeds will be delayed until all the required information and documentation is received by the Fund or the Administrator on the Fund's behalf.

Each Subscriber acknowledges that the Administrator shall be held harmless against any loss arising as a result of a failure to process his application for, or request for the redemption of, Shares if such information and documentation as has been requested by the Administrator has not been provided by the applicant.

Each Subscriber will be required to make such representations as may be required by the Directors in connection with anti-money laundering programmes, including, without limitation, representations that such applicant is not a prohibited country, territory, individual or entity listed on the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programmes and that it is not named on a list of prohibited entities and individuals maintained under European Union or United Kingdom regulations (as extended to the Cayman Islands by statutory instrument), and is not operationally based or domiciled in a country or territory in relation to which current sanctions have been issued by the United Nations, the European Union or the United Kingdom.

The Fundand/or the Administrator and/or the Investment Manager may develop additional procedures to comply with applicable AML Regime.

The Fund, the Directors, the Administrator and the Investment Manager may also have responsibility to take certain other anti-money laundering measures under the laws and regulations of the Cayman Islands and other jurisdictions. Anti-money laundering regulations are developing and changing continually and the Fund, the Administrator and the Investment Manager may be required to implement other anti-money laundering measures from time to time. Subscribers shall be aware that in order to comply with any applicable anti-money laundering regulations, whether in the Cayman Islands or any other applicable jurisdiction, certain information regarding prospective and actual Shareholders may be required to be transmitted to, or held in, other jurisdictions or disclosed to certain regulatory authorities in any applicable jurisdiction.

By subscribing, applicants consent to the disclosure by the Fund, the Board, the Investment Manager and the Administrator of any information about them to regulators, law enforcement agencies, tax or other applicable authorities under applicable regulation, including treaties.

## AML Officers

The Board has appointed an anti-money laundering compliance officer, a money laundering reporting officer and a deputy money laundering reporting officer in accordance with the relevant and applicable Anti-Money Laundering Regulations.

# RESTRICTION OF INVITATIONS TO INVEST

## Canada

The Class A Shares may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 – Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and that are permitted clients, as defined in National Instrument 31-103 - Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the Class A Shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable Canadian securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this Memorandum (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

## Cayman Islands

No invitation may be made to the public in the Cayman Islands to subscribe for Participating Shares in the Fund unless such Participating Shares are listed on the Cayman Islands Stock Exchange.

## European Union

The Interests of the Fund may only be offered to professional investors in accordance with the local legislation implementing Directive 2011/61/EU (the "AIFM Directive") in member states of the European Economic Area (such as where the Memorandum or related materials has provided that the Fund has been registered under the national private placement regime of that member state) or generally in scenarios that is permitted by the local legislation of the member state (such as where the approach is at the initiative of a professional or sophisticated investor, commonly known as "reverse solicitation"). In connection with the offering of Interests in the European Economic Area, such Interests shall not and are not intended to be offered or made available to individuals classified as retail clients (as defined in Directive 2014/65/EU ("MiFID II") or a "customer" (as defined in Directive 2002/92/EC) where such a customer is not classified as a "professional client" (as defined in MiFiD II).

## Isle of Man

No invitation may be made to the public or individuals' resident in the Isle of Man to subscribe for Interests in the Fund. Interests in the Fund may be offered to institutional investors resident in the Isle of Man.

## Japan

The Class A Shares have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended, the "FIEA") and, accordingly, the Class A Shares may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with the FIEA and all applicable laws, regulations and guidelines promulgated by the relevant Japanese governmental and regulatory authorities and in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organised under the laws of Japan.

## Jersey

No invitation may be made to the public or individuals' resident in Jersey to subscribe for Interests in the Fund. Interests in the Fund may be offered to a select number of institutional investors and sophisticated individual investors resident in Jersey.

## United States of America

The Interests have not been registered under any United States securities laws and, except in transaction(s) which do not violate US securities laws, may not be directly or indirectly offered or sold in the US, or any of its territories or possessions or areas subject to its jurisdiction, or to or for the benefit of a US person.

## United Kingdom

The Fund is not a recognised collective investment scheme under the Financial Services and Markets Act 2000 of the United Kingdom, as such, Interests may not be offered or sold in the United Kingdom by means of this Memorandum except to persons authorised to carry out investment businesses under such laws, persons whose ordinary business involves the acquisition or disposal of investments similar to those of the Fund and persons otherwise permitted to receive this Memorandum under the relevant laws.

# DATA PROTECTION – PRIVACY NOTICE

The legal basis for this notification is to meet the standards required in respect of, and ensure compliance with, the requirements of the Cayman Islands' Data Protection Law, 2017 (the "DPL"), which came into effect on 30 September 2019. This privacy notice puts investors in the Fund on notice that through their investment in the Fund they will provide the Fund with certain personal information which constitutes personal data ("personal data") within the meaning of the DPL. The Fund collects, uses, discloses, retains and secures personal data to the extent reasonably required only and within the parameters that could be reasonably expected during the normal course of business. The Fund will only process, disclose, transfer or retain personal data to the extent legitimately required to conduct the activities of the Fund on an ongoing basis or to comply with legal and regulatory obligations to which the Fund is subject. The Fund will only transfer personal data in accordance with the requirements of the DPL, and will apply appropriate technical and organisational information security measures designed to protect against unauthorised or unlawful processing of the personal data and against the accidental loss, destruction or damage to the personal data. In the use by the Fund of this personal data, the Fund will be characterised as a "data controller" for the purposes of the DPL, while our affiliates and service providers who may receive this personal data from us in the conduct of our activities may either act as our "data processors" for the purposes of the DPL or may process personal information for their own lawful purposes in connection with services provided to the Fund.

If you are a natural person, this will affect you directly. If you are a corporate investor (including, for these purposes, legal arrangements such as trusts or exempted limited partnerships) that provides us with personal data on individuals connected to you for any reason in relation to your investment into the Fund, this will be relevant for those individuals and you should inform such individuals of the content.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8CFC07D1B00

Under the DPL, individuals must be informed of the purposes for which their personal data is processed and this privacy notice fulfils the obligation of the Fund in this respect. Individuals have rights under the DPL in certain circumstances. These may include the right to request access to their personal data, the right to request rectification or correction of personal data, the right to request that processing of personal data be stopped or restricted and the right to require that the Fund cease processing personal data for direct marketing purposes.

If you consider that your personal data has not been handled correctly, or you are not satisfied with the responses of the Fund to any requests you have made regarding the use of your personal data, you have the right to complain to the Cayman Islands' Ombudsman. The Ombudsman can be contacted by email at info@ombudsman.ky.

# Subscription Document

### Class A Shares

## Himalaya Digital Assets Fund SP

### a Segregated Portfolio of

### Hamilton Opportunity Fund SPC

A Segregated Portfolio of the Fund Hamilton Opportunity Fund SPC, A Cayman Islands Segregated Portfolio Company operating as a Fund under Section 4(3) of the Mutual Funds Law (Revised) of the Cayman Islands.

**Investment Manager**

Hamilton Investment Management Ltd

**Investment Adviser**

Ivy Capital Advisors Limited

## INVESTMENT PROCEDURES

1. Please read the Offering Memorandum (the "**Offering Memorandum**") for Hamilton Opportunity Fund SPC (the "**Fund**") and this document in full, prior to subscribing for the Shares (as defined in the Offering Memorandum) of the Fund.
2. Prospective investors are required to complete the two steps as listed below, in order for their subscriptions to be processed by the Fund Administrator:
   - Complete, digitally sign and submit Know-Your-Customer ("**KYC**") application on the Fund's Dashboard, including uploading the required supplemental documentation. The completed "KYC application" will be appended to this Subscription Agreement as an Investor Supplement. The Investor Supplement will include information on the following: Investor profile, eligibility of the investor and an Anti-Money Laundering and Anti-Terrorism Compliance section.
   - Complete, digitally sign and submit this Subscription Agreement.
   - **The Fund Administrator being:**

NAV Fund Administration Group,
NAV Consulting | NAV Cayman | NAV Backoffice,
5th Floor Harbour Place, 103 South Church Street,
George Town, Grand Cayman KY1-1202, CAYMAN ISLANDS,
P: 1.630.954.1919, P: 1.345.946.5006,
F: 1.630.596.8555 F: 1.345.946.5007 F: 1.630.954.2881,
Transfer.agency@navconsulting.net

3. By submitting this document via the Dashboard, you consent to the transmission of all the attached and appended information and documentation being sent to the Administrator.
4. Payment for the Shares should be made by wire transfer using the payment instructions that will be sent via email after signing of this Subscription Document.
5. The Fund has the right to accept or reject (in whole or part) any Subscription Agreement(s) and/or application(s) for the purchase of Shares.
6. In the event that subscription monies are received in a currency other than Fund's base currency, conversion into the Fund's base currency will be arranged by the Investment Manager at your risk and expense. In addition, any bank charges or fees incurred in association and in connection with the wire transfers will be deducted from subscription and the net amount will be deemed as the amount invested in Shares.
   o Fiat Subscription

   The Subscriber undertakes to remit the subscription monies in full, net of bank charges, by electronic transfer so that cleared funds are received in the bank account of the Fund by no later than 5:00 pm on the last Business Day of the Initial Offer Period or 5:00 pm (London (United Kingdom) time) on the Business Day before the relevant Subscription Day, as applicable.

7. The payment details will be sent to the potential investor after signing this agreement.
8. If you have any queries on the procedure regarding the subscription process and payment, please contact the Fund or the Administrator.
9. The Subscription Agreement, together with any supporting documents, must be received no later than Close of Business time on the last Business Day before the relevant Subscription Day, as applicable.

## SUBSCRIPTION AGREEMENT

Hamilton Opportunity Fund SPC

McGrath Tonner Corporate Services Limited, Genesis Building, 5th Floor, Genesis Close, PO Box 446 Grand Cayman KY1-1106, Cayman Islands

Re: Application for Shares

Dear Sir:

The undersigned (the "**Prospective Investor**") hereby applies to become a shareholder (a "**Shareholder**") of Hamilton Opportunity Fund SPC, A Segregated Portfolio of the Fund Hamilton Opportunity Fund SPC, A Cayman Islands Segregated Portfolio Company operating as a Fund under Section 4(3) of the Mutual Funds Law (Revised) of the Cayman

Islands. and to subscribe for Class A Shares or Participating Shares ("Shares") in the Fund upon the terms and conditions set out in this Subscription Document, in the Offering Memorandum, and in the Memorandum and Articles of Association of the Fund (the "**Articles**"), (collectively, the "**Fund Documents**") as each may be amended from time to time. Capitalised terms used herein but not defined herein shall have the meanings assigned to them in the Articles.

Accordingly, the Prospective Investor agrees as follows:

## 1. SUBSCRIPTION FOR SHARES

| | |
|---|---|
| **Class of Shares:** | Class A |
| | \_\_\_\_\_ Individual Ownership |
| | \_\_\_\_\_ Trust |
| | \_\_\_\_\_ Limited Partnership |
| | \_\_\_\_\_ Limited Liability Company |
| **Investor Type:** | __X__ Corporation |
| | \_\_\_\_\_ Individual Retirement Account (IRA) |
| | \_\_\_\_\_ Joint (Tenants in Common) |
| | \_\_\_\_\_ Joint (with rights of survivorship) |
| | Other (Please specify) _____ |
| **Full Name of Investor:** | Sonar Advisers Inc. |
| **Subscription Amount:** | USD1,000,000.00 |

**Bank Name:** The Reserve Trust Company

**Wire Instructions:**   **Bank Address:** 5600 S. Quebec St. Suite 205D Greenwood Village, CO 80111

**Bank ABA/Routing:** ███████

**Recipient Name:** Medici Bank International

**Recipient Address:** 1250 Ponce de Leon AVE. Suite 301 San Juan, PR 00907

**Recipient Number:** ▮▮▮▮▮▮▮▮

**Reference/Memo (required):** FFC MBI ▮▮▮▮▮▮▮ Hamilton Opportunity Fund SPC

**Investor Wire Instructions:**

**Name of Subscriber's Bank:** Mizuho Bank Ltd.

**SWIFT or ABA #:** ▮▮▮▮▮

**Name on Subscriber's Account:** Sonar Advisers Inc.

**Subscriber's Account Number:** ▮▮▮▮▮▮

**Further Credit Instructions:**

Wiring Instructions of Record: Please note that redemption payments, in accordance with both the current Anti-Money Laundering regulatory environment and industry best practice, will be paid only to the bank account used for the subscription payment which should be noted below and certified as the bank account of record for the Investor. The titling of the bank account must match the titling of this subscription. If not, the Registrar and Transfer Agent and the Manager must be notified now regarding the discrepancy and its reason. The Registrar and Transfer Agent and/or the Manager may reject any subscription at any time where payment is sourced from a different bank account than the bank account of record or a bank account with different titling than the subscription, regardless of whether such payment was received in advance or accordance with the payment deadline requirements.

