UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **THIRD-PARTY PETITION TO ADJUDICATE PETITIONERS' INTEREST IN FORFEITED PROPERTY AND TO AMEND THE PRELIMINARY ORDER OF FORFEITURE  -** |
| - v. - | |
| YVETTE WANG a/k/a "Yanping," a/k/a "Y," | **VERIFIED CLAIM OF HIMALAYA INTERNATIONAL FINANCIAL GROUP, LTD., HIMALAYA INTERNATIONAL RESERVES, LTD., HIMALAYA INTERNATIONAL CLEARING, LTD., HIMALAYA CURRENCY CLEARING PTY LTD., HAMILTON CAPITAL HOLDING, LTD., AND HAMILTON OPPORTUNITY FUND SPC** |
| Defendant. | |
| | S4 23 Cr. 118 (AT) |

Petitioners Himalaya International Financial Group, Ltd. ("HIFG"), Himalaya International Reserves, Ltd. ("Himalaya International Reserves"), Himalaya International Clearing, Ltd. ("Himalaya International Clearing")[1], Hamilton Capital Holding, Ltd ("HCH"), Himalaya Currency Clearing, Ltd. ("Himalaya Currency Clearing")[2], and Hamilton Opportunity Fund SPC ("Hamilton") (together, Himalaya Group, Exchange Service Companies, and Hamilton are the "Petitioners") file this Third-Party Petition to Adjudicate Petitioners' Interest in Forfeited Property and to Amend the Preliminary Order of Forfeiture, pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(c) (the "Petition"). Petitioners seek the return of funds in

---

[1] Collectively, HIFG, Himalaya International Reserves and Himalaya International Clearing are the "Himalaya Group."

[2] Collectively, HCH and Himalaya Currency Clearing are "Exchange Service Companies."

which Petitioners have a legal right, title, and/or interest ("Petitioners' Property") (as defined below) and that the United States Government (the "Government") seized as part of an order of forfeiture entered into with Defendant Yvette Wang ("Defendant Wang"). However, any order of forfeiture reaching the funds in the Accounts is unlawful and improper as Defendant Wang has no legal right, title, or interest in the Accounts or the funds therein. The Forfeiture Order[3] is therefore rendered invalid as to Petitioners' Property because the right, title, or interest in Petitioners' Property was vested in Petitioners rather than Defendant Wang, and was superior to any right, title, or interest of Defendant Wang at the time of the commission of the acts which gave rise to the Forfeiture Order. As such, this Court should amend the Forfeiture Order to remove Petitioners' Property from the Forfeiture Order and order that the Government immediately return Petitioners' Property to Petitioners.[4] In support of Petitioners' claim, Petitioners respectfully state as follows:

## I.    **PRELIMINARY STATEMENT**

This Petition is aimed primarily to stop the forfeiture of funds that belong to legitimate Customers of a legitimate business – the Himalaya Exchange (the "Exchange") – and to return such funds to those Customers. As part of Defendant Wang's sentencing, the Government seeks to forfeit hundreds of millions of dollars of funds in various accounts without showing that these funds have the requisite nexus to the charges to which Defendant Wang pled guilty. In the

---

[3] Reference is to the Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment (the "Forfeiture Order") that this Court entered on January 7, 2025, with consent from Defendant Wang. ECF No. 488.

[4] The ultimate goal here is to return any funds properly invested by Petitioners' customers and/or investors in the Exchange ("Customers") to the Customers themselves. As such, Petitioners reserve the right to request that any part of Petitioners' Property that came from Customers is returned directly to such Customers. Additionally, to the extent any Customers file petitions in this matter, Petitioners reserve the right to endorse the legal theories in such petitions, and to make the arguments in this Petition – or some portion of this Petition – in the alternative, solely to be applied in case the Court deems that Petitioners' Property remains the legal property of Petitioners, rather than the Customers.

Superseding Information (as defined below), there is only one allegation with respect to the Exchange - that "coconspirators" (not even Defendant Wang herself) "made false representations to investors that. . .they would receive cryptocurrency in exchange for their investments into the Himalaya Exchange." Superseding Information at 2. However, it is unclear what nexus exists between this allegation and the attempted forfeiture of Petitioners' Property.

