# Exhibit B

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 10979 / September 13, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20537**

| | |
|---|---|
| **In the Matter of** <br><br> **GTV MEDIA GROUP, INC., SARACA MEDIA GROUP, INC., and VOICE OF GUO MEDIA, INC.,** <br><br> **Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") against GTV Media Group, Inc. ("GTV"), Saraca Media Group, Inc. ("Saraca," and together with GTV, the "G Entities"), and Voice of Guo Media, Inc. ("VOG") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement ("Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant To Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-And-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

**Summary**

1.    This proceeding involves violations of the Securities Act registration provisions by Respondents.  From approximately April 2020 through June 2020, Respondents generally solicited thousands of individuals to invest in an offering of GTV common stock (the "Stock Offering"). During the same period, the G Entities solicited individuals to invest in their offering of a digital asset security that was referred to as either G-Coins or G-Dollars (the "Coin Offering").  As a result of these two unregistered securities offerings, whose proceeds were commingled, Respondents collectively raised approximately $487 million from more than 5,000 investors, including individuals in the United States, through approximately July 2020.

2.    According to the Stock Offering's information memorandum ("Memorandum"), the G Entities recently launched a news-focused social media platform, including the website *www.gtv.org*.  The Memorandum claimed it would be "the first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and planned to be "the only uncensored and independent bridge between China and the Western world."

3.    Respondents disseminated information about the two offerings to the general public through publicly-available videos on the G Entities' websites, *www.gtv.org* and *www.gnews.org* as well as on social media platforms such as YouTube and Twitter.  With respect to the Stock Offering, Respondents provided prospective investors with access to Google Drives that contained investment agreements and wire instructions for investors to send funds to purchase securities, while the G Entities solicited investments in the Coin Offering on the G Entities' public websites, social media platforms, and mobile applications.

4.    The G Entities touted the Coin Offering as an investment opportunity with a likelihood of significant returns based on the G Entities' ability to develop an online platform through which investors would be able to transact using either G-Coins or G-Dollars.  To date, the G Entities have not developed their social media platform's ability to accept payment using digital assets or otherwise exchange any digital assets, including those offered in the Coin Offering.

5.    Through both the Stock Offering and the Coin Offering, the G Entities violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration.

---

[1]    The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Respondents

6.      GTV, a Delaware corporation based in New York, New York, owns and operates a social media platform, containing numerous publicly-available videos. Saraca wholly owned GTV prior to the Stock Offering and has controlled GTV at all times since its incorporation in April 2020. Neither GTV nor its securities have ever been registered with the Commission in any capacity.

7.      Saraca, a Delaware corporation based in New York, New York, is the parent company of GTV. Saraca sold a minority stake of its ownership interest in GTV through the Stock Offering. Neither Saraca nor its securities have ever been registered with the Commission in any capacity.

8.      VOG, an Arizona corporation based in Phoenix, Arizona, provided various support services, including translation services, to the G Entities. VOG is not registered with the Commission in any capacity.

## Facts

9.      On April 17, 2020, Saraca established GTV as a wholly-owned subsidiary to own and operate a news-focused social media platform that was still in development. Saraca contributed all assets of the platform to GTV. Saraca's president and sole director at the time was named as one of GTV's executive directors and the two companies shared the same headquarters in New York, New York. Almost immediately after the creation of GTV, the G Entities initiated two unregistered securities offerings: the Stock Offering and the Coin Offering.

**The Stock Offering**

10.      On April 20, 2020, the G Entities launched the Stock Offering to sell between 20 million and 200 million shares of GTV common stock at a price of $1 per share. The Stock Offering offered to sell up to 10% of Saraca's 100% ownership interest in GTV. The Memorandum informed prospective investors that Saraca would continue to exert significant control over GTV after the Stock Offering.

*The G Entities Solicited the General Public to Invest in the Stock Offering*

11.      From approximately April 20, 2020 through June 2, 2020, the G Entities, through their management team and agents, marketed the Stock Offering to the general public through a series of publicly-available videos on GTV's websites, *www.gtv.org* and *www.gnews.org*, as well as YouTube, Twitter, and other social media platforms that constitute general solicitation. The first video, posted on YouTube on April 21, 2020, was entitled, as translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering. The Launch Video has had over 4,000 views. None of the G Entities' offering videos, including the Launch Video, were password protected or

3

placed any restriction on who could view them or any limitations on their ability to be shared. As a result, the general public, including prospective U.S. investors, accessed the online marketing videos about the Stock Offering through, for example, independent online research, social media, or referrals from other investors. While the Launch Video stated that the Stock Offering had a minimum investment of $100,000, many investors invested less than $100,000, as discussed below.

12.     Further, the G Entities sent the Launch Video via text messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering materials for the Stock Offering, such as the information memorandum, subscription agreement, and investment instructions. The G Entities, which owned and controlled the Google Drive folder, did not put any restrictions on the recipients' ability to forward the Google Drive folder or its contents, which were not password-protected, to other prospective investors.