A. The Prospective Investor agrees to become a Shareholder of the Fund on and subject to the terms and conditions of the Fund Documents and, in connection therewith, subscribes for and agrees to make the investment for the number of Shares (including fractional Shares) which can be acquired for the subscription amount set out below at the subscription price per Share set forth in the Offering Memorandum.

B. Payment in cleared funds for Shares must be received prior to the closing date for subscriptions specified in the Offering Memorandum. Subject to any legal or regulatory restrictions, the Prospective Investor's payment (the "**Payment**") will be held by the Fund (or its delegate) in trust in a segregated non-interest bearing account.

C. The minimum initial subscription is USD100,000.00, subject to the discretion of the Board of Directors of the Fund (the "**Board**") to accept a lower amount.

D. The minimum subscription amount for additional shares is USD10,000.00.

E. Investors may subscribe for additional Shares by completing the additional Subscription Form via the Dashboard or by completing a digital copy of the additional Subscription Form by hand and email the scanned copy to the Fund or to the Administrator.

F. The Prospective Investor understands and agrees that the Fund reserves the right to reject this subscription for Shares for any reason or no reason, in whole or in part, and at any time prior to its acceptance. If the subscription is rejected in full, the Payment will be returned to the Prospective Investor and this Subscription Agreement shall have no force or effect. Acceptance of this subscription by the Fund shall take place by the entry of the Prospective Investor's name on the Register of Members of the Fund, at which time the Prospective Investor shall become a Shareholder of the Fund and shall be subject to the terms and conditions of the Fund Documents.

2. **Subscriber information:**

| | |
|---|---|
| **Signature:** | *[signature]* Kentaro Azuma |
| **Subscriber's Primary Physical (Street) Address:** | 4-1-19F Kioicho, Chiyoda-ku, Tokyo, Japan |
| **Email Address** | doi@sonaradvisers.com |
| **Phone Number:** | +81-3-6380-8199 |
| **Date of Birth:** | |
| **Country of Birth:** | |
| **Country of Citizenship:** | |
| **Date of Formation:** | 20th October 2010 |
| **Country of Formation:** | Japan |
| **Please Tick:** | I Confirm that by subscribing for these shares that I am, or I am investing on behalf of an accredited investor(s) and have a net worth of at least $1,000,000, excluding the value of my primary residence, or have an income at least $200,000 each year for the last two years (or $300,000 combined income if married) and have the expectation to make the same amount his year. |

*[Tick box marked with X]*

3. **REPRESENTATIONS AND COVENANTS OF THE PROSPECTIVE INVESTOR**

A.  The Prospective Investor represents and warrants that (i) it is a person who is able to acquire and hold the Shares without breaching the law or requirements of any country, regulatory body or government authority (an "**Eligible Investor**"); and (ii) it is not acting on behalf of, or for the benefit of, nor does it intend transferring any Shares which it may hold from time to time to, any person who is not an Eligible Investor. The Prospective Investor agrees that it will notify the Fund immediately if it becomes aware that it, or any person for whom it holds the Shares, has ceased to be an Eligible Investor.

B.  The Prospective Investor represents and warrants that it is not a U.S. Person for the purposes of the United States Securities Act, 1933 (as amended) and that all offers to acquire the Shares were made to or by the Prospective Investor while the Prospective Investor was outside the United States, and the Prospective Investor's request to acquire the Shares originated while the Prospective Investor was outside of the United States. The Prospective Investor agrees that it will notify the Fund immediately if it becomes a U.S. person or is no longer a Non-United States person or if it becomes aware that any person for whom it holds the Shares has become a U.S. person or is no longer a Non-United States person. The Prospective Investor (i) covenants that it will not resell, reoffer or transfer any Shares or any interest therein, except with the consent of the Fund, to a U.S. Person; (ii) acknowledges that reoffers, resales or any transfer of the Shares may be made only in compliance with applicable securities laws and only with the prior authorisation of the Fund, which may, in its discretion, decline to issue any Shares to, or register Shares in the name of, any person; and (iii) understands that a transfer of Shares may only be effected on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are Eligible Investors as described in the Offering Memorandum. The Prospective Investor understands that the Fund may compulsorily redeem or repurchase all or any portion of a Shareholder's Shares in accordance with the Fund Documents.

C.  The Prospective Investor has received, carefully read and understands the Fund Documents, including the sections of the Offering Memorandum outlining, among other things, the investment objectives and strategy of the Fund. The Prospective Investor acknowledges that it has made an independent decision to invest in the Fund and that, in making its decision to subscribe for Shares, the Prospective Investor has relied solely upon the Fund Documents and any independent investigations made by the Prospective Investor. The Prospective Investor is not relying on the Fund, the Fund's Board, the Administrator, or any other person or entity with respect to the legal, tax and other economic considerations involved in investment in the Fund other than the Prospective Investor's own advisers.

D.  The Prospective Investor confirms that it has not been invited as a member of the public in the Cayman Islands to subscribe for Shares.

E.  The Prospective Investor acknowledges that it is not subscribing for Shares as a result of, or pursuant to: (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site whose information about the Fund is not password protected) or broadcast over television or radio; or (ii) any seminar or meeting

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-8GCFC07D1B00

whose attendees, including the Prospective Investor, had been invited as a result of, or pursuant to, any of the foregoing.

F.  The Prospective Investor acknowledges that it will receive or have access to confidential proprietary information concerning the Fund, including, without limitation, portfolio positions, valuations, information regarding potential investments, financial information, trade secrets and the like (collectively, "Confidential Information"), which is proprietary in nature and non-public. The Prospective Investor agrees that it shall not disclose or cause to be disclosed any Confidential Information to any person or use any Confidential Information for its own purposes or its own account, except in connection with its investment in the Fund and except as otherwise required by any regulatory authority, law or regulation, or by legal process. The Prospective Investor will notify the Fund of any such disclosure requirement as soon as reasonably practicable (including the basis upon which it believed the information was required to be disclosed) unless such notice is otherwise prohibited by applicable law or the relevant central bank or any governmental, regulatory or taxation authority. Furthermore, the Prospective Investor has not reproduced, duplicated or delivered the Fund Documents or this Subscription Agreement for or to any other person, except professional advisers to the Prospective Investor or as instructed or authorised by the Fund. Notwithstanding the foregoing, the Prospective Investor (and each employee, representative or other agent of the Prospective Investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of: (i) the Fund; and (ii) any of its transactions, and all materials of any kind (including opinions or other tax analyses) that are provided to the Prospective Investor relating to such tax treatment and tax structure.

G.  The Prospective Investor has consulted appropriate professional advisors to the extent it deems necessary concerning the propriety and appropriateness of making an investment in the Fund. The Prospective Investor is fully informed as to the legal, tax and regulatory requirements within the Prospective Investor's own country (or countries) and any other relevant country (or countries) regarding the investment in the Fund.

H.  The Prospective Investor is acquiring the Shares for its own account, for investment purposes only and not with a view toward distributing or reselling the Shares in whole or in part.

I.  The Prospective Investor understands that: (i) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (ii) the representations, warranties, agreements, undertakings and acknowledgments made by the Prospective Investor in this Subscription Agreement will be relied upon by the Fund, the Board, the Administrator and the Investment Manager, in determining the Prospective Investor's suitability as a subscriber for Shares and the Fund's compliance with various securities laws, and shall survive the Prospective Investor's becoming a Shareholder of the Fund.

J.  The Prospective Investor has all requisite power, authority and capacity to acquire and hold Shares and to execute, deliver and comply with the terms of each of the instruments required to be executed and delivered by the Prospective Investor in connection with the Prospective Investor's subscription for Shares, including this Subscription Agreement, and such execution, delivery and compliance does not conflict with, or constitute a default under,

any instruments governing the Prospective Investor, any law, regulation or order, or any agreement to which the Prospective Investor is a party or by which the Prospective Investor may be bound. If the Prospective Investor is an entity, the person executing and delivering each of such instruments on behalf of the Prospective Investor has all requisite power, authority and capacity to execute and deliver such instruments, and, upon request by the Fund, the Administrator or the Investment Manager, will furnish to the Fund a true and correct copy of any instruments governing the Prospective Investor, including all amendments thereto.

K.  All information which the Prospective Investor has provided to the Fund, the Administrator or the Investment Manager concerning the Prospective Investor, the Prospective Investor's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Prospective Investor that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date hereof.

L.  The Prospective Investor understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and, in some cases, estimated valuations of the Fund's investments and that valuations provided in an Prospective Investor's account statement may be an unaudited, estimated value.

M.  The Prospective Investor understands and agrees that, although the Fund, the Investment Manager and the Administrator will use their reasonable efforts to keep the information provided in the answers to this Subscription Agreement strictly confidential, the Fund, the Investment Manager and the Administrator may present this Subscription Agreement and the information provided in answers to it to such parties (e.g., affiliates, attorneys, auditors, administrators, brokers and regulators) as it deems necessary or advisable to facilitate the acceptance and management of the Prospective Investor's subscription for Shares including, but not limited to, in connection with anti-money laundering and similar laws, if called upon to establish the availability under any applicable law of an exemption from registration of the Shares, the compliance with applicable law and any relevant exemptions thereto by the Fund, the Investment Manager, the Administrator and/or any of their affiliates, or if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Fund, the Investment Manager, the Administrator and/or any of their affiliates are a party or by which they are or may be bound. The Fund may also release information about the Prospective Investor if directed to do so by the Prospective Investor, if compelled to do so by law, or in connection with any government or self-regulatory organization request or investigation. The Fund seeks to carefully safeguard investor's private information and to that end, the Fund restricts access to non public personal information to those employees and other persons who need to know to enable the Fund to provide services to its investors. The Fund maintains physical, electronic and procedural safeguards to protect investor's non-public information.

N.  The Prospective Investor understands and agrees that any redemption proceeds paid to it will be paid to the same account from which the subscription monies for the Prospective Investor's investment in the Fund were originally remitted, unless the Fund agrees otherwise.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

O.  The Prospective Investor acknowledges and understands that after the relevant lock-up period (if any) its investment in the Fund cannot be withdrawn except by way of redemption of Shares in accordance with the terms of the Memorandum and the Articles and that with effect from the Redemption Day in respect of which a redemption request for any Shares is received, it shall (save as provided below) cease to be entitled to any rights in respect of such Shares and accordingly, its name will be removed from the Register of Members of the Fund with respect thereto. The Prospective Investor understands and agrees that notwithstanding that its name may remain on the Register of Members of the Fund pending determination of the Redemption Price and/or payment of the redemption proceeds, it will (in the event it requests the redemption of all or any part of its Shares on any particular Redemption Day), with effect from that Redemption Day (i) be treated as a creditor of the Fund (rather than as a Shareholder of the Fund) in respect of the Redemption Price and will rank accordingly in the event of a winding up of the Fund; and (ii) have no rights as a Shareholder of the Fund in respect of the Shares being redeemed, save for the right to receive the Redemption Price in accordance with the Articles of Association and the right to receive any dividend which has been declared in respect of such Shares prior to that Redemption Day and, in particular, will not have the right to convene, receive notice of, attend or vote at any meetings of the Fund.

P.  The Prospective Investor acknowledges and understands that in the event of a failure or delay by a Shareholder of the Fund seeking to redeem its Shares to produce any information required for verification purposes, payment of the redemption proceeds may be delayed and neither the Fund, the Administrator nor the Investment Manager (or any of their delegates or agents) will be liable to the Prospective Investor for any loss suffered as a result of the delay of payment of redemption proceeds.

Q.  The Prospective Investor agrees and covenants that it shall not take any action to present a petition or commence any case, proceeding, proposal or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, arrangement in the nature of insolvency proceedings, adjustment, winding-up, liquidation, dissolution, composition or analogous relief with respect to the Fund or the debts of the Fund unless and until a debt is immediately due and payable by the Fund to the Investor.

## 4. ANTI-MONEY LAUNDERING

A.  The Prospective Investor acknowledges that, in order to comply with measures aimed at the prevention of money laundering and terrorism, the Fund and/or any of its delegates or agents may require verification of the identity of the Prospective Investor and the source of the Prospective Investor's subscription monies before this application can be processed. The Prospective Investor undertakes to provide (i) such information and documentation as the Fund and/or any of its delegates or agents may request to verify its identity in compliance with applicable anti-money laundering laws and regulations; and (ii) any further information and documentation as the Fund and/or any of its delegates or agents may request from time to time to ensure ongoing compliance with applicable laws and regulations.

B.  The Prospective Investor acknowledges in the event of delay or failure by the Prospective Investor to produce any information required for verification

purposes, this application may be refused or there may be a delay in processing this application. The Prospective Investor further acknowledges that neither the Fund nor any of its delegates or agents shall be liable for any loss arising as a result of a failure to process the Prospective Investor's application for Shares if such information and documentation as has been requested has not been provided by the Prospective Investor. The Prospective Investor agrees to indemnify and hold harmless the Fund and its delegates and agents against any loss incurred by them due to such information and documentation as has been requested not being provided by the Prospective Investor.