If the Government is taking the position that Defendant Wang made any misrepresentations regarding the Exchange – and it is not even clear the Government is making this allegation – such representations were not authorized by the Exchange or made as an agent of the Exchange, and the Exchange bears no responsibility for any such statements. The only representations from the Exchange to investors about the mechanics of the Exchange, including what Customers would receive, were those contained in the terms and conditions of the Exchange and the White Papers of the Exchange, which were reviewed by lawyers in 12 jurisdictions and published on the Exchange website. The Exchange bears no responsibility for any other statements made by any other actors about how the Exchange operates, particularly if such statements are contradicted by the clear statements in the White Papers and the terms and conditions of the Exchange. And, importantly, despite the Government's contentions otherwise, Petitioners staunchly maintain that any of the Exchange's Customers who invested in Himalaya Exchange *did* receive cryptocurrency (assuming they passed the requisite Know-Your-Customer ("KYC") protocol), which is verified by the cryptocurrency auditor, Armanino LLP, and the cryptocurrency expert, Maggie Sklar.

It is unclear what basis the Government has for attempting this forfeiture of the Exchange's accounts. It is even more unclear what basis the Government has for attempting the forfeiture of the accounts of the other entities discussed herein, which are only tangentially related to the

Exchange. The Government cannot rely on Defendant Wang's "consent" to seize accounts without proving the requisite nexus.

As will be shown below, Petitioners are all the named owners of their respective Accounts and thus have a valid property interest in Petitioners' Property - the funds in the Accounts. Petitioners' Property cannot be seized by the Government in this case. Neither Defendant Wang, nor the Government who now stands in her shoes, have demonstrated that they have the requisite interest in Petitioners' Property to justify forfeiture under the law. While Defendant Wang consented to the forfeiture of "all her right, title, and interest" in Petitioners' Property in the Forfeiture Order (ECF No. 488 at 2-3), her consent has no legal bearing as to Petitioners' Property. Defendant Wang cannot forfeit property that she does not own, and in which she has no interest. In fact, it appears that the Court never established that Petitioners' Property is even subject to forfeiture in the first instance, as required by Fed.R.Crim.P. 32.2(b)(1)(A). Due to the Government's improper seizures, the Exchange's operations have been frozen, jeopardized, and continue to be jeopardized to this day.

For all the foregoing reasons, and for the reasons demonstrated below, Petitioners respectfully request that this Court: (1) grant this Petition; (2) amend the Forfeiture Order to exclude Petitioners' Property; (3) order the immediate return of Petitioners' Property to Petitioners[5]; (4) order that Petitioners are entitled to recover Petitioners' attorneys' fees and costs incurred in connection with this Petition and grant Petitioners leave to submit an application for such attorneys' fees and costs; and (5) grant such and other relief that is necessary and just.

---

[5] With the caveat noted in footnote 4, *supra*.

II.    **BACKGROUND FACTS**

A.  **The Himalaya Exchange – Overview**

1.      The Himalaya Group owns and operates the Exchange – a cryptocurrency[6] exchange.

2.      The Exchange employs stringent onboarding protocols, comprehensive Anti-Money Laundering ("AML") and KYC checks and proper regulatory mapping as to where they can provide their services and the prohibition of providing services in jurisdictions in which they still were required to obtain licenses, including the U.S.

3.      The Exchange has more than 10,000 customers. The Exchange facilitates the buying and selling of two types of digital assets: the Himalaya Dollar, known as the "HDO" ("HDO") and the Himalaya Coin, known as the "HCN" (the "HCN").

4.      The HDO is a "stable coin" token that is intended to be fixed to the U.S. dollar and was at all times backed by reserves consisting of dollar-for-dollar cash or cash-equivalent assets (the "Reserves"). At all times prior to the Government's seizures of the Accounts, the Reserves contained assets that were equivalent in value to all HDO's in circulation at any given time. The Reserves will be discussed more fully below.

5.      The HCN is a trading cryptocurrency valued by supply and demand. Customers use HDO to purchase HCN and then can sell HCN to obtain HDO, which can be redeemed back to fiat U.S. dollar.

---

[6] Again, we note the Government's position that the Exchange was not a legitimate cryptocurrency, however, Petitioners strongly disagree and maintain that a preponderance of the evidence will show that the Exchange was, indeed, a legitimate cryptocurrency and that the facts stated herein are correct.

B. **The Himalaya Group Entities Relevant to this Petition, their Role in the Operation of the Exchange, and their Seized Property**

    i)     *Himalaya International Clearing*

6.    Himalaya International Clearing is an entity organized under the laws of the British Virgin Islands ("BVI").

7.    The Himalaya International Clearing's trading name is Himalaya Exchange.

8.    Himalaya International Clearing maintains bank accounts that serve as clearing accounts for customer deposits and redemptions (the "Clearing Accounts") (as more fully defined below).