13.     In total, the G Entities sold approximately $339 million worth of GTV common stock to more than 1,000 investors, including U.S. investors. Some of these investors were unaccredited. Pursuant to the Stock Offering's investment instructions, the vast majority, if not all, of the offering proceeds were deposited directly to U.S. bank accounts in the name of Saraca.

14.     On or around June 5, 2020, Saraca transferred $100 million of the Stock Offering proceeds to Hedge Fund A for purposes of investing in the fund. Hedge Fund A's investment strategy involves taking positions in various Asian currencies, particularly the Hong Kong dollar, versus certain developed market currencies through foreign currency forward and option contracts. By late July 2020, Hedge Fund A had invested $30 million of Saraca's $100 million transfer and, to date, that $30 million investment in Hedge Fund A has lost approximately $29.2 million in value.

*VOG Offered and Sold GTV Stock*

15.     VOG engaged in steps necessary to the distribution of the Stock Offering. Specifically, the G Entities, through their management team and agents, directed VOG to purchase GTV stock from the G Entities on behalf of prospective investors who wanted to invest less than $100,000. VOG then solicited investors and collected investor funds for the purpose of purchasing shares of GTV stock on their behalf. There was no minimum investment amount to invest in the Stock Offering through VOG and investment amounts were generally in the amount of $100 or more.

16.     To help facilitate VOG's role in offering and selling of GTV stock, the G Entities gave VOG a one-page Limited Purpose Agency Agreement ("LPAA") to provide to prospective investors in the Stock Offering. The LPAA specified that, in return for minimal consideration, a representative of VOG would serve as a so-called "agent" for an investor and purchase GTV shares on behalf of the investor in exchange for funds provided by the investor.

17.     In response to inquiries received from prospective investors about the Stock Offering, VOG sent prospective investors a text message with a link to a folder on its Google Drive that contained the LPAA as well as wire instructions to a VOG bank account, but not any other

offering documents or financial information about the G Entities. VOG did not put any restrictions on prospective investors' ability to forward the Google Drive folder or its contents, which were not password-protected, to other prospective investors.

18.     As part of the Stock Offering, VOG sold approximately $114 million in GTV stock to more than 4,500 investors, including U.S. investors. None of these investors ultimately was issued GTV shares. Many of these investors were unaccredited.

19.     At the direction of the G Entities, VOG transferred a total of $61,274,318 in funds received from investors through the Stock Offering to bank accounts of the G Entities. Specifically, on May 15, 2020, VOG provided separate $15 million checks each to GTV and Saraca. VOG also provided Saraca with a check for $31,274,318 that Saraca deposited on or about July 22, 2020. VOG continued to receive funds from investors for the purchase of GTV stock through at least June 2020.

20.     During the Stock Offering, VOG provided the G Entities with updates on its fundraising efforts and amounts collected from investors.

21.     Based on the above, VOG engaged in steps necessary for the distribution of GTV stock and therefore offered and sold GTV stock.

*Respondents' Conduct Violated the Offering Registration Provisions of the Securities Act*

22.     No registration statements were filed or in effect for the Respondents' offers and sales of GTV common stock, and the offers and sales did not qualify for an exemption from registration under the Securities Act.

23.     As a result of the conduct described above, Respondents violated Section 5(a) of the Securities Act, which states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such a security through the use or medium of any prospectus or otherwise, or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

24.     As a result of the conduct described above, Respondents violated Section 5(c) of the Securities Act, which states that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."

**The Coin Offering**

*The G Entities Solicited the General Public to Invest in the Coin Offering*

25.     From approximately April 1, 2020 through June 30, 2020, the G Entities, through their management team and agents, marketed the sale of G-Coins and G-Dollars to the general public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.  The G Entities have yet to develop or distribute the digital assets sold in the Coin Offering or a platform that would allow users to transact with or sell digital assets.

26.     The G Entities' online promotions set forth that G-Coins, which the G Entities' indicated would eventually be merged into G-Dollars forming a single digital asset, and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on the G Entities' online platform.  As part of its solicitation of G-Coin and G-Dollar investors, the G Entities did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a white paper or private placement memorandum.

27.     The G Entities collected approximately $34 million from the G-Coin and G-Dollar investors, pooling the proceeds in the G Entities' bank accounts and commingling them with proceeds from the Stock Offering.  As part of the Coin Offering, many investors received a 20% discount on the $.01 purchase price for G-Coins and G-Dollars.  Investors participated in the Coin Offering by transferring funds directly to the G Entities' U.S. bank accounts, by making payments to the G Entities' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.  The vast majority of G-Coin and G-Dollar investors invested no more than $10,000 per investor, and the G Entities never inquired as to the financial or investment background of these investors.