C.  The Prospective Investor represents and warrants that it is not, nor is any person or entity controlling, controlled by or under common control with the Prospective Investor, acting, directly or indirectly (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions; (ii) on behalf of terrorist or terrorist organisations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) or on any lists or resolutions issued by the United Nations (whether through the Security Council or otherwise) pursuant to which dealings with persons specified therein are prohibited, restricted or discouraged, as such lists may be amended from time to time; (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure unless the Directors, after being specifically notified by the Prospective Investor in writing that it is such a person, conducts further due diligence and determines that the Prospective Investor shall be permitted to invest in the Fund; or (iv) as trustee, agent, representative or nominee for a foreign shell bank, (each such person in (i) to (iv), a "**Prohibited Person**").

D.  The Prospective Investor represents and warrants that to the extent the Prospective Investor has any beneficial owners it has carried out due diligence to establish the identities of such beneficial owners and, based on the evidence it holds of the identities of such beneficial owners, the Prospective Investor reasonably believes that no such beneficial owner is a Prohibited Person.

E.  The Prospective Investor agrees that to the extent the Prospective Investor has any beneficial owners (i) it will maintain evidence of the identities of such beneficial owners for at least five years from the date of the Prospective Investor's complete redemption from the Fund; and (ii) it will make available such evidence and any additional evidence that the Fund may require upon request in accordance with applicable regulations.

F.  The Prospective Investor acknowledges that if any of the representations, warranties or agreements in this clause cease to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, the Fund may be obligated to take certain actions relating to the Prospective Investor's holding of Shares. Such action may include disclosing the Prospective Investor's identity to OFAC or other authority. The Prospective Investor acknowledges and agrees that if the Fund is required to take any such action, it shall have no claim against the Fund for any form of damages as a result of any of such actions.

G.  The Prospective Investor acknowledges that pursuant to the Proceeds of Criminal Conduct Law of the Cayman Islands, if a person who is a resident in

the Cayman Islands knows or suspects that a payment to the Fund (by way of subscription or otherwise) represents proceeds of criminal conduct, that person must report his knowledge or suspicion to the reporting authority. The Prospective Investor acknowledges that any such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

H.  Where this application is made as trustee, custodian, nominee or otherwise on behalf of another person or persons (each such person an "**underlying investor**"), the Prospective Investor (i) represents and warrants that (a) it has carried out reasonable verification checks on, and obtained sufficient evidence as to the identity of, each underlying investor on whose behalf the Prospective Investor will be holding the Shares so as to satisfy itself of the identity of the underlying investor or the ultimate beneficial owners of the underlying investor, as applicable, and of the provenance and legitimacy of the source of funds used to subscribe for the Shares; and (b) it has otherwise complied with the laws and regulations relating to anti-money laundering procedures that are applicable in the jurisdiction where such Shares are offered or distributed and (ii) agrees to disclose to the Fund and/or any of its delegates or agents and/or any competent regulatory authority, all relevant documentation and information held by it in relation to the underlying investor and, if required, agrees to obtain the consent of the underlying investor to such disclosure.

I.  For Anti-Money Laundering purposes, please describe specifically:

(Please fill out the section as applicable to the investor)

The source of the money/ wealth/ income used for this investment:

_____

_____

_____

The occupation of the Investor:

**For Individual Investors:** _____

Purpose of the Investment:

_____

Expected frequency of transactions:

The source of the money/ wealth/ income used for this investment:

Own capital and investors money which is
_____
accumulated through QII activities permitted
_____
by accumulated FSA
_____

**For Entity Investors:**

The nature of the investor's business:

Investment Adviser
_____

Purpose of the Investment:

Capital Gain
_____

Expected frequency of transactions:

Once a year or less
_____

**Name of Trustee or IRA Custodian:** _____

**If IRA Investors, please provide:**

**EIN of Trustee or Custodian:** _____

**Duplicate Statement Address of Trustee or Custodian:**

_____

_____

5. **GENERAL**
   A. The Prospective Investor hereby acknowledges that the Investment Manager, the Administrator, and each director and officer of the Fund are entitled to be indemnified (for all indemnities provided in this Subscription Agreement) out of the assets of the Fund as provided in the Fund Documents.
   B. This Subscription Agreement (i) shall be binding upon the Prospective Investor and the heirs, legal representatives, successors, and permitted assigns of the Prospective Investor and shall inure to the benefit of the Fund and its successors and assigns, (ii) shall be governed, construed, and enforced in accordance with the laws of the Cayman Islands, (iii) shall survive the acceptance of the Prospective Investor as a Shareholder of the Fund, and (iv) shall, if the Prospective Investor consists of more than one person, be the joint and several obligation of each such person.
   C. The Prospective Investor hereby irrevocably agrees that any suit, action or proceeding with respect to this Subscription Agreement or the Fund and any or all transactions relating hereto and thereto may be brought in the courts of the Cayman Islands. The Prospective Investor hereby irrevocably (i) submits to the jurisdiction of such courts with respect to any such suit, action or proceeding and agrees and consents that service of process as provided by Cayman Islands law may be made upon the Prospective Investor in any such

suit, action or proceeding brought in any of said courts, and may not claim that any such suit, action or proceeding has been brought in an inconvenient forum and (ii) consents to the service of process out of any of the aforesaid courts, in any such suit, action or proceeding, by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to the Prospective Investor at the address of the Prospective Investor then appearing on the records of the Fund. Nothing contained herein shall affect the right of the Fund to commence any action, suit or proceeding or otherwise to proceed against the Prospective Investor in any other jurisdiction or to serve process upon the Prospective Investor in any manner permitted by any applicable law in any relevant jurisdiction.

D.  If any provision of this Subscription Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law shall not affect the validity or enforceability of any other provisions hereof, and to this extent the provisions hereof shall be severable.

E.  If any answers provided or background documentation required under this Subscription Agreement is found to be false, forged or misleading, the Prospective Investor understands that the Fund may compulsorily redeem or repurchase the Shares held by such Prospective Investor in accordance with the Fund Documents.

## 6.  INFORMATION PROVIDED IN THIS SUBSCRIPTION AGREEMENT

A.  The Prospective Investor represents and warrants that the information given in this Agreement is true, accurate and complete in all respects and may be relied upon by the Fund and/or any of its delegates and agents.

B.  The Prospective Investor agrees to notify the Fund promptly of any change with respect to any information given in this Agreement or if any of the warranties, representations or statements in this Agreement are no longer accurate and complete in all respects.

C.  The Prospective Investor agrees that it will, if requested to do so, provide such certifications, documents or other evidence as the Fund and/or any of its delegates or agents may reasonably require in connection with the Prospective Investor's holding of Shares, including to substantiate the warranties, representations or statements contained in this Agreement.

D.  The Prospective Investor agrees that if it provides information or documentation to the Fund that is in anyway misleading, or fails to provide the Fund, its delegates or agents with any requested information or documentation or otherwise takes any action which directly or indirectly causes the Fund to suffer any liability, cost, expense, tax, withholding or deduction, the Fund may hold back from any redemption proceeds or distributions and retain, an amount sufficient to discharge any such liability, cost, expense, tax, withholding or deduction.

## 7.  FATCA/CRS

A.  For the purpose of this clause, "**FATCA/CRS**" means: (i) sections 1471 to 1474 of the United States Internal Revenue Code of 1986, the Standard for Automatic Exchange of Financial Account Information developed by the Organisation for Economic Co-operation and Development (each as amended from time to time), and any associated legislation, regulations or guidance, or

similar legislation, regulations or guidance enacted in any jurisdiction which seeks to implement similar tax reporting and withholding tax regimes and common reporting standards; (ii) any intergovernmental agreement, common reporting standard, treaty, regulation, guidance or any other agreement between the Cayman Islands (or any Cayman Islands government body) and the United States or any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in paragraph (i) above (including without limitation (a) the Agreement between the Cayman Islands government and the government of the United States of America to improve tax compliance and to implement FATCA signed on 29 November 2013; and (b) the Multilateral Competent Authority Agreement on Automatic Exchange of Financial Account Information signed by the Cayman Islands government on 29 October 2014, each as amended from time to time); and (iii) any legislation, regulations or guidance in the Cayman Islands giving effect to the matters outlined in paragraphs (i) and (ii) above including without limitation the Tax Information Authority Law (2017 Revision) (as amended), the Tax Information Authority (International Tax Compliance) (United States of America) Regulations, 2014 (as amended), the Tax Information Authority (International Tax Compliance) (Common Reporting Standard) Regulations, 2015 (as amended), and the Guidance Notes on (i) the International Tax Compliance Requirements of the Intergovernmental Agreement between the Cayman Islands and the United States of America, or (ii) the Common Reporting Standard for Automatic Exchange of Financial Account Information in Tax Matters, or other guidance promulgated thereunder.

B. **"FATCA/CRS Liabilities"** means any withholding(s) (including without limitation U.S. withholding tax), costs, debts, expenses, penalties, obligations, losses or liabilities (including without limitation all costs, legal fees, professional fees and other costs) incurred by the Fund, the Investment Manager, the Administrator or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons for or arising out of or in connection with FATCA/CRS.

C. In order to comply with FATCA/CRS, the Fund, the Investment Manager, the Administrator or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons (each, a "Relevant Person") shall be entitled to release and to disclose to the Cayman Islands Government (and any department, ministry, agency and representative thereof, including without limitation the Cayman Islands Tax Information Authority) or any other state or governmental department or taxation or other authority (each, a "Relevant Authority") in relation to FATCA/CRS any information in its or its agents' or delegates' possession regarding a Prospective Investor (which for the purpose of this clause shall include a Shareholder and a person that has ceased to be a Shareholder) including without limitation financial information, information regarding the Prospective Investor's investment in the Fund and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Prospective Investor.

D. By becoming an Investor, the Prospective Investor acknowledges and agrees that:

I.     any Relevant Person may disclose the identity of, and information relating to, the Prospective Investor (including without limitation any of the information specified in (b) above) to any Relevant Authority in order to comply with FATCA/CRS and or avoid any FATCA/CRS Liabilities;

II.     the Prospective Investor shall take any action and provide any information and documentation that any Relevant Person requires for the Fund to (A) enter into, maintain or otherwise comply with FATCA/CRS or (B) comply with any due diligence, reporting, withholding, or other requirements under FATCA/CRS;

III.     the Fund may exercise all available rights and remedies to ensure that all FATCA/CRS Liabilities are borne economically by the relevant Prospective Investor, the status, action or inaction of which results or may result in such withholding or noncompliance (in each case directly or indirectly, including by virtue of the status, action or inaction of any person related or connected to such Prospective Investor, including without limitation the Prospective Investor's direct or indirect shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect); and

IV.     the Prospective Investor shall promptly notify the Fund if there is any change of circumstances that renders the information furnished under this Subscription Agreement or otherwise provided to any Relevant Person in respect of FATCA/CRS incorrect.

E.   The Prospective Investor acknowledges and agrees that if (i) it does not provide the requested information or documentation or has not itself complied with the applicable requirements of FATCA/CRS, whether or not that actually leads to compliance failures by the Fund, or (ii) the Board in its sole discretion determines that there is a risk of FATCA/CRS Liabilities, the Board reserves the right to take any action and pursue all remedies at its disposal (including without limitation the immediate compulsory redemption or withdrawal of the Prospective Investor from the Fund for an amount equal to the Net Asset Value of the Prospective Investor's Shares, the compulsory transfer, re-designation or conversion of the Prospective Investor's Shares, the allocation of the relevant FATCA/CRS Liabilities to the Prospective Investor and the deduction of such allocations from any account of, or distribution or other payment due to, the Prospective Investor).

F.   The Prospective Investor shall indemnify each Relevant Person for any FATCA/CRS Liabilities arising out of any failure on the part of the Prospective Investor (directly or indirectly, including by virtue of the status, action or inaction of any person related or connected to such Prospective Investor, including without limitation direct or indirect shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Prospective Investor) to comply in a timely manner with FATCA/CRS and its obligations under this clause, such indemnity to be the fullest extent permitted by applicable law. The indemnity obligation of the Prospective Investor will survive the closing date and shall continue (i) where the Prospective Investor is a Shareholder and where the

Shareholder has redeemed but has not received the proceeds of redemption whether or not the date for Redemption Day has passed, and (ii) where the Prospective Investor has redeemed and received the proceeds of redemption.

G. For the purposes of FATCA/CRS, the Prospective Investor shall be required to self-certify and complete the necessary self-certification forms and or provide such other documents as may be required from time to time by any Relevant Person.

H. To the extent the Prospective Investor is affected by any action or remedy pursued by or on behalf of the Fund in order to comply with FATCA/CRS, it shall not have any claim against any Relevant Person or any other Prospective Investor or Shareholder or any agent, delegate, employee or director, officer or affiliate of any of the foregoing persons for any form of damages or liability as a result of such action or remedy and the Prospective Investor shall be deemed to have consented to the taking of such action or the exercise of such remedy and to have waived any and all rights or claims in respect thereof, to the fullest extent permitted by applicable law.

I. This clause shall survive termination of this Agreement and for the avoidance of doubt shall survive where the Prospective Investor has ceased to be a Shareholder of the Company.

## 8. RIGHTS UNDER THE CONTRACTS (RIGHTS OF THIRD PARTIES) LAW, 2014

A. In accordance with section 4 of The Contracts (Rights of Third Parties) Law 2014, the indemnified parties specified in clause 4(a) of this Subscription Agreement (save the Fund which is already a party to this Subscription Agreement) shall be entitled to enforce all of the rights and benefits under clauses 4(a) of this Subscription Agreement at all times as if they were a party to this Subscription Agreement.

B. The indemnified parties in clause 4(a) of this Subscription Agreement (save the Fund which is already a party to this Subscription Agreement) may not bring any action to enforce their rights under this Subscription Agreement without the prior written consent of the Fund, which may be withheld at the sole discretion of the Fund.

C. The consent of the indemnified parties specified in clause 4(a) of this Subscription Agreement (save the Fund which is already a party to this Subscription Agreement) is not required for any rescission or variation of this agreement agreed to by the Fund and the Prospective Investor, or any termination of this agreement by the Fund and the Prospective Investor.

D. The indemnified parties specified in clause 4(a) of this Subscription Agreement (save the Fund which is already a party to this Subscription Agreement) may not assign their rights, in whole or in part, under this Subscription Agreement without the prior written consent of the Fund.

## 9. DATA PROTECTION

A. The Prospective Investor acknowledges and agrees that information supplied on this Agreement and otherwise in connection with the Prospective Investor's application for Shares (collectively "**Personal Information**") may be held by the Fund and/or its delegates and agents and may be used for the purpose of:

B. processing the Prospective Investor's subscription for Shares and completion of information on the register of Shareholders;

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-9CFC07D1B00

C.   carrying out the Prospective Investor's instructions or responding to any enquiry purporting to be given by the Prospective Investor or on behalf of the Prospective Investor;

D.   dealing in any other matters relating to the Prospective Investor's holding of Shares (including the mailing of reports or notices); or

E.   observing any legal, governmental or regulatory requirements of any relevant jurisdiction (including any disclosure or notification requirements to which any recipient of the data is subject).

F.   The Prospective Investor acknowledges and agrees that, subject to the requirements of applicable law, the Fund and/or its delegates and agents may:

G.   retain Personal Information after the Prospective Investor has redeemed or transferred all of its Shares and after the termination of the Fund;

H.   maintain Personal Information on computer systems based or maintained in such places as the Fund and/or its delegate or agent determines, which may be in countries that have not enacted data protection legislation;

I.   disclose and transfer Personal Information, by any method including electronically and/or by making available the original or a copy of this Agreement, to:

    I.   the Fund and/or any delegate or agent of the Fund and/or the professional advisers of any of them and/or any of their employees, officers, directors, agents and/or affiliates; or

    II.   any third party employed to provide administrative, computer or other services or facilities to any person to whom data is disclosed or transferred as aforesaid; or

J.   disclose Personal Information where such disclosure is required by any law or order of any court or pursuant to any direction, request or requirement (whether or not having the force of law) of any central bank or governmental or other regulatory or taxation authority.

## 10. POWER AND AUTHORITY

A.   If the Prospective Investor is an entity: The person executing this Agreement for the Prospective Investor represents and warrants that he or she is duly authorised to do so and the Prospective Investor has the full power and authority under its governing instruments to acquire the Shares. The Prospective Investor represents and warrants that:

    I.   it is duly organised, validly existing and in good standing under the laws of its jurisdiction of organisation;

    II.   the execution and delivery of this Agreement and performance by it of its terms (i) are within its powers and have been duly authorised by all necessary actions on its behalf, (ii) require no action by or in respect of, or filing with, any governmental body, agency or official (except as disclosed in writing to the Fund), and (iii) do not contravene, or constitute a breach of or default under any provision of applicable law or governmental rule, regulation or policy statement or of its certificate of incorporation or other comparable organisational documents or any agreement, judgment, injunction, order, decree or other instrument binding upon it; and

III.   this Agreement constitutes a valid and binding agreement of the Prospective Investor and is enforceable against the Prospective Investor in accordance with its terms.

B.  If the Prospective Investor is acting as trustee, agent, representative or nominee for another person or entity (a Beneficial Owner): The Prospective Investor understands and acknowledges that the representations, warranties and agreements made in this Agreement are made by the Prospective Investor (a) with respect to the Prospective Investor, and (b) with respect to the Beneficial Owner. The Prospective Investor represents and warrants that it has all requisite power and authority from the Beneficial Owner to execute and perform the obligations under this Agreement.

C.  If the Prospective Investor is an individual: The Prospective Investor represents and warrants that (a) this Agreement constitutes a valid and binding agreement of the Prospective Investor and is enforceable against the Prospective Investor in accordance with its terms, and (b) the Prospective Investor has legal competence and capacity to execute this Agreement.

## 11. INDEMNITY

The Prospective Investor agrees to indemnify and keep indemnified the Fund and its directors, officers and employees, from and against any and all costs, claims, demands, liabilities, expenses, damages or losses including, without limitation, consequential losses and loss of profit and all interest, penalties and legal and other professional costs and expenses due to, or arising out of, breach of any of the representations, warranties, acknowledgements, undertakings or agreements by the Prospective Investor contained in this Agreement.

## 12. GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the Cayman Islands. Each party irrevocably agrees to submit to the non-exclusive jurisdiction of the courts of the Cayman Islands in respect of any claim or matter arising under or in connection with this Agreement.

## 13. COUNTERPARTS

This Subscription Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument. Delivery of a counterpart signature page by facsimile transmission or by email transmission of an Adobe Portable Document Format file (or similar electronic record) shall be effective as delivery of an executed counterpart signature page.

## 14.   Tax Fund Rules
### A.  Cayman Funds Tax Form Rules



B. For CRS (Common Reporting Standard) in the Cayman Islands, all Investors need to provide a full`y completed and signed Cayman Islands Self Certification Form.

C. **Non-US Funds ID Rules**

D. **Individual Subscribers** are required to provide a photocopy of a valid passport along with one additional form of government-issued identification (usually driver's license). If language of document is not in English, please provide explanation of document and appropriate translation of fields and data appearing on the identification into English.

E. **Entity (non-individual) Subscribers** are required to provide copies of their formative documents, a list of authorized signatories with specimen signatures and confirmation of the corporate authority of such signatories. If not in English, please provide explanation of document and appropriate translation of fields and data into English.

F. **Entity (non-individual) Subscribers** are additionally required by the Anti-Money Laundering Regulations, 2017 of the Cayman Islands to provide their beneficial ownership detail and identification of controlling parties.

- "Beneficial owner" means the natural person who ultimately owns or controls the subscriber or on whose behalf this subscription transaction is being conducted.
- For any natural person with beneficial ownership interest in the Subscriber of more than 10%, please provide first and last name, source of wealth, citizenship, date of birth, and a copy of valid passport or other valid photo government identification.
- For any entity or trust with beneficial ownership interest in the Subscriber of more than 10%, please detail list entity's owners and provide for each first and last name, source of wealth, citizenship, date and place of birth, and a copy of valid passport or other valid photo government identification.
- Also for any entity, please provide name of at least one individual with significant responsibility for managing the entity (controlling party). This can include any executive officer or senior manager or any other individual who regularly performs similar functions such as Managing Member, Director, or General Partner. Please provide for such controlling parties their first and last name, citizenship, date and place of birth, and a copy of valid passport or other valid photo government identification.

**Partnerships** are required to provide a copy of the government registration of the Partnership with along with a copy of the signed Partnership Agreement identifying the General Partner and/or the designate empowered to sign this document. Please see items 2-4 above for significant additional beneficial ownership requirements.

**Corporations** are required to provide a copy of the government registration of the Corporation with along with a copy of its articles of incorporation with officer signatures. We additionally request a signed, certified corporate resolution identifying the corporate officer(s) empowered to sign the Subscription Document. Please see items 2-4 above for significant additional beneficial ownership requirements.

**Trusts** are required to provide a full copy of the Trust Agreement. We can alternatively accept copies of pages from the Trust showing the following relevant

sections: articles establishing Trust (showing name of the Trust) and naming Trustees, and articles/clauses showing Trustee signatures. A valid passport or other government-issued identification (with photo) will be requested for Trustees of the Trust. If the Subscriber is a trust, please provide for each settlor, grantor, donor, and trustee their first and last name, source of wealth, citizenship, and date and place of birth.

## *FOR INTERNAL USE ONLY*

*To be completed by a Director on behalf of Hamilton Opportunity Fund SPC*

*SUBSCRIPTION ACCEPTED*

*By:* David Fallon

*Date:* 21 July 2021 | 2:21:23 AM PDT

## SIGNATURE PAGE

The undersigned hereby represents that:

- the undersigned has carefully read and is familiar with this Subscription Agreement and the Fund Documents;
- the information contained herein is complete and accurate and may be relied upon; and
- The undersigned agrees and consents to any proposed variation or abrogation of the special rights that are attached to the Class A Shares being purchased herein, such consent shall be deemed to have been consented to the proposed variation or abrogation if the undersigned does not affirmatively object in writing to such proposed variation or abrogation within twenty (20) days (or such shorter time as may be determined by the Fund's Board of Directors in its sole discretion) after such notice is received or deemed to have been received in accordance with the notice provisions of the Articles.

DocuSign Envelope ID: 3AC15D55-2ACA-4C99-94CF-9CCFC07D1B00

Certificate of full registry records、certificate of complete historical records

Is the certified record of the company which shows the registration, board member, capital injection and so on.

DocuSign Envelope ID: 3AC15D55-2A6A-4C90-94CF-9CCFC07D1800

# 履歴事項全部証明書

東京都千代田区紀尾井町４番１号
ソナー・アドバイザーズ株式会社

| | |
|---|---|
| 会社法人等番号 | ０１００－０１－１３７５４０ |
| 商　号 | ソナー・アドバイザーズ株式会社 |
| 本　店 | 東京都千代田区紀尾井町３番地３２ |
| | 東京都千代田区紀尾井町４番１号　　平成３０年　４月１６日移転<br>　　　　　　　　　　　　　　　　　平成３０年　４月１９日登記 |
| 公告をする方法 | 官報に掲載してする。 |
| 会社成立の年月日 | 平成２２年１０月２０日 |
| 目　的 | 当会社は、次の事業を営むことを目的とする。<br>（１）投資助言・代理業<br>（２）第二種金融商品取引業<br>（３）投資運用業<br>（４）投資事業組合等の組成及び投資事業有限責任組合等持分の募集又は私募<br>（５）投資事業組合等財産の運用、管理業務<br>（６）情報提供業務<br>（７）その他前各号に掲げる事業に付帯または関連する一切の事業 |
| 発行可能株式総数 | １０万３０００株 |
| 発行済株式の総数<br>並びに種類及び数 | 発行済株式の総数<br>　　４９４０株　　　　　　　平成２４年　６月３０日変更<br>　　　　　　　　　　　　　　平成２４年　７月１０日登記 |
| 資本金の額 | 金８４９６万３８１７円　　　　平成２４年　６月３０日変更<br>　　　　　　　　　　　　　　平成２４年　７月１０日登記 |
| 株式の譲渡制限に<br>関する規定 | 当会社の株式を譲渡により取得するには、株主総会の承認を受けなければならない。 |
| 役員に関する事項 | 取締役　　　　東　賢　太　郎 |
| | 取締役　　　　東　賢　太　郎　　令和　２年　３月　３日重任<br>　　　　　　　　　　　　　　　令和　２年　５月２６日登記 |

DocuSign Envelope ID: 3AC15D55-2A6A-4C90-94CF-9CCFC07D1800

東京都千代田区紀尾井町４番１号
ソナー・アドバイザーズ株式会社

| | | | | |
|---|---|---|---|---|
| 取締役 | 横 尾 敬 介 | | 令和　１年　５月　７日就任 |
| | | | 令和　１年　５月　７日登記 |
| 取締役 | 横 尾 敬 介 | | 令和　２年　３月　３日重任 |
| | | | 令和　２年　５月２６日登記 |

東京都世田谷区尾山台一丁目１０番２３号
代表取締役　　東 賢 太 郎

| | | |
|---|---|---|
| 東京都世田谷区尾山台一丁目１０番２３号<br>代表取締役　　東 賢 太 郎 | 令和　２年　３月　３日重任 |
| | 令和　２年　５月２６日登記 |

| | |
|---|---|
| 非業務執行取締役等の会社に対する責任の制限に関する規定 | 当会社は、会社法第２条第１５号に定める社外取締役との間で、会社法第４２３条第１項の取締役の責任について、当該社外取締役が職務を行うにつき善意でかつ重大な過失がない場合には、会社法第４２５条第１項に定める最低責任限度額を限度とする旨の契約を締結することができる。 |
| 新株予約権 | 第１回新株予約権<br>　新株予約権の数<br>　　２４７個<br>　新株予約権の目的たる株式の種類及び数又はその算定方法<br>　　当社普通株式２４７株（新株予約権１個につき当社普通株式１株）<br>　なお、当社が株式分割または株式併合を行う場合、次の算式により目的たる株式の数を調整するものとする。ただし、かかる調整は本新株予約権のうち、当該時点で行使されていない新株予約権の目的たる株式の数について行われ、調整により生じる１株未満の端数については、これを切り捨てる。<br>　　調整後株式数＝調整前株式数×分割・併合の比率<br>　また、当社が合併、会社分割、株式交換または株式移転（以下総称して「合併等」という。）を行う場合、株式の無償割当を行う場合、その他株式数の調整を必要とする場合には、合併等、株式の無償割当の条件等を勘案のうえ、合理的な範囲内で株式数を調整することができる。<br>　募集新株予約権の払込金額若しくはその算定方法又は払込を要しないとする旨<br>　金銭の払込みを要しないものとする。<br>　新株予約権の行使に際して出資される財産の価額又はその算定方法<br>　　新株予約権１個につき金１５，４９９円とする。<br>　なお、当社が当社普通株式につき株式分割または株式併合を行う場合、上記の行使価額は、株式分割または株式併合の比率に応じ、次の算式により調整されるものとし、調整により生じる１株未満の端数は切り上げる。<br>　　調整後行使価額＝調整前行使価額×分割・併合の比率<br>　また、当社が時価を下回る価額で当社普通株式につき、新株式の発行または自己株式の処分を行う場合、上記の行使価額は、次の算式により調整されるものとし、調整により生じる１円未満の端数は切り上げる。 |

$$\text{調整後行使価額} = \text{調整前行使価額} \times \frac{\text{既発行株式数} + \dfrac{\text{新規発行株式数} \times \text{１株当たり払込金額}}{\text{調整前行使価額}}}{\text{既発行株式数} + \text{新規発行株式数}}$$

DocuSign Envelope ID: 3AC15D55-2ACA-4C89-94CF-9CCFC07D1B00

東京都千代田区紀尾井町４番１号
ソナー・アドバイザーズ株式会社

上記算式において、「既発行株式数」とは当社の発行済普通株式総数から当社が保有する普通株式に係る自己株式数を控除した数とし、また、自己株式の処分を行う場合には「新規発行株式数」を「処分する自己株式数」に読み替える。さらに、当社が合併等を行う場合、株式の無償割当を行う場合、その他上記の行使価額の調整を必要とする場合には、合併等の条件、株式の無償割当の条件等を勘案のうえ、合理的な範囲内で行使価額を調整することができる。

新株予約権を行使することができる期間
　　平成３２年１月３１日から平成４０年１月３０日まで
新株予約権の行使の条件
　（１）本新株予約権の割当を受けた者（以下「新株予約権者」という）が権利行使時においても当社の取締役、監査役、執行役員または従業員、その他これに準ずる地位にあることを条件とする。ただし、健康上の理由による退職、任期満了による退職、定年退職その他正当な理由のある場合で、株主総会において退職後も権利行使することを個別に承認された場合はこの限りでない。なお、この株主総会による承認は、新株予約権者において新株予約権を行使した直後に発行会社又は発行会社の指定する買受人に対して株式を譲渡することにつき、発行会社と当該新株予約権者の間で合意することを前提とする。
　（２）新株予約権者が在任または在職中に死亡した場合は、相続人は新株予約権を行使することができない。ただし、株主総会において相続人による承継を個別に承認した場合はこの限りではない。行使期間経過前に株主総会で承認を受けた相続人は、行使期間経過後１年以内に限り権利行使ができるものとする。なお、この株主総会による承認は、相続人において新株予約権を行使した直後に発行会社又は発行会社の指定する買受人に対して株式を譲渡することにつき、発行会社と相続人の間で合意することを前提とする。
　（３）新株予約権の譲渡、買入その他の処分は認めないものとする。
　（４）新株予約権は一度の手続きにおいて新株予約権の全部または一部を行使することができる。
会社が新株予約権を取得することができる事由及び取得の条件
　（１）新株予約権者が権利行使をする前に、行使条件に該当しなくなったため本新株予約権を行使できない場合は、株主総会が別途定める日に、当社は当該新株予約権を無償で取得することができる。
　（２）当社が消滅会社となる合併契約承認の議案が株主総会で承認された場合、または当社が完全子会社となる株式交換契約承認の議案もしくは株式移転計画承認の議案が株主総会で承認された場合であって、当社株主総会が取得する日を定めたときは、当該日が到来することをもって、当社は新株予約権を無償で取得することができる。
　（３）当社が当社株式を証券取引所へ上場申請又は日本証券業協会に登録申請する場合において、新株予約権者がかかる証券取引所または日本証券業協会の規則による新株予約権の継続保有義務に違反したときは、当社は新株予約権を無償で取得することができる。

|  |
| --- |
| 平成３０年　１月３１日発行 |
| 平成３０年　２月１３日登記 |

第２回新株予約権
新株予約権の数
　　２４７個

東京都千代田区紀尾井町４番１号

ソナー・アドバイザーズ株式会社

新株予約権の目的たる株式の種類及び数又はその算定方法

当社普通株式２４７株（新株予約権１個につき当社普通株式１株）

なお、当社が株式分割または株式併合を行う場合、次の算式により目的たる株式の数を調整するものとする。ただし、かかる調整は本新株予約権のうち、当該時点で行使されていない新株予約権の目的たる株式の数について行われ、調整により生じる１株未満の端数については、これを切り捨てる。

調整後株式数＝調整前株式数×分割・併合の比率

また、当社が合併、会社分割、株式交換または株式移転（以下総称して「合併等」という。）を行う場合、株式の無償割当を行う場合、その他株式数の調整を必要とする場合には、合併等、株式の無償割当の条件等を勘案のうえ、合理的な範囲内で株式数を調整することができる。

募集新株予約権の払込金額若しくはその算定方法又は払込を要しないとする旨

金銭の払込みを要しないものとする。

新株予約権の行使に際して出資される財産の価額又はその算定方法

新株予約権１個につき金７，３３３円とする。

なお、当社が当社普通株式につき株式分割または株式併合を行う場合、上記の行使価額は、株式分割または株式併合の比率に応じ、次の算式により調整されるものとし、調整により生じる１株未満の端数は切り上げる。

調整後行使価額＝調整前行使価額×分割・併合の比率

また、当社が時価を下回る価額で当社普通株式につき、新株式の発行または自己株式の処分を行う場合、上記の行使価額は、次の算式により調整されるものとし、調整により生じる１円未満の端数は切り上げる。

$$
調整後行使額 = 調整前行使額 × \frac{既発行株式数 + \dfrac{新規発行株式数 × 1株当たり払込金額}{調整前行使価額}}{既発行株式数 + 新規発行株式数}
$$

上記算式において、「既発行株式数」とは当社の発行済普通株式総数から当社が保有する普通株式に係る自己株式数を控除した数とし、また、自己株式の処分を行う場合には「新規発行株式数」を「処分する自己株式数」に読み替える。さらに、当社が合併等を行う場合、株式の無償割当を行う場合、その他上記の行使価額の調整を必要とする場合には、合併等の条件、株式の無償割当の条件等を勘案のうえ、合理的な範囲内で行使価額を調整することができる。

新株予約権を行使することができる期間

令和３年１２月２５日から令和１１年１２月２５日まで

新株予約権の行使の条件

（１）本新株予約権の割当を受けた者（以下「新株予約権者」という）が権利行使時においても当社の取締役、監査役、執行役員または従業員、その他これに準ずる地位にあることを条件とする。ただし、健康上の理由による退職、任期満了による退職、定年退職その他正当な理由のある場合で、株主総会において退職後も権利行使することを個別に承認された場合はこの限りでない。なお、この株主総会による承認は、新株予約権者において新株予約権を行使した直後に発行会社を発行会社の指定する買受人に対して株式を譲渡することにつき、発行会社と当該新株予約権者の間で合意することを前提とする。

（２）新株予約権者が在任または在職中に死亡した場合は、相続人は新株予約権を行使することができない。ただし、株主総会において相続人による承継を個別に承認した場合はこの限りではない。行使期間経過直前に株主総会で承認を受けた相続人は、行使期間経過後１年以内に限り権利行使ができるも

DocuSign Envelope ID: 3AC15D55-2A6A-4C99-94CF-9CCFC87D1B00

東京都千代田区紀尾井町４番１号
ソナー・アドバイザーズ株式会社

| | |
|---|---|
| | のとする。なお、この株主総会による承認は、相続人において新株予約権を行使した直後に発行会社又は発行会社の指定する買受人に対して株式を譲渡することにつき、発行会社と相続人の間で合意することを前提とする。<br>（３）新株予約権の譲渡、質入その他の処分は認めないものとする。<br>（４）新株予約権は一度の手続きにおいて新株予約権の全部または一部を行使することができる。<br>会社が新株予約権を取得することができる事由及び取得の条件<br>（１）新株予約権者が権利行使をする前に、行使条件に該当しなくなったため本新株予約権を行使できない場合は、株主総会が別途定める日に、当社は当該新株予約権を無償で取得することができる。<br>（２）当社が消滅会社となる合併契約承認の議案が株主総会で承認された場合、または当社が完全子会社となる株式交換契約承認の議案もしくは株式移転計画承認の議案が株主総会で承認された場合であって、当社株主総会が取得する日を定めたときは、当該日が到来することをもって、当社は新株予約権を無償で取得することができる。<br>（３）当社が当社株式を証券取引所へ上場申請又は日本証券業協会に登録申請する場合において、新株予約権者がかかる証券取引所または日本証券業協会の規則による新株予約権の継続保有義務に違反したときは、当社は新株予約権を無償で取得することができる。<br><br>令和　１年１２月２５日発行<br><br>令和　２年　１月　６日登記 |
| 登記記録に関する事項 | 平成２２年１２月２７日東京都世田谷区尾山台一丁目１０番２３号から本店移転<br><br>平成２３年　１月１１日登記 |



これは登記簿に記録されている閉鎖されていない事項の全部であることを証明した書面である。
（東京法務局管轄）

　　　　　令和　３年　５月２８日
東京法務局渋谷出張所
登記官　　　　　　　　　　　　　肥　田　携　士



整理番号　ミ７６０７７１　　＊　下線のあるものは抹消事項であることを示す。　　　　　　５／５

## SIGNATURE AUTHORIZATION LIST

To whom concerned

**Sonar Advisers Inc. / SIGNATURE AUTHORIZATION**

The individuals below are authorized to sign for all matters relating to Sonar Advisers Inc.

COMPANY OFFICERS/MANAGERS/SUPERVISORS

Name: _Kentaro Azuma_____   Signature: _____   Title: _President & CEO_
          (Printed Name)

Name: _Yasuhito Doi_____   Signature: _____   Title: _Managing Director_
          (Printed Name)

Name: _Ayane Azuma_____   Signature: _Ayane Azuma._   Title: _____
          (Printed Name)


President, CEO or Executive Director: _Kentaro Azuma_____
                                          (Print Name)


E-Mail Address: _azuma@sonaradvisers.com_____

Signature: _____   Date: _20 July 2021_

respect of a legal person is direct or indirect ownership or control of 10% or more of the shares or voting rights in the legal person, being the threshold specified by the Anti-Money Laundering Regulations, 2017 which implement the FATF Recommendations in the Cayman Islands.

<mark>Entity Self-Certification</mark>

### Instructions for completion

*We are obliged under the Tax information Authority Law, the Regulations, and Guidance Notes made pursuant to that Law, and treaties and intergovernmental agreements entered into by the* <mark>Cayman</mark> *Islands in relation to the automatic exchange of information for tax matters (collectively "AEOI"), to collect certain information about each account holder's tax status. Please complete the sections below as directed and provide any additional information that is requested. Please note that we may be obliged to share this information with relevant tax authorities. Terms referenced in this Form shall have the same meaning as applicable under the relevant Cayman Islands Regulations, Guidance Notes or international agreements.*

*If any of the information below regarding your tax residence or AEOI classification changes in the future, please ensure you advise us of these changes promptly. If you have any questions about how to complete this Form, please refer to accompanying guidelines for completion or contact your tax advisor.*

## PART I: General

### Section 1: Account Holder Identification

Sonar Advisers Inc.                                          Japan

| | |
|---|---|
| Legal Name of Entity/Branch | Country of incorporation/organisation |

**Current Residence or Registered Address:**

4-1 Kioicho, Chiyoda-ku

| | | |
|---|---|---|
| Number & Street | | City/Town |

Tokyo, 102-0094, Japan

| | | |
|---|---|---|
| State/Province/County | Post Code | Country |

**Mailing address (if different from above):**

| | | |
|---|---|---|
| Number & Street | | City/Town |

| | | |
|---|---|---|
| State/Province/County | Post Code | Country |

## PART II: US IGA

### Section 2: U.S. Persons

Please tick and complete as appropriate.

(a) ☐ The entity is a **Specified U.S. Person** and the entity's U.S. federal taxpayer identifying number (U.S. TIN) is as follows:

_____

(b) ☐ The entity is a U.S. Person that is not a Specified U.S. Person.

Indicate exemption[1] _____

*If the entity is not a U.S. person, please complete Section 3.*

### Section 3: US FATCA Classification for all Non United States Entities

Please complete this section if the entity is **not** a *U.S. Person*

**3.1** If the entity is a **Registered Foreign Financial Institution,** please tick one of the below categories, and provide the entity's *FATCA GIIN at 3.1.1.*

(a) ☐ Reporting Model 1 FFI

(b) ☐ Registered Deemed Compliant Foreign Financial Institution (other than a reporting Model 1 FFI, sponsored FFI, or non-reporting IGA FFI)

(c) ☐ Reporting Model 2 FFI

(d) ☐ Participating Foreign Financial Institution

**3.1.1** Please provide your *Global Intermediary Identification number (GIIN):*

_____
(if registration in progress indicate so)

**3.2** If the entity is a **Financial Institution but unable to provide a GIIN or has a Sponsored Entity GIIN**, please complete one of the below categories:

(a) ☐ The Entity is a Sponsored Financial Institution (sponsored by another entity that has registered as a Sponsoring Entity) and (select one):

i. ☐ has no US reportable accounts, is a Sponsored FI in a Model 1 IGA jurisdiction and therefore not required to obtain a Sponsored Entity GIIN.  Please provide the Sponsoring Entity's name and GIIN.

Sponsoring Entity's Name: _____

Sponsoring Entity's GIIN: _____

Cont..

---

[1]     Under the US IGA and in the U.S. Internal Revenue Code, Specified US Person does not include: An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37); The United States or any of its agencies or instrumentalities; A state, the District of Columbia, a possession of the United States, or any of their political subdivisions, or instrumentalities; A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i); A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i); A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state; A real estate investment trust;  A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940; A common trust fund as defined in section 584(a); A bank as defined in section 581; A broker; A trust exempt from tax under section 664 or described in section 4947; or A tax-exempt trust under a section 403(b) plan or section 457(g) plan.

ii.  ☐   its Sponsor has obtained a Sponsored Entity GIIN on its behalf.

       Please provide the Sponsoring Entity's name and GIIN, and Sponsored Entity's GIIN.

       Sponsoring Entity's Name: _____

       Sponsoring Entity's GIIN: _____

       Sponsored Entity's GIIN: _____

(b)  ☐   The Entity is a Trustee Documented Trust.  Please provide the Trustee's name and GIIN.

       Trustee's Name: _____

       Trustee's GIIN: _____

(c)  ☐   The Entity is a Certified Deemed Compliant, or otherwise Non-Reporting, Foreign Financial Institution (including a Foreign Financial Institution deemed compliant under Annex II of an IGA, except for a Trustee Documented Trust or Sponsored Financial Institution).

       Indicate exemption: _____

(d)  ☐   The Entity is a Non-Participating Foreign Financial Institution

**3.3**   If the entity is **not a Foreign Financial Institution**, please confirm the Entity's FATCA status below:

(a)  ☐   The Entity is an ***Exempt Beneficial Owner.***[2]

       Indicate status: _____

(b)  ☐   The Entity is an ***Active Non-Financial Foreign Entity.***[3]  Indicate qualifying criteria (see Exhibit A):

       _____

(c)  ☐   The Entity is a ***Direct Reporting NFFE.***[4]  Please provide the Entity's GIIN.

       Direct Reporting NFFE's GIIN: _____

(d)  ☐   The Entity is a ***Sponsored Direct Reporting NFFE.***[5]  Please provide the Sponsoring Entity's name and GIIN.

       Sponsoring Entity's Name: _____

       Sponsoring Entity's GIIN: _____

       Sponsored Entity's GIIN: _____

(e)  ☒   The Entity is a ***Passive Non-Financial Foreign Entity.***[6]

---

[2] "*Exempt Beneficial Owner*" means any of the entities listed as such in Annex II.I of the US IGA or Section 1.1471-6 or 1.1471-6T of the U S. Treasury Regulations. See additional notes in Exhibit A

[3] See definition of *Active Non-Financial Foreign Entity* in Exhibit A

[4] See US Treasury FATCA Regulations, 26 CFR 1.1472-1(c)(3)

[5] See US Treasury FATCA Regulations, 26 CFR 1.1472-1(c)(5)

[6] See definition of *Passive Non-Financial Foreign Entity* in Exhibit A

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-A9CFC07D1B00

**If you have ticked 3.3(e)** *Passive Non-Financial Foreign Entity***, please complete either i. OR ii. below**

i.    Indicate the full name, address, and tax reference type and number of any *Substantial U.S. Owners.*

*If the Entity has chosen to use the definition of 'Substantial U.S. Owner' from the U.S. Treasury Regulations in lieu of the definition of 'Controlling Person' as permitted under Article 4(7) of the Agreement between the Government of the Cayman Islands and the Government of the United States of America to Improve International Tax Compliance and to Implement FATCA, please complete the table below providing details of any Substantial U.S. Owners.[7]*

**Note: The decision to utilize the definition of 'Substantial U.S. Owner' in lieu of Controlling Person is only permitted with respect to PART II: US IGA.**

| Full Name | Full residence address | Tax reference type and number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

OR

ii.    Alternatively, if you wish to use the Controlling Person definition as per the CRS definition in Exhibit B then please complete the following:

Please indicate the name of any *Controlling Person(s)*[8]:

| Full Name of any Controlling Person(s) |
|---|
| Kentaro Azuma |
|  |
|  |

**Please complete Part IV below providing further details of any ultimate Controlling Persons who are natural persons**

---

[7]    See definition of *Substantial U.S. Owner(s)* in Exhibit A.

[8]    See definition of *Controlling Person(s)* in Exhibit A.

**PART III: Common Reporting Standard**

**Section 4: Declaration of All Tax Residency [repeat any residences indicated in Part II, Section 2 (US)**

Please indicate the Entity's place of tax residence (if resident in more than one jurisdiction please detail all jurisdictions and associated tax reference number type and number).

For the purposes of the Common Reporting Standard (CRS), all matters in connection with residence are determined in accordance with the CRS and its Commentaries.

If an entity has no residence for tax purposes please indicate the jurisdiction in which its place of effective management is situated. Please indicate not applicable if jurisdiction does not issue or you are unable to procure a tax reference number or functional equivalent, and indicate the reason below.

| Jurisdiction(s) of tax residency | Tax reference number type | Tax reference number (e.g. TIN) |
|---|---|---|
| Japan | Corporate number | 2010001137540 |
| | | |
| | | |

**If applicable, please specify the reason for non-availability of a tax reference number:**

## Section 5: CRS Classification

Provide your CRS classification by checking the corresponding box(es). Note that CRS classification does not necessarily coincide with your classification for US FATCA purposes.

**5.1**  ☐  If the entity **is** a *Financial Institution[9]*, please tick this box and specify the type of Financial Institution in (a), (b), or (c) below[10]:

(a)  ☐  Reporting Financial Institution under CRS. (Please note this classification only applies to a Financial Institution in a CRS Participating Jurisdiction.  If the entity is a Financial Institution in a Non-Participating Jurisdiction[11] under CRS, proceed to 5.1 (c)).

OR

(b)  ☐  Non-Reporting Financial Institution under CRS.  (Please note this classification only applies to a Financial Institution in a CRS Participating Jurisdiction.  If the entity is a Financial Institution in a Non-Participating Jurisdiction under CRS, proceed to 5.1 (c)). Specify the type of Non-Reporting Financial Institution below:

☐  Governmental Entity

☐  International Organization

☐  Central Bank

☐  Broad Participation Retirement Fund

☐  Narrow Participation Retirement Fund

☐  Pension Fund of a Governmental Entity, International Organization, or Central Bank

☐  Exempt Collective Investment Vehicle

☐  Trust whose trustee reports all required information with respect to all CRS Reportable Accounts

☐  Qualified Credit Card Issuer

☐  Other Entity defined under the domestic law as low risk of being used to evade tax.

Specify the type provided in the domestic law:  _____

OR

---

[9]    See definition of *Financial Institution* in Exhibit B.

[10]    Where the entity is resident in a Participating Jurisdiction, use the terms as defined under the CRS regime in that Jurisdiction. Where the entity is resident in a Non-Participating Jurisdiction, definitions under the Cayman Islands CRS regime must be used.

[11]    See definition of *Non-Participating Jurisdiction* in Exhibit B.

(c) ☐ Financial Institution resident in a Non-Participating Jurisdiction under CRS.  Specify the type of Financial Institution below:

    i. ☐ Investment Entity managed by another Financial Institution[12] where a controlling ownership interest is held (directly or indirectly) by a company listed on a stock exchange and subject to disclosure requirements or is a majority owned subsidiary of such a company.

    ii. ☐ Investment Entity managed by another Financial Institution (other than i. above)

Note:  If you are either:

(a) ☐ a widely-held, regulated  Collective Investment Vehicle (CIV) established as a trust; OR

(b) ☐ a pension fund established as a trust,

you may apply the Controlling Persons test of a <u>legal person</u> as per the Controlling Person definition in Exhibit B, and where simplified due diligence procedures are permitted to be applied by the Financial Institution under the applicable AML regime[13] in relation to the Account Holder and its Controlling Persons, no further information is required.

**If you have ticked the box for 5.1(c) ii, and neither of the exemptions under (a) and (b) above applies, please indicate the name of the *Controlling Person(s)* in the table below.**

| Full Name of any Controlling Person(s). <br> *Please see definition in Exhibit B.* <br> *(This table must not be left blank unless exemption (a) or (b) above applies)* |
| --- |
| |
| |
| |
| |
| |
| |
| |
| |
| |

**Please also complete Part IV below providing further details of any ultimate Controlling Person(s) who are natural person(s).**

    iii. ☐ Other Investment Entity (other than i. or ii. above); OR

    iv. ☐ Other Financial Institution, including a Depository Institution, Custodial Institution, or Specified Insurance Company.

---

[12] The managing Financial Institution must be a Financial Institution other than an Investment Entity type b) defined within the definition of a Financial Institution in Exhibit B.

[13] Please contact the Financial Institution to confirm whether simplified due diligence procedures under the Cayman Islands AML regime may apply to you as an Account Holder (e.g. by being a regulated pension fund in an approved jurisdiction).

**5.2** ☐  If the entity is an *Active Non-Financial Entity* ("NFE") please tick this box and specify the type of Active NFE below:

(a) ☐  Corporation that is regularly traded or a related entity of a regularly traded corporation.

Provide the name of the stock exchange where traded: _____

If you are a related entity of a regularly traded corporation, provide the name of the regularly traded corporation:

_____

(b) ☐  Governmental Entity, International Organization, a Central Bank, or an Entity wholly owned by one or more of the foregoing; OR

(c) ☐  Other Active Non-Financial Entity.[14]  Indicate qualifying criteria (see Exhibit B):

_____

**5.3** ☒  If the entity is a *Passive Non-Financial Entity* please tick this box.[15]

**If you have ticked this box please indicate the name of the *Controlling Person(s)*. Please refer to the definition of Controlling Person in Exhibit B.**

| Full Name of any Controlling Person(s) | *(must not be left blank)* |
|---|---|
| Kentaro Azuma | |
| | |
| | |

**Please complete Part IV below providing further details of any ultimate Controlling Person(s) who are natural person(s).**

## Entity Declaration and Undertakings

I/We declare (as an authorised signatory of the Entity) that the information provided in this form is, to the best of my/our knowledge and belief, accurate and complete.  I/We undertake to advise the recipient promptly and provide an updated Self-Certification form within 30 days where any change in circumstances occurs, which causes any of the information contained in this form to be inaccurate or incomplete.  Where legally obliged to do so, I/we hereby consent to the recipient sharing this information with the relevant tax information authorities.

I/we acknowledge that it is an offence to make a self-certification that is false in a material particular.

Authorised Signature: _____     Authorised Signature: _____

Position/Title:  President & CEO                    Position/Title: _____

Date (dd/mm/yyyy):  2021年7月20日| 9:06:06 午後 PDT   Date (dd/mm/yyyy):  2021年7月20日| 9:06:06 午後 PDT

---

[14]    See definition of *Active Non-Financial Entity* in Exhibit B.

[15]    Please see the definition of *Passive Non-Financial Entity* in Exhibit B.

## PART IV: Controlling Persons

### (please complete for each Controlling Person who is a natural person)

### Section 6 – Identification of a Controlling Person

**6.1  Name of Controlling Person:**

Family Name or Surname(s):      Azuma

First or Given Name:      Kentaro

Middle Name(s):

**6.2  Current Residence Address:**

Line 1 (e.g. House/Apt/Suite Name, Number, Street)      1-10-23 Oyamadai,Setagaya-ku

Line 2 (e.g. Town/City/Province/County/State)      Tokyo

Country:      Japan

Postal Code/ZIP Code:      158-0086

**6.3  Mailing Address:** *(please complete if different from 6.2)*

Line 1 *(e.g. House/Apt/Suite Name, Number, Street)*

Line 2 *(e.g. Town/City/Province/County/State)*

Country:

Postal Code/ZIP Code:

**6.4  Date of birth**[16] *(dd/mm/yyyy)*      4th Feb 1955

**6.5  Place of birth**[17]

Town or City of Birth      Tokyo

Country of Birth      Japan

**6.6  Please enter the legal name of the <u>relevant</u> entity Account Holder(s) of which you are a Controlling Person**

Legal name of **Entity 1**      Sonar Advisers Inc.

Legal name of **Entity 2**      K.K. Raison

Legal name of **Entity 3**

---

[16]  The Controlling Person's date of birth is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person

[17]  The Controlling Person's place of birth is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person

**Section 7 – Jurisdiction of Residence for Tax Purposes and related Taxpayer Reference Number or functional equivalent ("TIN")**

Please complete the following table indicating:

(i)        where the Controlling Person is tax resident;

(ii)       the Controlling Person's TIN for each jurisdiction indicated;[18] and,

(iii)      if the Controlling Person is a tax resident in a jurisdiction that is a Reportable Jurisdiction(s) then please also complete **Section 10 "Type of Controlling Person".**

*If the Controlling Person is tax resident in more than three jurisdictions please use a separate sheet*

|   | Jurisdiction(s) of tax residency | Tax reference number type | Tax reference number (e.g. TIN) |
|---|---|---|---|
| **1** | Japan | My number | 476720738664 |
| **2** | | | |
| **3** | | | |

**If applicable, please specify the reason for non-availability of a tax reference number:**

---

18      The Controlling Person's TIN is not required to be collected if the Controlling Person is not a Reportable Jurisdiction Person.

## Section 8 – Type of Controlling Person

*(Please only complete this section if you are tax resident in one or more Reportable Jurisdictions)*

| Please provide the Controlling Person's Status by ticking the appropriate box. | Entity 1 | Entity 2 | Entity 3 |
|---|---|---|---|
| **a.** Controlling Person of a legal person – ***control by ownership*** | ☒ | ☒ | ☐ |
| **b.** Controlling Person of a legal person – ***control by other means*** | ☐ | ☐ | ☐ |
| **c.** Controlling Person of a legal person – ***senior managing official*** | ☐ | ☐ | ☐ |
| **d.** Controlling Person of a trust – ***settlor*** | ☐ | ☐ | ☐ |
| **e.** Controlling Person of a trust – ***trustee*** | ☐ | ☐ | ☐ |
| **f.** Controlling Person of a trust – ***protector*** | ☐ | ☐ | ☐ |
| **g.** Controlling Person of a trust – ***beneficiary*** | ☐ | ☐ | ☐ |
| **h.** Controlling Person of a trust – ***other*** | ☐ | ☐ | ☐ |
| **i.** Controlling Person of a legal arrangement (non-trust) – ***settlor-equivalent*** | ☐ | ☐ | ☐ |
| **j.** Controlling Person of a legal arrangement (non-trust) – ***trustee-equivalent*** | ☐ | ☐ | ☐ |
| **k.** Controlling Person of a legal arrangement (non-trust) – ***protector-equivalent*** | ☐ | ☐ | ☐ |
| **l.** Controlling Person of a legal arrangement (non-trust) – ***beneficiary-equivalent*** | ☐ | ☐ | ☐ |
| **m.** Controlling Person of a legal arrangement (non-trust) – ***other-equivalent*** | ☐ | ☐ | ☐ |

**Controlling Person Declaration and Undertakings**

- I acknowledge that the information contained in this form and information regarding the Controlling Person(s) and any Reportable Account(s) may be reported to the tax authorities of the jurisdiction in which this account(s) is/are maintained and exchanged with tax authorities of another jurisdiction(s) in which [I/the Controlling Person] may be tax resident pursuant to international agreements to exchange financial account information.

- I certify that either (a) I am the Controlling Person, or am authorised to sign for the Controlling Person, of all the account(s) held by the entity Account Holder to which this form relates; or (b) I am authorised by the Account Holder to make this declaration.

- **I declare that all statements made in this declaration are, to the best of my knowledge and belief, correct and complete.**

- I acknowledge that it is an offence to make a self-certification that is false in a material particular.

- I undertake to advise the recipient within 30 days of any change in circumstances which affects the tax residency status of the individual identified in Part IV of this form or causes the information contained herein to become incorrect, and to provide the recipient with a suitably updated self-certification and Declaration within 30 days of such change in circumstances**.**

Signature: _____

Print name:  Kentaro Azuma

Date (dd/mm/yyyy):  2021年7月20日 | 9:06:06 午後 PDT

**Note**: If you are not the Controlling Person, and not authorised to sign the Declaration on behalf of the Account Holder, please indicate the capacity in which you are signing the form on behalf of the Controlling Person.  If signing under a power of attorney or other equivalent written authorisation, on behalf of the Controlling Person, please also attach a certified copy of the power of attorney or written authorisation.

Capacity:  President & CEO

**EXHIBIT A**

**US IGA DEFINITIONS**

*Account Holder* means the person listed or identified as the holder of a Financial Account by the Financial Institution that maintains the account.  A person, other than a Financial Institution, holding a Financial Account for the benefit or account of another person as agent, custodian, nominee, signatory, investment advisor, or intermediary, is not treated as holding the account for purposes of this Agreement, and such other person is treated as holding the account.  For purposes of the immediately preceding sentence, the term "Financial Institution" does not include a Financial Institution organized or incorporated in a U.S. Territory. In the case of a Cash Value Insurance Contract or an Annuity Contract, the Account Holder is any person entitled to access the Cash Value or change the beneficiary of the contract.  If no person can access the Cash Value or change the beneficiary, the Account Holder is any person named as the owner in the contract and any person with a vested entitlement to payment under the terms of the contract.  Upon the maturity of a Cash Value Insurance Contract or an Annuity Contract, each person entitled to receive a payment under the contract is treated as an Account Holder.

*Active Non-Financial Foreign Entity* means any NFFE which is a Non U.S. entity that meets any of the following criteria:

(a)  Less than 50 percent of the NFFE's gross income for the preceding calendar year or other appropriate reporting period is passive income and less than 50 percent of the assets held by the NFFE during the preceding calendar year or other appropriate reporting period are assets that produce or are held for the production of passive income;

(b)  The stock of the NFFE is regularly traded on an established securities market or the NFFE is a Related Entity of an Entity the stock of which is traded on an established securities market;

(c)  The NFFE is organized in a U.S. Territory and all of the owners of the payee are bona fide residents of that U.S. Territory;

(d)  The NFFE is a non-U.S. government, a government of a U.S. Territory, an international organization, a non-U.S. central bank of issue, or an Entity wholly owned by one or more of the foregoing;

(e)  substantially all of the activities of the NFFE consist of holding (in whole or in part) the outstanding stock of, and providing financing and services to, one or more subsidiaries that engage in trades or businesses other than the business of a Financial Institution, except that an NFFE shall not qualify for this status if the NFFE functions (or holds itself out) as an investment fund, such as a private equity fund, venture capital fund, leveraged buyout fund or any investment vehicle whose purpose is to acquire or fund companies and then hold interests in those companies as capital assets for investment purposes;

(f)  The NFFE is not yet operating a business and has no prior operating history, but is investing capital into assets with the intent to operate a business other than that of a Financial Institution; provided, that the NFFE shall not qualify for this exception after the date that is 24 months after the date of the initial organization of the NFFE;

(g)  The NFFE was not a Financial Institution in the past five years, and is in the process of liquidating its assets or is reorganizing with the intent to continue or recommence operations in a business other than that of a Financial Institution;

(h)  The NFFE primarily engages in financing and hedging transactions with or for Related Entities that are not Financial Institutions, and does not provide financing or hedging services to any Entity that is not a Related Entity, provided that the group of any such Related Entities is primarily engaged in a business other than that of a Financial Institution; or

(i)  The NFFE is an "excepted NFFE" as described in relevant U.S. Treasury Regulations; or

(j)  The NFFE meets all of the following requirements:

   i)  It is established and maintained in its country of residence exclusively for religious, charitable, scientific, artistic, cultural, athletic or educational purposes; or it is established and operated in its jurisdiction of residence and it is a professional organization, business league, chamber of commerce, labour organization, agricultural or horticultural organization, civic league or an organization operated exclusively for the promotion of social welfare;

   ii)  It is exempt from income tax in its country of residence;

   iii)  It has no shareholders or members who have a proprietary or beneficial interest in its income or assets;

   iv)  The applicable laws of the Entity's country of residence or the Entity's formation documents do not permit any income or assets of the Entity to be distributed to, or applied for the benefit of, a private person or non- charitable Entity other than pursuant to the conduct of the Entity's charitable activities, or as payment of reasonable compensation for services rendered, or as payment representing the fair market value of property which the Entity has purchased; and

   v)  The applicable laws of the Entity's country of residence or the Entity's formation documents require that, upon the

Entity's liquidation or dissolution, all of its assets be distributed to a governmental entity or other non-profit organization, or escheat to the government of the Entity's jurisdiction of residence or any political subdivision thereof.

**Code** means the U.S Internal Revenue Code of 1986, as amended.

**Controlling Person** means the natural persons who exercise direct or indirect control over an entity.  In the case of a trust, such term means the settlor, the trustees, the protector (if any), the beneficiaries or class of beneficiaries, and any other natural person exercising ultimate effective control over the trust, and in the case of a legal arrangement other than a trust, such term means persons in equivalent or similar positions. The term 'Controlling Persons' shall be interpreted in a manner consistent with the Financial Action Task Force Recommendations ("FATF").

**FATF Recommendations on Controlling Persons**:

Identify the beneficial owners of the customer and take reasonable measures to verify the identity of such persons, through the following information. For legal persons[19]:

(a)    The identity of the natural persons (if any – as ownership interests can be so diversified that there are no natural persons (whether acting alone or together) exercising control of the legal person or arrangement through ownership) who ultimately have a controlling ownership interest[20] in a legal person; and

(b)    to the extent that there is doubt under (a) as to whether the person(s) with the controlling ownership interest are the beneficial owner(s) or where no natural person exerts control through ownership interests, the identity of the natural persons (if any) exercising control of the legal person or arrangement through other means.

(c)    Where no natural person is identified under (a) or (b) above, financial institutions should identify and take reasonable measures to verify the identity of the relevant natural person who holds the position of senior managing official.

**Entity** means a legal person or a legal arrangement such as a trust.

**Exempt Beneficial Owners** under the US IGA include Government entities, International Organisations, Central Bank, Broad Participation Retirement Funds, Narrow Participation Retirement Funds, Pension Funds of an Exempt Beneficial Owner, and Investment Entities wholly owned by Exempt Beneficial Owners. Please refer to the IGA for detailed definitions.

**Financial Institution** means a Custodial Institution, a Depository Institution, an Investment Entity, or a Specified Insurance Company, where:

(a)    *Custodial Institution* means any entity that holds, as a substantial portion of its business, financial assets for the account of others. An entity holds financial assets for the account of others as a substantial portion of its business if the entity's gross income attributable to the holding of financial assets and related financial services equals or exceeds 20 percent of the Entity's gross income during the shorter of: (i) the three-year period that ends on 31 December (or the final day of a non-calendar year accounting period) prior to the year in which the determination is being made; or (ii) the period during which the entity has been in existence;

(b)    *Depository Institution* means any entity that accepts deposits in the ordinary course of a banking or similar business;

(c)    *Investment Entity* means any entity that conducts as a business (or is managed by an entity that conducts as a business) one or more of the following activities or operations for or on behalf of a customer: (1) trading in money market instruments (cheques, bills, certificates of deposit, derivatives, etc.); foreign exchange; exchange, interest rate and index instruments; transferable securities; or commodity futures trading; (2) individual and collective portfolio management; or (3) otherwise investing, administering, or managing funds or money on behalf of other persons. The term Investment entity shall be interpreted in a manner consistent with similar language set forth in the definition of "financial institution" in the Financial Action Task Force Recommendations; and

(d)    *Specified Insurance Company* means any entity that is an insurance company (or the holding company of an insurance company) that issues, or is obligated to make payments with respect to, a Cash Value Insurance Contract or an Annuity Contract.

**NFFE** means any Non-U.S. Entity that is not a Financial Institution as defined in US FATCA.

**Non-U.S. Entity** means an Entity that is not a U.S. Person.

---

[19]    Measures (a) to (b) are not alternative options, but are cascading measures, with each to be used where the previous measure has been applied and has not identified a beneficial owner.

[20]    A controlling ownership interest depends on the ownership structure of the company. It may be based on a threshold, e.g. any person owning more than a certain percentage of the company (e.g. 25%).

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

**Passive Non-Financial Foreign Entity** means any NFFE that is not an Active Non-Financial Foreign Entity.

**Related Entity** An entity is a *Related Entity* of another entity if either entity controls the other entity, or the two entities are under common control. For this purpose control includes direct or indirect ownership of more than 50 percent of the vote or value in an entity. Notwithstanding the foregoing, either Party may treat an entity as not a related entity if the two entities are not members of the same affiliated group, as defined in section 1471(e)(2) of the Code.

**Specified U.S. Person** means a U.S. Person other than:

(a)  a corporation the stock of which is regularly traded on established securities markets;

(b)  any corporation that is a member of the same expanded affiliated group;

(c)  the United States or any wholly owned agency or instrumentality thereof;

(d)  any State of the United States, any U.S. Territory, any political subdivision or wholly owned agency or instrumentality of any one or more of the foregoing;

(e)  any organization exempt from taxation under section 501 (a) of the Internal Revenue Code (the "Code") or certain individual retirement plans defined in section 7701(a)(37) of the Code ;

(f)  any bank as defined in section 581 of the Code;

(g)  any real estate investment trust as defined in section 856 of the Code;

(h)  any regulated investment company defined in section 851 of the Code or any entity registered with the U.S. Securities and Exchange Commission under the Investment Company Act of 1940;

(i)  any common trust fund as defined in section 584(a) of the Code;

(j)  any trust that is exempt from tax under section 664(c) of the Code or that is described in 4947(a)(1) of the Code;

(k)  a dealer in securities, commodities, or derivative financial instruments that is registered as such under the laws of the United States or any State;

(l)  a broker as defined in section 6045(c) of the Code; or

(m)  any tax-exempt trust under a plan that is described in section 403(b) or section 457(g) of the Code

**Substantial U.S. Owner** (as defined in Regulations section 1.1473-1(b)) means generally:

(a)  With respect to any foreign corporation, any Specified U.S. Person that owns, directly or indirectly, more than 10 percent of the stock of such corporation (by vote or value);

(b)  With respect to any foreign partnership, any Specified U.S. Person that owns, directly or indirectly, more than 10 percent of the profits interests or capital interests in such partnership; and

(c)  In the case of a trust–

   i.  Any Specified U.S. Person treated as an owner of any portion of the trust under sections 671 through 679 of the IRC; and

   *ii.*  Any Specified U.S. Person that holds, directly or indirectly, more than 10 percent of the beneficial interests of the trust.

**U.S. Person** means a U.S. citizen or resident individual, a partnership or corporation organized in the United States or under the laws of the United States or any State thereof, a trust if (i) a court within the United States would have authority under applicable law to render orders or judgments concerning substantially all issues regarding administration of the trust, and (ii) one or more U.S. persons have the authority to control all substantial decisions of the trust, or an estate of a decedent that is a citizen or resident of the United States.  Refer to the U.S. Internal Revenue Code for further interpretation.

**EXHIBIT B**

**CRS DEFINITIONS**

*Account Holder* means the person listed or identified as the holder of a Financial Account by the Financial Institution that maintains the account. A person, other than a Financial Institution, holding a Financial Account for the benefit or account of another person as agent, custodian, nominee, signatory, investment advisor, or intermediary, is not treated as holding the account for purposes of the Common Reporting Standard, and such other person is treated as holding the account. In the case of a Cash Value Insurance Contract or an Annuity Contract, the Account Holder is any person entitled to access the Cash Value or change the beneficiary of the contract. If no person can access the Cash Value or change the beneficiary, the Account Holder is any person named as the owner in the contract and any person with a vested entitlement to payment under the terms of the contract. Upon the maturity of a Cash Value Insurance Contract or an Annuity Contract, each person entitled to receive a payment under the contract is treated as an Account Holder.

*Active Non-Financial Entity* means any NFE that meets any of the following criteria:

a) less than 50% of the NFE's gross income for the preceding calendar year or other appropriate reporting period is passive income and less than 50% of the assets held by the NFE during the preceding calendar year or other appropriate reporting period are assets that produce or are held for the production of passive income;

b) the stock of the NFE is regularly traded on an established securities market or the NFE is a Related Entity of an Entity the stock of which is regularly traded on an established securities market;

c) the NFE is a Governmental Entity, an International Organisation, a Central Bank, or an Entity wholly owned by one or more of the foregoing;

d) substantially all of the activities of the NFE consist of holding (in whole or in part) the outstanding stock of, or providing financing and services to, one or more subsidiaries that engage in trades or businesses other than the business of a Financial Institution, except that an Entity does not qualify for this status if the Entity functions (or holds itself out) as an investment fund, such as a private equity fund, venture capital fund, leveraged buyout fund, or any investment vehicle whose purpose is to acquire or fund companies and then hold interests in those companies as capital assets for investment purposes;

e) the NFE is not yet operating a business and has no prior operating history, but is investing capital into assets with the intent to operate a business other than that of a Financial Institution, provided that the NFE does not qualify for this exception after the date that is 24 months after the date of the initial organisation of the NFE;

f) the NFE was not a Financial Institution in the past five years, and is in the process of liquidating its assets or is reorganising with the intent to continue or recommence operations in a business other than that of a Financial Institution;

g) the NFE primarily engages in financing and hedging transactions with, or for, Related Entities that are not Financial Institutions, and does not provide financing or hedging services to any Entity that is not a Related Entity, provided that the group of any such Related Entities is primarily engaged in a business other than that of a Financial Institution; or

h) the NFE meets all of the following requirements:

   i) it is established and operated in its jurisdiction of residence exclusively for religious, charitable, scientific, artistic, cultural, athletic, or educational purposes; or it is established and operated in its jurisdiction of residence and it is a professional organisation, business league, chamber of commerce, labour organisation, agricultural or horticultural organisation, civic league or an organisation operated exclusively for the promotion of social welfare;

   ii) it is exempt from income tax in its jurisdiction of residence;

   iii) it has no shareholders or members who have a proprietary or beneficial interest in its income or assets;

   iv) the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents do not permit any income or assets of the NFE to be distributed to, or applied for the benefit of, a private person or non- charitable Entity other than pursuant to the conduct of the NFE's charitable activities, or as payment of reasonable compensation for services rendered, or as payment representing the fair market value of property which the NFE has purchased; and

   v) the applicable laws of the NFE's jurisdiction of residence or the NFE's formation documents require that, upon the NFE's liquidation or dissolution, all of its assets be distributed to a Governmental Entity or other non-profit organisation, or escheat to the government of the NFE's jurisdiction of residence or any political subdivision thereof.

***Controlling Person*** means the natural persons who exercise direct or indirect control over an entity.

In the case of a trust, such term means the settlor(s), the trustees(s), the protector(s) (if any), the beneficiary(ies) or class(es) of beneficiaries, and any other natural person(s) exercising ultimate effective control over the trust, and in the case of a legal arrangement other than a trust, such term means persons in equivalent or similar positions. The term 'Controlling Persons' shall be interpreted in a manner consistent with the Financial Action Task Force Recommendations ("FATF").

FATF Recommendations on Controlling Persons:

Identify the beneficial owners of the customer and take reasonable measures to verify the identity of such persons, through the following information.  For legal persons[21]:

(a)   The identity of the natural persons (if any – as ownership interests can be so diversified that there are no natural persons (whether acting alone or together) exercising control of the legal person or arrangement through ownership) who ultimately have a controlling ownership interest[22] in a legal person; and

(b)   to the extent that there is doubt under (a) as to whether the person(s) with the controlling ownership interest are the beneficial owner(s) or where no natural person exerts control through ownership interests, the identity of the natural persons (if any) exercising control of the legal person or arrangement through other means.

(c)   Where no natural person is identified under (a) or (b) above, financial institutions should identify and take reasonable measures to verify the identity of the relevant natural person who holds the position of senior managing official.

***Financial Institution*** means a Custodial Institution, a Depository Institution, an Investment Entity, or a Specified Insurance Company, where:

(a)   ***Custodial Institution*** means any entity that holds, as a substantial portion of its business, financial assets for the account of others. An entity holds financial assets for the account of others as a substantial portion of its business if the entity's gross income attributable to the holding of financial assets and related financial services equals or exceeds 20 percent of the Entity's gross income during the shorter of: (i) the three-year period that ends on 31 December (or the final day of a non-calendar year accounting period) prior to the year in which the determination is being made; or (ii) the period during which the entity has been in existence;

(b)   ***Depository Institution*** means any entity that accepts deposits in the ordinary course of a banking or similar business;

(c)   ***Investment Entity*** means any entity :

(A)   that primarily conducts as a business one or more of the following activities or operations for or on behalf of a customer:

    i)     trading in money market instruments (cheques, bills, certificates of deposit, derivatives, etc.); foreign exchange; exchange, interest rate and index instruments; transferable securities; or commodity futures trading;

    ii)    individual and collective portfolio management; or

    iii)   otherwise investing, administering, or managing Financial Assets or money on behalf of other persons; or

(B)   the gross income of which is primarily attributable to investing, reinvesting, or trading in Financial Assets, if the entity is managed by another entity that is a Depository Institution, a Custodial Institution, a Specified Insurance Company, or an Investment Entity described in limb (A) of this definition.

An entity is treated as primarily conducting as a business one or more of the activities described in limb (A), or an entity's gross income is primarily attributable to investing, reinvesting, or trading in Financial Assets for purposes of limb (B) if the entity's gross income attributable to the relevant activities equals or exceeds 50% of the entity's gross income during the shorter of: (i) the three-year period ending on 31 December of the year preceding the year in which the determination is made; or (ii) the period during which the entity has been in existence. The term "Investment Entity" does not include an entity that is an Active Non-Financial Foreign Entity because it meets any of the criteria in subparagraphs d) through (g) of the definition of Active NFE.

---

[21]   Measures (a) to (b) are not alternative options, but are cascading measures, with each to be used where the previous measure has been applied and has not identified a beneficial owner.

[22]   A controlling ownership interest depends on the ownership structure of the company. The threshold in respect of a legal person is direct or indirect ownership or control of 10% or more of the shares or voting rights in the legal person, being the threshold specified by the Anti-Money Laundering Regulations, 2017 which implement the FATF Recommendations in the Cayman Islands.

DocuSign Envelope ID: 3AC1ED55-2ACA-4680-9465-89CFC07D1B00

The preceding paragraph shall be interpreted in a manner consistent with similar language set forth in the definition of "financial institution" in the Financial Action Task Force Recommendations; and

(d) **Specified Insurance Company** means any entity that is an insurance company (or the holding company of an insurance company) that issues, or is obligated to make payments with respect to, a Cash Value Insurance Contract or an Annuity Contract.

**Non-Financial Entity** or **NFE** means any Entity that is not a Financial Institution.

**Non-Participating Jurisdiction** means a jurisdiction that is not a Participating Jurisdiction.

**Non-Reporting Financial Institution** means any Financial Institution that is:

(a) a Governmental Entity, International Organisation or Central Bank, other than with respect to a payment that is derived from an obligation held in connection with a commercial financial activity of a type engaged in by a Specified Insurance Company, Custodial Institution, or Depository Institution;

(b) a Broad Participation Retirement Fund; a Narrow Participation Retirement Fund; a Pension Fund of a Governmental Entity, International Organisation or Central Bank; or a Qualified Credit Card Issuer;

(c) any other Entity that presents a low risk of being used to evade tax, has substantially similar characteristics to any of the Entities described in subparagraphs B(1)(a) and (b), and is defined in domestic law as a Non-Reporting Financial Institution, provided that the status of such Entity as a Non-Reporting Financial Institution does not frustrate the purposes of the Common Reporting Standard;

(d) an Exempt Collective Investment Vehicle; or

(e) a trust to the extent that the trustee of the trust is a Reporting Financial Institution and reports all information required to be reported pursuant to Section I with respect to all Reportable Accounts of the trust.

**Participating Jurisdiction** means a jurisdiction (i) with which an agreement is in place pursuant to which it will provide the information specified in Section I (of the CRS), and (ii) which is identified in a published list.

**Participating Jurisdiction Financial Institution** means (i) any Financial Institution that is resident in a Participating Jurisdiction, but excludes any branch of that Financial Institution that is located outside such Participating Jurisdiction, and (ii) any branch of a Financial Institution that is not resident in a Participating Jurisdiction, if that branch is located in such Participating Jurisdiction.

**Passive Non-Financial Entity** means any: (i) Non-Financial Entity that is not an Active Non-Financial Entity; or (ii) an Investment Entity described in limb B (or subparagraph A(6)(b) of the Standard) of the definition of Investment Entity that is not a Participating Jurisdiction Financial Institution.

**Related Entity** means an entity related to another entity because (i) either entity controls the other entity; (ii) the two entities are under common control; or (iii) the two entities are Investment Entities described limb B of the definition of Investment Entity, are under common management, and such management fulfils the due diligence obligations of such Investment Entities. For this purpose control includes direct or indirect ownership of more than 50 % of the vote and value in an Entity.