9.    When a customer purchases HDOs, the customer's cash payment is initially deposited into a Clearing Account. In exchange, the customer receives a credit for an equivalent number of HDOs. The customer can then use his or her HDO credits to buy and sell HCNs, the Exchange's market-traded cryptocurrency. When customers buy and sell HCNs, they are credited or debited HDOs in an amount corresponding to the market price of the HCN at the time of the transaction. When customers want to redeem their HDOs back into U.S. dollars, this redemption also occurs through the Clearing Accounts, with cash being sent back from the Clearing Accounts to the customer's personal bank account.

10.    The Government seized two of Himalaya International Clearing's bank accounts. The first bank account seized by the Government is as follows:

    $14,599,257.25 in United States currency formerly on deposit in account number 7801000254 at FV Bank, held in the name of "Himalaya International Clearing, Ltd." and seized by the Government on or about September 20, 2022 (23-FBl-000051).

Original Forfeiture Order[7] at 3; Forfeiture Order at 3. This bank account will be hereinafter referred to as the "FV Clearing Account." The second Clearing Account that was seized by the Government is as follows:

> $10,008,284.04 in United States currency formerly on deposit in account number MBl10133-0000 at Mercantile Bank International, held in the name of "Himalaya International Clearing Ltd." and seized by the Government between on or about October 16, 2022, and on or about March 10, 2023 (23-FBl-000289).

Original Forfeiture Order at 4; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "Mercantile Clearing Account."

11.     The FV Clearing Account and the Mercantile Clearing Account contain the funds of the Exchange's customers.

ii)     *Himalaya International Reserves*

12.     Himalaya International Reserves is a limited company incorporated in the BVI.

13.     Himalaya International Reserves owns the bank accounts that hold funds that make up the cash reserves backing the HDO (the "Reserves Accounts") (as more fully described below).

14.     The Reserve Accounts also consist of customer funds.

15.     After a customer purchases HDOs, funds processed in the Clearing Accounts are often sent to the Reserves Accounts, where they back the HDOs. Likewise, when customers seek to redeem their HDOs back to hard currency, money in the Reserves Accounts travels back to the Clearing Accounts to meet the redemption request. In addition, the Clearing Accounts discussed above also contain a large buffer of reserves to facilitate customer redemptions.

16.     Himalaya International Reserves is also the entity that issues the HDOs.

---

[7] Reference is to the Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment ("Original Forfeiture Order") entered by this Court on May 3, 2024, as consented to by Defendant Wang. ECF No. 329.

17.     At all times prior to the Government seizures, the Reserves Accounts held cash or cash-equivalent assets that backed 100% of the HDOs in circulation at any given time. This is supported by two audits conducted by Armanino LLP – a reputable stable coin auditor. A true and correct copy of the supporting Armanino reports are attached hereto as **Exhibit A** and **Exhibit B**. These audits were done soon after the exchange was launched and then a few months before the seizures occurred.

18.     The Government seized two bank accounts held by Himalaya International Reserves. The first bank accounts seized by the Government is as follows:

> $4,643,744.70 in United States currency formerly on deposit in account number 7801000590 at **FV Bank**, held in the name of "Himalaya International Reserves, Ltd." and seized by the Government on or about September 20, 2022 (23-FBl-000050).

Original Forfeiture Order at 3; Forfeiture Order at 3. This bank account will be hereinafter referred to as the "FV Reserves Account." The second Himalaya International Reserves account that was seized by the Government is as follows:

> $272,350,429.22 in United States currency formerly on deposit in account number MBl10138-0000 at **Mercantile Bank International**, held in the name of "Himalaya International Reserves Ltd." and seized by the Government between on or about October 16, 2022, and on or about March 10, 2023 (23-FBl-000290).

Original Forfeiture Order at 4; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "Mercantile Reserves Account." Together, the FV Reserves Account and the Mercantile Reserves Account are the "Reserves Accounts."

19.     Given the size of the Exchange and the size of the reserves prior to the seizure, the Exchange held additional reserves in various other bank accounts in addition to the Reserves Accounts and the Clearing Accounts discussed above. For example, prior to the seizure, the Exchange had approximately $75 million in cash reserves that were held via one of Hamilton's

segregated funds, Hamilton FX Fund SP (the "FX Fund"). This will be discussed below.

        iii)    *Himalaya International Financial Group, Ltd.*

20.     HIFG is an entity organized under the laws of BVI.

21.     HIFG issues and manages the HCN.

22.     HFIG's bank accounts hold commissions or revenues earned by the Exchange (the "Exchange Earnings"), which are largely used to meet operational expenses. Portions of the Exchange Earnings were used for operating purposes and for certain discretionary loans; however, Customer funds were never used for such purposes – again, the customer Reserve Accounts were fully intact and accounted for at the time of the Government's seizure of Petitioners' Property.

23.     The Government seized two of HFIG's bank accounts. The first HIFG bank account seized by the Government is as follows:

> $7,715.00 in United States currency formerly on deposit in account number 7801000589 at FV Bank, held in the name of "Himalaya International Financial Group, Ltd." and seized by the Government on or about September 20, 2022 (23-FBl-000011).

Original Forfeiture Order at 4; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "First HIFG Account." The second HIFG account that was seized by the Government is as follows:

> $310,594.31 in United States currency formerly on deposit in account number MBl10139-0000 at **Mercantile Bank International**, held in the name of "Himalaya International Financial Group Ltd." and seized by the Government between on or about October 16, 2022, and on or about March 10, 2023 (23-FBl-000182).

Original Forfeiture Order at 4; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "Second HIFG Account." The First HIFG Account and the Second HIFG account are collectively, the "HIFG Accounts."

## C. **Other Entities Relevant to the Operations of the Exchange**

   iv) *Hamilton Capital Holding*

24. Hamilton Capital Holding is an entity organized under the law of the United Kingdom.

25. Hamilton Capital Holding provides various services to the Exchange. These services include staffing, legal and compliance, accounting and finance, cybersecurity, programming, marketing, customer services, and entering into contracts with third-party vendors. Payments pursuant to these contracts are made through Hamilton Capital Holding.

26. The Hamilton Capital Holding account seized by the Government is as follows:

$3,090,856.54 in United States currency formerly on deposit in account number MBl10137-0000 at Mercantile Bank International, held in the name of "Hamilton Capital Holding Ltd." and seized by the Government between on or about October 16, 2022, and on or about March 10, 2023 (23-FBl-000288).

Original Forfeiture Order at 4; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "First Services Account."

   v) *Himalaya Currency Clearing*

27. Himalaya Currency Clearing is an entity organized under the laws of Australia.

28. The Himalaya Currency Clearing account seized by the Government is as follows:

$176,983.37 in United States currency formerly on deposit in account number MBl10183-0000 at Mercantile Bank International, held in the name of "Himalaya Currency Clearing Pty Ltd." and seized by the Government on or about October 16, 2022 (23-FBl-000183).

Original Forfeiture Order at 5[8]; Forfeiture Order at 4. This bank account will be hereinafter referred to as the "Second Services Account." Together, the First Services Account and the Second Services Account are the "Services Accounts."

        vi)    *Hamilton FX Fund SP*

29.     The Hamilton FX Fund SP (the "FX Fund") is a segregated portfolio of Hamilton. Hamilton is Cayman Islands Segregated Portfolio Company operating as a mutual fund under Section 4(3) of the Mutual Funds Law (Revised) of the Cayman Islands. Pursuant to the laws of the Cayman Islands, the assets of Hamilton FX were kept segregated, separate, and separately identifiable from those of any other segregated portfolios of Hamilton and any general assets of Hamilton.

30.     As discussed above, the FX Fund held additional HDO reserves for the Exchange in its bank account. However, these funds had been seized by the Government. Specifically, FX Fund's account that was seized is as follows:

> $75,000,000.00 in United States currency formerly on deposit in account number 5090037705 at **Silvergate Bank**, held in the name of "Hamilton Opportunity Fund SPC" and seized by the Government on or about September 18, 2022 (23-FBl-000078).

Original Forfeiture Order at 2; Forfeiture Order at 2. This bank account will be hereinafter referred to as the "FX Reserves Account."

31.     Together, the Clearing Accounts, the Reserves Accounts, HFIG Accounts, the Services Accounts, and the FX Reserves Account are the "Accounts."

32.     Because Petitioners are the named account holder of its respective accounts as described above, and because they exercise full dominion and control over the funds in those

---

[8] In the Original Forfeiture Order, the amount in the Second Services Account was listed as $161,809.47. *See* Original Forfeiture Order at 5.

respective accounts, each Petitioner has a property interest in its respective funds deposited the Accounts (collectively, the "Petitioners' Property").

**D.  The Criminal Case of Defendant Wang and Defendant Guo**

33.    On March 6, 2023, the Government filed an indictment against Defendant Wang, Defendant Guo, and a third defendant, William Je, who has never been arraigned. ECF No. 2.

34.    On May 3, 2024, the Government filed a superseding information (the "Superseding Information") against Defendant Wang. ECF No. 325. The Superseding Information charged Defendant Wang with one count of Conspiracy to Commit Wire Fraud (Count I) (Superseding Information at 1-2) and one count of Conspiracy to Commit Money Laundering (Count II) (Superseding Information at 2-4). The Superseding Information also contained a Forfeiture Allegation (the "Forfeiture Allegation"). Superseding Information at 4.

35.    On the same day, May 3, 2024, Defendant Wang pled guilty to Count I and Count II as charged in the Superseding Information.

36.    Also on May 3, 2024, this Court entered the Original Forfeiture Order. ECF No. 329.

37.    In the Original Forfeiture Order, Defendant Wang consented to forfeit, "all *her* right, title, and interest in" certain assets, including the Accounts, because such property purportedly "constitute[ed] proceeds of the offenses charged in Count One that the Defendant personally obtained and/or property involved in offense charged in Count Two of the [Superseding] Information." Original Forfeiture Order at 2-6 (emphasis added).

38.    Defendant Guo did not plead guilty to any of the offenses charged against him. Accordingly, a jury trial was held between May 22, 2024 and July 16, 2024 (the "Guo Trial"). On July 16, 2024, the jury found Defendant Guo guilty of racketeering conspiracy, conspiracy to commit wire fraud, conspiracy to commit money laundering, conspiracy to commit securities

fraud, securities fraud, wire fraud, and money laundering. ECF No. 395. As of the date of this Petition, Defendant Guo has not yet been sentenced.

39.    On January 6, 2025, Defendant Wang was sentenced.

40.    On January 7, 2025, this Court entered the Forfeiture Order. ECF No. 488. As it pertains to Petitioners, the Forfeiture Order is substantially similar to the Original Forfeiture Order in all material respects. In the Forfeiture Order, Defendant Wang consented to forfeit, "all *her* right, title, and interest in" certain assets, including the Accounts, because such property purportedly "constitute[ed] proceeds of the offenses charged in Count One that the Defendant personally obtained and/or property involved in offense charged in Count Two of the [Superseding] Information." Forfeiture Order at 2-11 (emphasis added).

## III.    __ARGUMENT__

41.    In an ancillary criminal forfeiture proceeding pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(c)(1), this Court must determine, by a preponderance of the evidence, whether a petitioner has a legal right, title, or interest in the property to be forfeited, and whether such right, title, or interest renders the order of forfeiture invalid, in whole or in part, because such interest was vested in the petitioner rather than the defendant, or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property. *See* 21 U.S.C. § 853(n)(6)(A).

42.    Here, Petitioners have a legal right, title, or interest in Petitioners' Property pursuant to 21 U.S.C. §853(n)(6)(A) because they are the legal owners of the Accounts and exercise dominion and control over the funds contained therein. Moreover, Petitioners' interest in Petitioners' Property was both vested in Petitioners and was superior to any right Defendant Wang had in Petitioners' Property because Defendant Wang had *no* legal right, title or, interest in Petitioners' Property. In other words, Defendant Wang could not forfeit her interest in the

Accounts because she had no interest that was properly subject to criminal forfeiture. Accordingly, the Forfeiture Order should be amended to remove Petitioners' Property, and Petitioners' Property should be returned to the Petitioners.[9]

### A. <u>The Government Failed to Demonstrate that the Funds in the Accounts Were Properly Subject to Forfeiture in the First Instance, Making the Forfeiture Order Improper as to Such Funds</u>

43.     The Government has no legal cause to retain Petitioners' Property because the Government has failed to present any evidence to demonstrate that Petitioners' Property constitutes forfeitable property as required by Fed.R.Crim.P. 32.2(b)(1)(A).

44.     "When the government seeks to obtain an order of forfeiture, 'Federal Rule of Criminal Procedure 32.2(b)(1) ... requires the sentencing court to determine what property is subject to forfeiture under the applicable statute.'" *United States v. Watts*, 786 F.3d 152, 172 (2d Cir. 2015) (citing *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir.2007)). Pursuant to Fed.R.Crim.P. 32.2, "if the government seeks forfeiture of specific property, the court *must* determine whether the government has established the requisite nexus between the property and the offense." Fed.R.Crim.P. 32.2.(b)(1)(A) (emphasis added); *U.S. v. Watts*, 786 F.3d at 172. "At various points in the proceedings, *the government bears the burden of proving this legal conclusion* to varying degrees of certainty: as a matter of probable cause at a post-indictment hearing. . .or by a preponderance of the evidence at a bench trial or before a jury." *Id.* (emphasis added) (internal citations omitted). "Only if the government meets the relevant legal threshold, however, may the property in question be considered 'subject to forfeiture' in any legal sense. Prior to that, while the government has simply announced its intent to seek forfeiture through the indictment, the property is seen merely as 'potentially forfeitable' . . . or 'potentially subject to

---

[9] Again, with the caveat noted in footnote 4, *supra*.

forfeiture.'" *Id.* (internal citations omitted).

45.     This means that before the court even reaches the question of whether the Petitioners are entitled to the return of the property under §853(n), it is necessary to determine if the property in dispute is actually forfeitable in the first instance. If not, the government had no statutory authority to seize the property. If the property was improperly seized, the government must return the accounts seized regardless of whether the claimant can meet the criteria set forth in §853(n). *See e.g. United States v. Delco Wire & Cable Co.*, 772 F. Supp. 1511, 1518 (E.D.PA, 1991).

46.     A full and complete Fed. R. Crim. P. 32.2(b)(1)(A) inquiry is critical to the fair administration of justice. The entire forfeiture system rests upon the supposition that a court has conducted an inquiry and determined that the property is subject to forfeiture. In enacting ancillary proceeding statutes, Congress chose to place the burden of proof on the third-party during an ancillary proceeding, since "the United States will have already proven its forfeiture allegations in the criminal case beyond a reasonable doubt." S. REP. 98-225, 209, 1984 U.S.C.C.A.N. 3182, 3392.

47.     In this matter, there has never been a determination that there exists a nexus between the Accounts and any of the offenses with which Defendant Wang was charged (and to which she pled guilty), and, as a result, Petitioners are forced to file this Petition.

48.     As to Count I, the Forfeiture Allegation states that, "[a]s a result of committing the wire fraud offense alleged in Count One of this Superseding Information, YVETTE WANG, a/k/a "Yanping" a/k/a "Y," the defendant, shall forfeit to the United States pursuant to Title 18, United

States Code, Section[] 981(a)(1)(C)[10]. . .and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense." Superseding Information at 4.

49.    The Government must prove the elements of forfeiture under 18 U.S.C. § 981(a)(1)(C) by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). Moreover, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

50.    In Defendant Wang's criminal case, the Government has not shown how funds in the Accounts are, or are derived from, proceeds traceable to Defendant Wang's conspiracy to commit wire fraud. The Superseding Information alleges that "[f]rom at least in or about 2018 until at least on or about March 15, 2023, coconspirators made false representations to investors that they would receive stock in exchange for their investments in GTV, the Himalaya Farm Alliance organization, and GClubs, and *that they would receive cryptocurrency in exchange for their investments in the Himalaya Exchange* [(the "Fraud Scheme")]. Through the [Fraud Scheme], YVETTE WANG, a/k/a 'Yanping,' a/k/a 'Y,' the defendant, and her coconspirators, including Miles Guo, induced investors to invest more than $1 billion into entities Guo controlled." Superseding Information at 2 (emphasis added).

51.    There is nothing from these allegations that show a direct nexus between the charge

---

[10] 18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, [is subject to forfeiture] which constitutes or is derived from proceeds traceable to a violation of" various specified offenses, including violations of 18 U.S.C. § 1343, wire fraud, as charged against Defendant Wang in Count I.

of conspiracy to commit wire fraud and the Accounts. There is no evidence that Defendant Wang (as opposed to unidentified purported "coconspirators") made any false statements regarding the receipt of cryptocurrency to anyone, and certainly not to any customers who invested in the Exchange. Here, Petitioners believe that the preponderance of evidence will show that, notwithstanding the Government's position to the contrary, all customers who deposited money into the Exchange did receive cryptocurrency and were able to redeem that cryptocurrency prior to the seizures. As such, any statements about the receipt of cryptocurrency would not be false and would therefore not be fraudulent. The Superseding Information is therefore silent on any information that would indicate there is a nexus between funds in the Accounts and Defendant Wang's wire fraud charge, let alone sufficient evidence to determine that the Government met its burden of showing, and the Court properly adjudicated, that the appropriate nexus exists for forfeiture of the Accounts to be proper.

52.     As to Count II, the Forfeiture Allegation states that, "[a]s a result of committing the money laundering offense alleged in Count Two of this Information, YVETTE WANG, a/k/a "Yanping" a/k/a "Y," the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1)[11], any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense." Superseding Information at 4. As to Count II, The Government "must prove the elements of forfeiture under 18 U.S.C. § 982(a)(1) by a preponderance of the evidence." *U.S. v. Beltramea*, 785 F.3d 287, 290 (8th

---

[11] 18 U.S.C. § 982(a)(1) provides that "[t]he court, imposing sentence on a person convicted of an offense in violation of section 1956 [the money-laundering statute] of this title . . . shall order that the person forfeit to the United States any property, real or personal, *involved in such offense*, or any property *traceable to such property*." 18 U.S.C. § 982(a)(1) (emphasis added).

Cir. 2015).

53.     The Superseding Information alleges that Defendant Wang committed conspiracy to launder money because Defendant Wang "knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions. . .and which in fact involved the proceeds of specified unlawful activity, to wit, proceeds of the wire fraud scheme alleged in Count One of this Information." Superseding Information at 3.

54.     Here, the Accounts cannot be forfeited for the money laundering charge in Count II. From the allegations, the charge of money laundering arises from Defendant Wang engaging in financial transactions with the "proceeds of the wire fraud scheme alleged in Count One." Superseding Information at 3. As argued above, the Government has not met its burden of demonstrating how the funds in the Accounts were related to the Fraud Scheme alleged in Count I (*see* ¶¶ 48-51, above) – there is no information from which to glean that such funds "constitute[d] or [were] derived from proceeds traceable to the commission of" wire fraud. *See e.g.* 18 U.S.C. § 981(a)(1)(C). Accordingly, such funds could not serve as the basis for the money laundering charge in Count II and cannot be forfeited as part of Defendant Wang's conviction for Count II.

55.     The overt acts that the Government alleges to support the money laundering charge further fail to show how the funds in the Accounts can be forfeitable. In the Superseding Information, the Government sets forth two acts evidencing money laundering.[12] Superseding Information at 3.

56.     First, per the Superseding Information, on May 20, 2020, Defendant Wang opened

---

[12] Although the Government states that these two overt acts were "among others" that Defendant Wang committed in furtherance of the alleged conspiracy to launder money (Superseding Information at 3), these other acts are not identified.

a bank account in the name of GTV. Superseding Information at 3. Notably, none of the Accounts were in the name of GTV. Also, according to the Superseding Information, on June 2, 2020, Defendant Wang transferred approximately $200 million to the GTV account. *Id.* The funds transferred into the GTV account were from a JP Morgan Chase Bank account held by Saraca Media, Group, Inc. ("Saraca") (Guo Trial, 05/31/2024, 953:25-954:4; Guo Trial, 06/26/2024, 4359:1-14), *not* from any of the Accounts.

57.    The second act the Government alleges in the Superseding Information for Count II is that "on or about June 5, 2020," Defendant Wang "authorized a wire transfer of $100 million from GTV's parent company, Saraca Media, Group, Inc., to a high-risk hedge fund, for the benefit of Saraca and its ultimate beneficial owner, Guo's son." Superseding Information at 3-4. This plainly alleges that the money was transferred from a Saraca account, which the Accounts were demonstrably not.[13]

58.    As seen from above, there is not a sufficient nexus between Defendant Wang's charges and the Accounts to permit a forfeiture of the Accounts. There are no allegations in the Superseding Information with respect to specific Accounts, any specific investments that the Government deems fraudulent, or how Defendant Wang acquired interest in the Accounts that she can now forfeit. The *only* concrete reference in the record as to the Accounts in Defendant Wang's case is Defendant Wang's consent to forfeit these funds. However, "a defendant's consent to forfeiture [does not] abrogate the requirement that a nexus exist between the property sought for forfeiture and the conviction of offense." *Beltramea*, 785 F.3d at 291. As the Eighth Circuit stressed, "[t]he district court had an independent duty to *ensure* that the required nexus exists." *Id.*

---

[13] It should be noted that the $100 million transfer from Saraca was to the Hayman Hong Kong Opportunities Onshore Fund L.P., an entity that has no relationship to any of the Petitioners.

(emphasis added).

59.     Here, there are no factual allegations in the Superseding Information in the Original Forfeiture Order or the Forfeiture Order as to an alleged nexus between the Accounts and the offenses to which Defendant Wang pled guilty.

**B.  Petitioners Have an Interest in Petitioners' Property Because They are the Named Owners of the Accounts**

60.     Here, Petitioners have a legal interest and right in the funds in Accounts by virtue of being the named owners of the Accounts associated with them and having complete dominion and control over the funds in their respective Accounts. Thus, Petitioners have standing to challenge the Forfeiture Order.

**C.  Petitioners Have a Superior Interest in the Petitioners' Property**

61.     Petitioners' interest in Petitioners' Property is superior to any interest that the Government or Defendant Wang have in Petitioners' Property.

62.     21 U.S.C. § 853(n) is clear that, in addition to establishing Petitioners' interest in the forfeited property, that Petitioners must demonstrate, by a preponderance of the evidence, that Petitioners' interest "renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner *rather than the defendant* or was superior to any right, title, or interest *of the defendant* at the time of the commission of the acts which give rise to the forfeiture of the property under this section." 21 U.S.C. § 853(n)(6)(A) (emphasis added).

63.     Here, as set forth above, the Government never met their burden of proof to show that the Accounts were property that would be properly subject to forfeiture in Defendant Wang's case. As such, the Government never demonstrated that its interest in the Accounts is superior to that of Petitioners.

64.     To be sure, "[u]nlike a civil forfeiture action, which is an *in rem* proceeding brought

against the property sought to be forfeited, criminal forfeiture is an *in personam* proceeding. . .[it] is a sanction against the individual defendant rather than a judgment against the property itself. . . Thus, in a criminal forfeiture proceeding, the Government acquires only the *defendant's* interest in the property. Because criminal forfeiture follows the defendant as part of his penalty, the Government may seize any of the *defendant's* property that is traceable to the proceeds of criminal conduct." *U.S. v. Bailey*, No. 1:11CR10, 2012 WL 569744, at *14 (W.D.N.C. Feb. 22, 2012) (internal citations omitted) (emphasis in original).

65.    It is axiomatic that neither the Government nor Defendant Wang can argue that they have a superior interest in a property in which they never had an interest. Accordingly, Petitioners' interest in the Account is superior to that of Defendant Wang and the Government.

### D.  Petitioners Are Entitled to Costs and Attorneys' Fees

66.    Petitioners have been required to retain legal counsel and have incurred costs to file this petition asserting Petitioners' right to Petitioners' Property and to challenge the forfeiture of Petitioners' Property. Upon prevailing in this proceeding, Petitioners reserve all rights to recover attorneys' fees and costs incurred in connection with this Petition and may recover Petitioners' costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Federal courts have consistently held that § 853(n) proceedings are civil for the purposes of allowing a successful claimant to collect attorney's fees under the EAJA. *See United States v. Cox*, 575 F.3d 352, 355 (4th Cir. 2009); *United States v. Douglas*, 55 F.3d 584, 588 (11th Cir. 1995); *U.S. v. Bailey*, 2015 WL 1893610 at *20 (W.D.N.C. Apr. 27, 2015).

### IV.  CONCLUSION

67.    For the reasons stated above, Petitioners have an interest in Petitioners' Property, which renders the Forfeiture Order invalid as to such property. *See e.g.* 21 U.S.C. § 853(n)(6)(A). Defendant Wang does not have any right, title, or interest in Petitioners' Property, and never did.

Petitioners have proven, and can prove at any necessary hearing, by preponderance of evidence that the Forfeiture Order needs to be amended to exclude Petitioners' Property.

68.    Therefore, Petitioners respectfully request that this Court: (1) grant this Petition; (2) amend the Forfeiture Order to exclude Petitioners' Property; (3) order the immediate return of Petitioners' Property to Petitioners[14]; (4) order that Petitioners are entitled to recover Petitioners' attorneys' fees and costs incurred in connection with this Petition and grant Petitioners leave to submit an application for such attorneys' fees and costs; and (5) grant such and other relief that is necessary and just.

Dated: April 7, 2025                                  Respectfully submitted,

/s/ Jeffrey S. Gavenman
Jeffrey S. Gavenman, Esq.
Jeremy W. Schulman, Esq.
SCHULMAN BHATTACHARYA, LLC
6116 Executive Boulevard, Suite 425
North Bethesda, MD 20852
(240) 356-8550
jgavenman@schulmanbh.com
jschulman@schulmanbh.com

/s/ Paul W. Butler
Paul W. Butler, Esq.
BUTLER LEGAL STRATEGIES
1201 Connecticut Avenue, NW, Suite 531
Washington, D.C. 20036
paul@butlerlegalstrategies.com

*Counsel for Petitioners*

---

[14] Again, with the caveat noted in footnote 4, *supra*.

## ATTESTATION AND OATH

Pursuant to 21 U.S.C. § 853(n)(3), I attest and declare under penalty of perjury that my claim to this property is not frivolous and that the information provided in support of this claim is true and correct, to the best of my knowledge and belief.

HIMALAYA INTERNATIONAL
FINANCIAL GROUP, LTD.
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

HIMALAYA INTERNATIONAL
RESERVES, LTD.
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

HIMALAYA INTERNATIONAL
CLEARING, LTD.
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

HIMALAYA CURRENCY CLEARING
PTY, LTD.
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

HAMILTON CAPITAL HOLDING, LTD.
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

HAMILTON OPPORTUNITY FUND SPC
By: Ehsan Masud E.Hasuk
Title: Chief Financial Officer
Date: 7th April 2025

23