*Investors in the Coin Offering had a Reasonable Expectation of Obtaining a Future Profit from the Efforts of the G Entities*

28.     The G Entities promoted the sale of G-Coins and G-Dollars as an opportunity to obtain future profits from the efforts of the G Entities' management team and agents in the development of a digital asset and platform, and purchasers would have reasonably expected that they would profit from the G Entities' efforts.  In the G Entities' online solicitations, the G Entities referred to G-Coin and G-Dollar purchases as "investments" and highlighted the likelihood of significant return on capital on the investment.  In their online videos, the G Entities also discussed their view of the anticipated liquidity of G-Coins and G-Dollars on the GTV online platform, and their plan to allow users to exchange G-Coins and G-Dollars for fiat currency and goods and services available through the platform.  At the time of the Coin Offering, the G Entities also discussed plans to develop the GTV online platform's capability to process transactions using G-Coins and G-Dollars and touted the "management, financial, investment, and merger and acquisition" experience of the G Entities' management team and agents.  In fact, the Coin Offering's online materials stated that the GTV team would be "making an all-out effort to completely upgrade the G-Dollar system."  The Memorandum also stated that the G Entities and their management team planned to build a platform that "will utilize state-of-the-art technology

including big data, artificial intelligence, 5G, and the blockchain payment system (G coin)."

*The G Entities Offered and Sold G-Coins and G-Dollars in Violation of the Securities Act*

29.    Based on the above, the G Entities offered and sold G-Coins and G-Dollars as investment contracts and therefore securities pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant To Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017) (the "DAO Report").

30.    No registration statements were filed or in effect for the G Entities' offers and sales of securities as part of the Coin Offering, and the offers and sales did not qualify for an exemption from registration under the Securities Act.

31.    As a result of the conduct described above, the G Entities violated Section 5(a) of the Securities Act, which states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such a security through the use or medium of any prospectus or otherwise, or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

32.    As a result of the conduct described above, the G Entities violated Section 5(c) of the Securities Act, which states that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."

**Disgorgement and Civil Penalties**

33.    The disgorgement and prejudgment interest ordered in paragraph IV is consistent with equitable principles and does not exceed each Respondent's net profits from its violations, and will be distributed to harmed investors to the extent feasible. The Commission will hold funds paid pursuant to paragraph IV in an account at the United States Treasury pending distribution. Upon approval of the distribution final accounting by the Commission, any amounts remaining that are infeasible to return to investors, and any amounts returned to the Commission in the future that are infeasible to return to investors, may be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

**Undertakings**

34.    Respondents have undertaken to:

A.    Not participate, directly or indirectly, in any offering of a digital asset security.

B.    Assist the Commission staff in the administration of a distribution plan,

7

including any and all efforts to distribute to affected investors the monetary relief described in paragraph IV below. In connection with such assistance, Respondents will produce, without service or notice of subpoena, any and all documents and other information reasonably requested by the Commission staff.

       C.      Publish notice of this Order on the G Entities' websites, including, but not limited to, *www.gtv.org* and *www.gnews.org*, and social media channels, in a form not unacceptable to Commission staff, within 10 days of the date of this Order.

       D.      Certify, in writing, compliance with the undertaking set forth above in paragraph 34.C. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Sandeep Satwalekar, Assistant Regional Director, Division of Enforcement, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than thirty (30) days from the date of the completion of the undertakings.

       E.      In determining whether to accept the Offers, the Commission has considered these undertakings.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that pursuant to Section 8A of the Securities Act:

       A.      Respondents cease and desist from committing or causing any violations and any future violations of Sections 5(a) and 5(c) of the Securities Act.

       B.      Respondents shall comply with the undertakings enumerated in paragraph 34 above.

       C.      Respondents GTV and Saraca shall, within 14 days of the entry of this Order, pay, jointly and severally, disgorgement of $434,134,141, and prejudgment interest of $15,776,488 to the Securities and Exchange Commission. If timely payment of disgorgement and prejudgment interest is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

       D.      Respondent GTV shall, within 14 days of the entry of this Order, pay a civil penalty of $15,000,000 to the Securities and Exchange Commission. If timely payment of penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

       E.      Respondent Saraca shall, within 14 days of the entry of this Order, pay a

civil penalty of $15,000,000 to the Securities and Exchange Commission.  If timely payment of penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

        F.      Respondent VOG shall, within 14 days of the entry of this Order, pay disgorgement of $52,610,922, prejudgment interest of $1,911,877, and a civil penalty of $5,000,000 to the Securities and Exchange Commission.  If timely payment of disgorgement and prejudgment interest is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.  If timely payment of civil penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment by each Respondent must be made in one of the following ways:

      (1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

      (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at *http://www.sec.gov/about/offices/ofm.htm*; or

      (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

            Enterprise Services Center
            Accounts Receivable Branch
            HQ Bldg., Room 181, AMZ-341
            6500 South MacArthur Boulevard
            Oklahoma City, OK 73169

    Payments by check or money order must be accompanied by a cover letter identifying Respondent GTV, Saraca, or VOG, respectively, as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Sanjay Wadhwa, Senior Associate Regional Director, Securities and Exchange Commission, 200 Vesey Street, Suite 400, New York, New York 10281, or such other person or address as the Commission staff may provide.

        G.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the disgorgement, prejudgment interest, and penalties referenced in paragraph IV above.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, each of the Respondents GTV, Saraca, and VOG agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, each of the Respondents GTV, Saraca, and VOG agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the

Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents GTV, Saraca, or VOG by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary